

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | 08CV192 |
| **Plaintiff,** | JUDGE KENDALL |
| **v.** | MAGISTRATE JUDGE ASHMAN |
| **EDWARD C. SARVEY** and **DAVID G. SKLENA,** **Defendants;** | |
| **LAWRENCE-BONFITTO TRADING COMPANY** and **JOSEPH J. BONFITTO,** **Relief Defendants.** | |



## Complaint For Injunctive And Other Equitable Relief And Civil Monetary Penalties Under The Commodity Exchange Act

The United States Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its attorneys, hereby alleges as follows:

## I.

## SUMMARY

1.     On April 2, 2004, Defendant Edward C. Sarvey, a floor broker at the Chicago Board of Trade ("CBOT"), engaged in a series of non-competitive trades in the Five-Year Treasury Note ("Five-Year Note") futures pit that resulted in defrauding customers of at least $2 million dollars. Sarvey reaped approximately $357,000 in profits from these trades. Defendant David G. Sklena, a floor broker trading for his own account, traded opposite Sarvey in most of the trades and reaped approximately

$1.65 million in profits while accommodating and aiding and abetting Sarvey's illegal trade practices.

2.      Sklena's clearing firm, Relief Defendant Lawrence-Bonfitto Trading Company ("Bonfitto Trading"), and the firm's principal, Relief Defendant Joseph J. Bonfitto ("J. Bonfitto"), took approximately $640,000 of the illegal trading profits in Sklena's account as compensation for purportedly exposing the clearing firm to risk. Neither Bonfitto Trading nor J. Bonfitto has any legitimate equitable or legal claim to the trading profits. They are joined to aid recovery of relief for customers defrauded by Sarvey and Sklena.

3.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-1 (2002), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks restitution, disgorgement, civil monetary penalties and such other equitable relief as this Court may deem necessary or appropriate.

## II.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper District Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

5.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants and Relief Defendants reside in this jurisdiction and the acts and practices in violation of the Order have occurred within this District.

6.      Unless restrained and enjoined by this Court, Defendants are likely to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

### III.

### THE PARTIES

**A.**      **Plaintiff**

7.      Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007).

**B.**      **Defendants**

8.      Defendant Edward Charles Sarvey, 45, resides in Lemont, Illinois and has been registered with the CFTC as a floor broker since 1988. At all relevant times, Sarvey was an Associate Member delegate and a dual trader in the Five-Year Note pit at the CBOT. Sarvey stands on the top step of the Five-Year Note pit and handles a large "deck" of customer orders.

9.      Defendant David George Sklena, 47, resides in Skokie, Illinois and has been registered with the CFTC as a floor broker since 1987. At all relevant times, Sklena was an Associate Member delegate and a dual trader in the Five-Year Note pit at the

3

CBOT, where he stood a step below Sarvey. Sklena primarily traded for his personal account and cleared his trades through Bonfitto Trading.

**C.    Relief Defendants**

10.    Relief Defendant Lawrence-Bonfitto Trading Company was registered with the CFTC as a futures commission merchant from November 1994 through November 2004. At all relevant times, Bonfitto Trading maintained its principal place of business in Chicago, Illinois and cleared the trading activity of Sklena and other local floor traders.

11.    Relief Defendant Joseph James Bonfitto resides in Lemont, Illinois. Bonfitto was President and principal of Bonfitto Trading at all relevant times. He was registered with the CFTC as a floor broker from April 1984 through May 2006.

**IV.**

**OTHER RELEVANT ENTITIES**

12.    The Chicago Board of Trade, Inc. is a registered entity and a designated contract market for trading Five-Year Note futures contracts pursuant to Section 5 of the Act, 7 U.S.C. § 7. The CBOT is now part of CME Group, Inc. and maintains its principal place of business is in Chicago, Illinois.

**V.**

**RELEVANT FUTURES MARKET BACKGROUND**

**A.    Five-Year Notes**

13.    Treasury Notes are medium-term (more than one year but not more than ten years) obligations of the United States government that pay interest semiannually until they mature, at which time the principal and the final interest payment is paid to the investor.

14.     CBOT futures contracts on Five-Year Notes are interest rate futures, identified under the CBOT rules as "Medium Term Treasury Note Futures." The Five-Year Note futures contract unit of trading is a Treasury Note having face value at maturity of one hundred thousand dollars ($100,000), or multiples thereof. The price of the futures contract is quoted in points, with "par" on the basis of 100 points. Each point equals $1,000. The minimum price fluctuation is a trading increment, or "tick", of one-half of one thirty-second (1/32) of one point, which is equivalent to $15.625 per contract.

15.     The trading venues for the Five-Year Note futures contracts include the CBOT's trading floor in Chicago, Illinois and the CBOT's electronic trading platform called the e-cbot. Five-Year Notes are traded on the CBOT trading floor from 7:20 a.m. to 2:00 p.m., and on e-cbot from 6:00 p.m. to 4:00 p.m. the next day. Five-Year Note futures contracts are traded concurrently in the pit and on e-cbot during pit trading hours.

**B.     Order Instruction Terminology**

16.     There are several types of order instructions that a customer can place to buy or sell commodity futures contracts, including market orders, limit orders, and stop orders.

17.     A "market order" is an order to buy or sell a futures contract at the best available price obtainable at the time it is entered in the pit. The prevailing price is known as "at the market."

18.     A "stop order" is an order that becomes a market order when the market price reaches the price specified in the order. A stop instruction on a price order means that the order cannot be executed until that price level is reached, but once the specified price is touched, the stop order is "elected" and becomes immediately executable. Thus,

5

once elected, a stop order can be executed at the specified stop price, or at a price lower or higher than the specified stop price, depending upon market conditions.

## C.   Relevant Market Participants and Trading Practices

19.   A "floor broker" is a person with exchange trading privileges, who, in any pit, executes for another person (e.g., customer) orders for the purchase or sale of any commodity for future delivery.

20.   A "floor trader" is a person with exchange trading privileges, who, in any pit, executes trades for his own personal account by being personally present in the pit or ring for futures trading.  Floor traders are often referred to as "locals."

21.   "Dual trading" occurs when a floor broker executes orders for customers and, on the same day, and in the same contract, trades for his own personal account or for an account in which he has an interest.

22.   Commission Regulations and exchange rules require that all purchases and sales of commodity futures submitted for execution to the trading pit shall be executed "openly and competitively," by "open outcry" or posting of bids and offers or by other equally open and competitive methods of public auction, regardless of market conditions.

23.   The hectic trading conditions that often accompany volatile markets are neither unusual nor unforeseeable.  A "fast market" is a designation used to describe trading conditions when transactions in the pit or ring take place in such volume and with such rapidity that price reporters insert "FAST" in their price quotations and do not necessarily report every price change.

24.   "Bucketing" or "trading against" is the practice of a floor broker directly or indirectly taking the opposite side of a customer's order into the broker's own account or

into an account in which the broker has an interest without the open and competitive execution of the order on an exchange by open outcry.

25.    An "indirect bucket" occurs when a floor broker trades for his personal account opposite his customer, while appearing to trade opposite another trader, known as an "accommodator." The practice of indirectly bucketing customer orders can enable a floor broker to establish or offset positions for his personal account at larger quantities and better prices than he could have achieved through the competitive process. Moreover, if a floor broker indirectly buckets his customer order at a price better than at the market, the floor broker can immediately offset the trade at a profit for his personal account at current market prices.

26.    An "accommodation trade" is a trade that one broker or trader enters into with another broker or trader that enables the first broker (trader) to achieve his trading objectives through noncompetitive means.

## VI.

## FACTS

**A.    Five-Year Note Futures Contract Market Conditions On April 2, 2004**

27.    With limited exceptions, the Department of Labor's Bureau of Labor Statistics ("BLS") releases its monthly "Employment Situation" report of payroll and unemployment figures for the previous month (hereafter "number release") on the first Friday of each month at 7:30 a.m. Central Standard Time.

28.    The BLS number release is considered one of the most closely watched of the federal government's economic indicators. Trading in the Five-Year Note futures contract frequently is very active on BLS number release dates because the employment

7

data is a fundamental factor that affects the market value, and therefore prices, of Treasury Notes and Treasury Note futures contracts.

29.    Friday, April 2, 2004 was the BLS number release date for March 2004 payroll and unemployment figures.

30.    As reflected in the CBOT price quotes, the June 2004 Five-Year Note futures contract market was quoted at 112.260 (*i.e.*, 112 and 26/32nds points) in the pit at 7:29:24 a.m. and at prices ranging up to 112.285 (*i.e.*, 112 and 28-½/32nds points) on e-cbot by 7:29:31 a.m. on April 2, 2004.

31.    From 7:27:52 a.m. through 7:53:33 a.m. on April 2, 2004, the open outcry pit trading in the June 2004 Five-Year Note futures contract market was designated "FAST". The CBOT did not record all price changes at which trades occurred in the pit during this period.

32.    BLS issued the March 2004 number release at 7:30 a.m. After the number release, June 2004 Five-Year Note futures contract prices broke sharply, and dropped more than a point in approximately one and one-half minutes. The pit's low of 111.050 was quoted at 7:31:35 a.m. and the e-cbot low of 111.045 occurred at 7:31:23 a.m.

33.    The June 2004 Five-Year Note futures contract market subsequently rallied off its lows and was quoted a point higher at 112.050 at 7:36:07 a.m. in the pit and at 112.055 at 7:36:03 a.m. on e-cbot.

34.    Sarvey was dual trading in the Five-Year Note futures contract pit and on e-cbot immediately prior to and following the number release.

35.    Sklena was trading for his personal account in the Five-Year Note pit and on e-cbot immediately prior to and following the number release.

8

**B.**  **The Stop Orders to Sell 2,474 Contracts**

36.    On April 2, 2004, Sarvey possessed orders to sell a total of 2,474 June 2004 Five-Year Note futures contracts at stop prices ranging from 112.195 to 111.065. These sell stop orders were all elected and became immediately executable when the June 2004 Five-Year Note futures contract market broke after the number release and declined to its lows of 111.050 in the pit and 111.045 on e-cbot shortly after 7:31 a.m.

37.    Once the sell stop orders for the 2,474 contracts were elected, Sarvey was obligated to fill the stop orders by open outcry in the prevailing market at his first opportunity.

38.    The June 2004 Five-Year Note futures contract market rallied to higher prices in both the pit and on e-cbot before Sarvey filled any of the elected sell stop orders. That price move should have been beneficial to the customer sell orders.

39.    From 7:31:51 a.m. onward, the June 2004 Five-Year Note futures contract was quoted at 111.135 and higher in the pit and traded 111.145 and higher on e-cbot.

40.    Between 7:33:20 a.m. and 7:37:14 a.m., Sarvey noncompetitively executed the sell stop orders by selling 2,274 contracts to Sklena and 100 contracts each to two other traders, all at 111.065, a price that was a few ticks above the market low and that was last active before 7:31:51 a.m.

41.    At the time Sarvey sold the 2,274 contracts to Sklena and the 100 contracts each to the two other traders, the market was trading within a range of 111.230 to 112.055.

42.    If Sarvey had competitively filled the stop orders for the 2,274 contracts by open outcry at the time he realized the orders had been elected, the orders would have been exposed to the higher prices prevailing in the market. Instead, Sarvey deprived his

9

customers of the opportunity to sell at these higher prices and sold them at a low price that was no longer active in the pit. As a result, Sarvey's customers were disadvantaged by as much as $2.1 million.

43.     At about the same time that Sarvey noncompetitively sold the 2,274 June 2004 Five-Year Note futures contracts to Sklena at 111.065 to fill his customers' stop orders, Sarvey noncompetitively bought back 485 contracts for his personal trading account from Sklena at 111.070, also a price near the market low.

44.     Sklena offset the net 1,789 contracts that resulted from his purchase from and sale to Sarvey as set forth in paragraph 43 above, by selling at higher prices ranging from 112.015 to 112.065 in the prevailing market on April 2, 2004, turning a profit of approximately $1.65 million.

45.     Sarvey's purchase of the 485 contracts from Sklena at the same time that he sold 2,274 contracts to Sklena constituted an indirect bucket of 485 of the 2,474 customer sell stop orders.

46.     Sarvey offset the 485 contracts he purchased from Sklena at 111.070 by selling most at higher prices ranging from 111.070 to 112.270 in the prevailing market on April 2, 2004, at a profit of approximately $357,250.

47.     By picking customer prices and opposing traders on April 2, 2004, Sarvey willfully removed his customers' orders from the pit's competitive marketplace and forced the customers to accept the results he and the accommodating traders selected, guaranteeing profits to himself and the accommodating traders and denying the customers the opportunity to obtain a better price. That shifting or altering of economic

risk and opportunity to affect his customers' financial position adversely deprived the customers of money or property.

48.     Sklena willfully aided and abetted and accommodated Sarvey's noncompetitive trading, trading opposite, and indirect bucketing of customer orders by noncompetitively purchasing customer orders from Sarvey and then selling a portion of the customer orders back to Sarvey at other than prevailing market prices.

## C.     Bonfitto Trading and J. Bonfitto Received Funds That Were Obtained as a Result of the Defendants' Fraudulent Conduct

49.     Sklena's clearing firm, Bonfitto Trading, and its president and principal, J. Bonfitto, took approximately $650,000 of Sklena's profits as compensation for Sklena purportedly exposing the clearing firm to risk, in that Sklena did not have sufficient margin to have purchased 2,274 contracts from Sarvey on April 2, 2004. This left Sklena with a net profit from the activity of approximately $1 million.

50.     In fact, Sklena did not expose Bonfitto Trading to meaningful market risk, because at the time he undertook to purchase 2,274 June 2004 Five-Year Note futures contracts from Sarvey, the market was trading substantially above the 111.065 purchase price.

51.     Neither Bonfitto Trading nor J. Bonfitto made any meaningful effort to determine whether the 2,274 contracts Sklena had purchased were competitively executed on the open market.

11

## VI.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

### VIOLATIONS OF SECTIONS 4b(a)(2)(i) and (iii) OF THE ACT: CHEATING, DEFRAUDING AND DECEIVING CUSTOMERS

52.     The allegations set forth in paragraphs 1 through 51 are re-alleged and incorporated herein.

53.     Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, to cheat or defraud or attempt to cheat or defraud, or to willfully deceive or attempt to deceive such other person by any means whatsoever.

54.     Sarvey violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), by cheating or defrauding or attempting to cheat or defraud, or willfully deceiving or attempting to deceive other persons on at least April 2, 2004, by noncompetitively executing and indirectly bucketing his customers' Five-Year Note futures contracts orders at prices lower than those prevailing in the market at the time such orders were executed.

12

55.   Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Sklena is liable for Sarvey's violations of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), in that, on at least April 2, 2004, he willfully aided and abetted Sarvey in noncompetitively executing and indirectly bucketing his customers' Five-Year Note futures contracts orders at prices lower than those prevailing in the market at the time such orders were executed.

56.   Each and every transaction in which Sarvey cheated or defrauded or attempted to cheat or defraud other persons, or willfully deceived or attempt to deceive such other person by any means whatsoever, or in which Sklena aided and abetted Sarvey in cheating, defrauding and deceiving or attempting to cheat, defraud and deceive other persons, as described above, is alleged herein as a separate violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii).

## COUNT TWO

### VIOLATIONS OF SECTION 4b(a)(2)(iv) OF THE ACT: INDIRECTLY BUCKETING CUSTOMER ORDERS

57.   The allegations set forth in paragraphs 1 through 51 are re-alleged and incorporated herein.

58.   Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in

13

interstate commerce for the fulfillment thereof, to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.

59.    Sarvey violated Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv), by indirectly bucketing customer orders and willfully and knowingly trading opposite his customers without such customers' prior consent in the Five-Year Note pit on April 2, 2004.

60.    Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Sklena is liable for Sarvey's violations of Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv), by aiding and abetting Sarvey, within the meaning of Section 13(a) of the Act, 7 U.S.C. § 13c(a), in that, on at least April 2, 2004, he willfully aided and abetted Sarvey in noncompetitively executing and indirectly bucketing his customers' Five-Year Note futures contracts orders at prices lower than those prevailing in the market at the time such orders were executed.

61.    Each and every transaction in which Sarvey indirectly bucketed customer orders or willfully and knowingly traded opposite his customers without such customers' prior consent, or in which Sklena aided and abetted Sarvey in indirectly bucketing customer orders, as described above, is alleged herein as a separate violation of Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv).

## COUNT THREE

### VIOLATIONS OF SECTION 4c(a) OF THE ACT:
### ACCOMMODATION TRADES

62.     The allegations set forth in paragraphs 1 through 51 are re-alleged and incorporated herein.

63.     Section 4c(a) of the Act, 7 U.S.C. § 6c(a), makes it unlawful for any person to offer to enter into, enter into or confirm the execution of any transaction that is, is of the character of, or is commonly known to the trade as an "accommodation trade" involving the purchase or sale of any commodity for future delivery if such transaction is used or may be used to (a) hedge any transaction in interstate commerce in the commodity or the products or byproducts of the commodity, or (b) determine the price basis of any transaction in interstate commerce in the commodity, or (c) deliver any such commodity sold, shipped or received in interstate commerce for the execution of the transaction.

64.     Sklena violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a), in that, on at least April 2, 2004, he offered to enter into, entered into or confirmed the execution of, Five-Year Note futures contracts, where such transactions were commonly known to the trade as accommodation trades.

65.     Each and every transaction in which Sklena entered into as an accommodation trade, as described above, is alleged herein as a separate and distinct violation of Section 4c(a) of the Act, 7 U.S.C. § 6c(a).

## COUNT FOUR

### VIOLATIONS OF COMMISSION REGULATION 1.38(a): FAILURE TO EXECUTE TRADES OPENLY AND COMPETITIVELY

66. The allegations set forth in paragraphs 1 through 51 are re-alleged and incorporated herein.

67. Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a), requires that all purchases and sales of commodity futures be executed "openly and competitively," by open outcry or posting of bids and offers or by other equally open and competitive methods.

68. Sarvey and Sklena violated Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a), in that, on at least April 2, 2004, they knowingly executed purchases and sales of Five-Year Note futures contracts in a manner other than openly and competitively by open outcry in the trading pit during trading hours.

69. Each and every transaction in which Sarvey and Sklena failed to execute purchases and sales of Five-Year Note futures contracts openly and competitively by open outcry, as described above, is alleged herein as a separate and distinct violation of Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a).

## COUNT FIVE

### RELIEF DEFENDANTS

70. The allegations set forth in paragraphs 1 through 51 are re-alleged and incorporated herein.

71. The Defendants have engaged in fraudulent conduct and other violations of the Act resulting in a fraud against customers.

16

72.     The Relief Defendants, Bonfitto Trading and J. Bonfitto, have received funds that were obtained as a result of the Defendants' fraudulent conduct.

73.     The Relief Defendants have no legitimate entitlement to or interest in the funds received from the Defendants' fraudulent conduct.

74.     The Relief Defendants should be required to disgorge the funds they received from the Defendants' fraudulent conduct, or the value of those funds that the Relief Defendants may have subsequently transferred to third parties.

75.     By reason of the foregoing, the Relief Defendants hold funds in constructive trust for the benefit of Sarvey's customers who were victimized by Defendants' fraudulent conduct.

## VII.

## RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that Sarvey violated Sections 4b(a)(2)(i), (iii) and (iv) of the Act, 7 U.S.C. §§ 6b(2)(a)(i), (iii) and (iv), and Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a);

B.      An order finding that Sklena violated Sections 4b(a)(2)(i), (iii) and (iv), and 4c(a) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (iii) and (iv), and 6c(a), and Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a);

C.      Enter an order of preliminary injunction pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, restraining Defendants and all persons or entities insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and

attorneys, and all persons insofar as they are acting in active concert or participation with

Defendants who receive actual notice of such order by personal service or otherwise,

from directly or indirectly:

1. Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants wherever located;

2. Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of the Defendants wherever located, including all such records concerning Defendants' business operations;

3. Transferring, selling, or disposing of, in any manner, any membership interests on the CBOT.

D. Enter orders of preliminary and permanent injunction enjoining Sarvey

and all persons insofar as they are acting in the capacity of his agents, servants,

employees, successors, assigns, and attorneys, and all persons insofar as they are acting

in active concert or participation with him who receive actual notice of such order by

personal service or otherwise, from directly or indirectly, engaging in any activity related

to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C.

§ 1a(4) ("commodity interest"), including but not limited to, the following:

1. Engaging in conduct in violation of Sections 4b(a)(2)(i), (iii) and (iv) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (iii) and (iv), and Regulation 1.38(a), 17 C.F.R. § 1.38(a);

2. Engaging, directly or indirectly, in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

   a. trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

18

b.  engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise; and

c.  entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf.

E.    Enter orders of preliminary and permanent injunction enjoining Sklena and all persons insofar as they are acting in the capacity of his agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with him who receive actual notice of such order by personal service or otherwise, from directly or indirectly, engaging in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

1.   Engaging in conduct in violation of Sections 4b(a)(2)(i), (iii) and (iv), and 4c(a) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (iii) and (iv), and 6c(a), and Regulation 1.38(a), 17 C.F.R. § 1.38(a);

2.   Engaging, directly or indirectly, in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

a.  trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

b.  engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise; and

c.  entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf.

F.    Enter an order directing that each Defendant make an accounting to the Court of his assets and liabilities;

G.    Enter an order requiring Defendants to disgorge to any officer appointed or directed by the Court or directly to customers injured by Defendants' illegal trading activities on April 2, 2004 and other dates, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act as described herein, including pre-judgment interest;

H.    Enter an order requiring Defendants to make restitution by making whole each and every customer injured by them, in violation of the provisions of the Act and/or Commission Regulations as described herein;

I.    Enter an order requiring Relief Defendants to disgorge to any officer appointed or directed by the Court or directly to customers injured by Defendants' illegal trading activities on April 2, 2004 and other dates, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and/or Commission Regulations as described herein, including pre-judgment interest;

J.    Enter an order requiring each Defendant to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to him for each violation of the Act and/or Commission Regulations, or (2) a penalty of $120,000 for each violation committed by him prior to October 23, 2004.

K.      Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2); and

L.      Enter an Order providing such other and further relief as this Court may

deem necessary and appropriate under the circumstances.


Date: January 9, 2008                        Respectfully submitted,


COMMODITY FUTURES TRADING
COMMISSION                                   Camille M. Arnold
525 West Monroe Street, Suite 1100           Senior Trial Attorney
Chicago, IL 60661                            New York Bar No. 7868
(312) 596-0700 (main)                        (312) 596-0524
(312) 596-0714 (facsimile)                   carnold@cftc.gov


                                             Susan J. Gradman
                                             Senior Trial Attorney
                                             ARDC No. 6225060
                                             (312) 596-0523
                                             sgradman@cftc.gov


                                             Scott R. Williamson
                                             Deputy Regional Counsel
                                             ARDC No. 6191293
                                             (312) 596-0560
                                             swilliamson@cftc.gov


                                             Rosemary Hollinger
                                             Associate Director and Regional Counsel
                                             ARDC No. 3123647
                                             (312) 596-0520
                                             rhollinger@cftc.gov