

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>EDWARD C. SARVEY<br>　　and<br>DAVID G. SKLENA,<br>　　　　　　Defendants;<br><br>LAWRENCE-BONFITTO TRADING COMPANY<br>　　and<br>JOSEPH J. BONFITTO,<br>　　　　　　Relief Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 08 CIV

08CV192
JUDGE KENDALL
MAGISTRATE JUDGE ASHMAN

**RECEIVED**

JAN - 9 2008
Jan 9, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

**ATTORNEY FOR THE PLAINTIFF**
Camille M. Arnold
Senior Trial Attorney [carnold@cftc.gov]
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
[312] 596-0524
[312] 596-0714 (facsimile)

## TABLE OF CONTENTS

I.   SUMMARY ................................................................................................................. 1

II.  PARTIES ................................................................................................................... 3

    A.   **Plaintiff** ............................................................................................................ 3

    B.   **Defendants** ...................................................................................................... 3

    C.   **Relief Defendants** ......................................................................................... 4

III. FACTS ...................................................................................................................... 5

    A.   The Five-Year Note Futures Market and the BLS Jobs Report .................... 5

    B.   Sarvey and Sklena's Background ................................................................... 6

    C.   The Transactions Involved Sarvey's Mishandling of Sell Stop Orders .......... 7

    D.   The April 2, 2004 Trade ................................................................................ 8

    E.   Sarvey and Sklena Defrauded Customers Through Non-Competitive Trades ......... 11

         1.   Audio Tapes Of Conversation Carried Over The Headsets Worn By Sarvey's Clerk and Others Demonstrate That Sarvey and Sklena Executed The 2,274 x 485 Trades At Off-Market Prices .................................. 11

         2.   Audit Trail Irregularities Demonstrate That Sarvey and Sklena Executed The 2,274 x 485 Trades At Off-Market Prices ................................. 13

         3.   Sklena Did Not Possess Sufficient Equity to Purchase The 2,274 Contracts in a Competitive Transaction ................................................................... 14

         4.   Trading Patterns Demonstrate That Sarvey and Sklena Executed The 2,274 x 485 Trades At Off-Market Prices ................................................... 14

IV.  LEGAL DISCUSSION ......................................................................................... 15

    A.   Sarvey Defrauded Customers in Violation of Sections 4b(a)(1)(i) and (iii) of the Act .................................................................................................... 17

    B.   Sarvey Acted with Scienter ......................................................................... 18

    C.   Sarvey Indirectly Bucketed Customer Orders In Violation of Section 4b(a)(1)(iv) of the Act ................................................................................................................ 20

    D.   Sklena Aided and Abetted Sarvey's Violations of Sections 4b(a)(1)(i), (iii) and (iv) ...................................................................................................... 21

    E.   Sklena Accommodated Sarvey's Trading In Violation of Section 4c(a) of the Act ......................................................................................................... 23

F.    Sarvey and Sklena Violated Commission Regulation 1.38(a) by Failing to
      Execute Trades Openly and Competitively ............................................................ 24

V.    **RELIEF SOUGHT** ........................................................................................................... 24

      A.    Preliminary Injunction ............................................................................................ 25

      B.    Asset Freeze ............................................................................................................ 27

VI.   **CONCLUSION** ............................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ........................................................... 27

*CFTC v. British American Commodity Options Corp.*, 560 F.2d 135 (2nd Cir. 1977) ........... 25, 26

*CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573 (9th Cir. 1982) .................................... 27

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979), *cert denied*, 442 U.S. 921 (1979) ............. 25, 26, 27

*CFTC v. Midland Rare Coin Exchange*, 1999 U.S. Dist Lexis 20977 *28 (S.D. Fl. 1999) ......... 26

*CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669 (S.D.N.Y. 1979) .............................. 27

*CFTC v. Muller*, 570 F.2d 1296 (5th Cir, 1978) ................................................................... 25, 27

*CFTC v. Noble Wealth Data Information Services, Inc.*, 90 F.Supp.2d 676 (D. Md. 2000) ........ 27

*CFTC v. Rosenberg*, 85 F. Supp. 2d 424 (D.N.J. 2000) ....................................................... 18, 26

*CFTC v. Savage*, 611 F.2d 270 (9th Cir. 1979) .................................................................. 23

*CFTC v. Trading Cycles for Commodities, Inc.*, [1980-1982 Transfer Binder] Comm. Fut. L.
Rep. (CCH) ¶ 21,013 (S.D. Fla. 1980) .................................................................. 27

*CFTC v. U.S Metals Depository Co.*, 468 F. Supp. 1149 (S.D.N.Y 1979) ................................ 27

*Hammond v. Smith Barney, Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L.
Rep. (CCH) ¶ 24,617 (CFTC Mar. 1, 1990) .............................................................. 18

*In re Bear Stearns*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,994 (CFTC
Jan. 25, 1991) ............................................................................................... 24

*In re Buckwalter*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995 (CFTC
Jan. 25, 1991) ............................................................................................... 19, 23

*In re Gilchrist*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,993 at 37,652 n.22
(CFTC Jan. 25, 1991) ........................................................................................ 22, 23

*In re Gorski*, [2003-2004 Transfer Binder] (CCH) ¶ 29,726 (CFTC March 24, 2004) ................ 24

*In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 (CFTC Dec.
10, 1996) ...................................................................................................... 26

*In re Lincolnwood Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH)
¶ 21,986 (CFTC Jan. 1984) ................................................................................. 18

*In re Murphy*, [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,798 at 31,351
(CFTC Sept. 25, 1985) ....................................................................................... 17

*In re Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28, 129 at 49,879 n.
28 (CFTC May 12, 2000) ..................................................................................... 21

*In re Premex*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,165 (CFTC Feb. 17,
1988) .......................................................................................................... 26

*In re Richardson Securities*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,145
(CFTC Jan. 21, 1981) ........................................................................................ 21

*In re Staryk*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,206 (CFTC Dec. 18,
1997) .......................................................................................................... 18

*In re Western Financial Management*, [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH)
¶ 22,814 (CFTC Nov. 1985) ................................................................................. 18, 21

*Porter v. Warner*, 328 U.S. 395 (1946) ............................................................................ 27

*Reddy v. CFTC*, 191 F.3d 109 (2nd Cir. 1999) .............................................................. 20, 21, 22

*US. v. Ashman*, 979 F.2d 469 (7th Cir. 1992) .................................................... 3, 15, 16, 17, 19, 27

**Statutes**

7 U.S.C. § 1 *et seq.* (2002) .................................................................................................. 2
7 U.S.C. § 13a-1 (2002) ............................................................................................... 24, 25
7 U.S.C. § 13c(a) (2002) ..................................................................................................... 21
7 U.S.C. § 13c(b) (2002) ..................................................................................................... 25
7 U.S.C. § 4b(a)(iv) (2002) ................................................................................................... 2
7 U.S.C. § 6b(a)(1)(i) (2002) ..................................................................................... 2, 17, 25
7 U.S.C. § 6b(a)(1)(iii) (2002) ................................................................................... 2, 17, 25
7 U.S.C. § 6b(a)(1)(iv) (2002) ....................................................................................... 20, 25
7 U.S.C. § 6c(a) (2002) .......................................................................................... 2, 23, 26
7 U.S.C. §§ 1 *et seq.* (2002) ................................................................................................ 3

**Regulations**

17 C.F.R § 1.38 ................................................................................................................... 25
17 C.F.R. § 1 *et seq.* (2007) ................................................................................................. 2
17 C.F.R. § 1.38 (a) (2007) ............................................................................................ 2, 24
17 C.F.R. §§ 1 *et seq.* (2007) .............................................................................................. 3

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EDWARD C. SARVEY ) <br> and ) <br> DAVID G. SKLENA, ) <br> Defendants; ) <br> ) <br> LAWRENCE-BONFITTO TRADING COMPANY ) <br> and ) <br> JOSEPH J. BONFITTO, ) <br> Relief Defendants. ) <br> ) | No. 08 CIV _____ |

### PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

### I. SUMMARY

On April 2, 2004, Edward Sarvey, a registered floor broker at the Chicago Board of Trade ("CBOT"), noncompetitively filled and indirectly bucketed customer orders to sell a total of 2,474 Five-Year Treasury Note ("Five- Year Note") futures contracts. Sarvey thereby defrauded his customers by $2 million dollars, while Sarvey reaped approximately $357,000 in profits trading for his own account. David Sklena, a registered floor broker trading for his own account, accommodated Sarvey by purchasing 2,274 of these Five-Year Note contracts from Sarvey at below market prices and reaped approximately $1.65 million in profits in the span of a few minutes.

Sarvey and Sklena's noncompetitive trading violated the anti-fraud provisions of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 1 *et seq.* (2002), and the Regulations thereunder promulgated by Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), 17 C.F.R. § 1 *et seq.* (2007). Specifically, Sarvey and Sklena violated Sections 4b(a)(1)(i) and (iii), 7 U.S.C. §§ 6b(a)(1)(i) and (iii) (2002), which prohibit cheating, defrauding or deceiving, and attempting to cheat, defraud or deceive customers in connection with the trading of commodity futures contracts; Section 4b(a)(iv) of the Act, 7 U.S.C. § 4b(a)(iv), which prohibits bucketing customer orders; and Commission Regulation 1.38 (a); 17 C.F.R. § 1.38 (a) (2007), which prohibits noncompetitive trading of commodity futures contracts. Sklena also violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a), which prohibits accommodation trading.

Sklena's clearing firm, Relief Defendant Lawrence-Bonfitto Trading Company ("Bonfitto Trading"), and the firm's principal, Joseph Bonfitto ("J. Bonfitto"), confiscated approximately $650,000 of the illegal trading profits in Sklena's account as compensation for purportedly exposing the clearing firm to market risk. Neither Bonfitto Trading nor its principal has any legitimate equitable or legal claim to the trading profits.

Plaintiff CFTC therefore brings this action to obtain preliminary and permanent injunctive relief, to enjoin these illegal acts, and an asset freeze to preserve assets pending issuance of a permanent injunction, ancillary relief in the form of restitution and disgorgement, and civil monetary penalties.

2

## II. PARTIES

### A.   Plaintiff

Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2007).

### B.   Defendants

Edward Sarvey is a resident of Lemont, Illinois.  Sarvey has been a member of the CBOT and registered with the Commission as a floor broker since 1988.

On January 19, 2007, the CBOT found that Sarvey had engaged in noncompetitive trading, among other violations of the CBOT rules and regulations, for the April 2, 2004 trading of the 2,274 June 2004 Five-Year Note contracts. *[Exhibit A, CBOT Notice to Sarvey, March 2007].*[1]  The CBOT also found that Sarvey had engaged in other trading violations on April 2, 2004, as well as on other trading days.  Specifically, the CBOT found that on April 2, 2004, Sarvey noncompetitively purchased 235 and sold 50 June 2004 contracts Five-Year Note contracts opposite another broker shortly after the open.  *[Id., pages 3-4 of Amended Decision Section].*  The CBOT found also found that Sarvey had traded ahead of his customers on three separate occasions - September 5, 2003, January 9, 2004, and March 5, 2004.[2] *[Id., pages 5-7 of Amended Decision Section].*  The CBOT fined Sarvey $175,000 and suspended his trading privileges for 60 days for all of these violations. *[Id., page 7 of Amended Decision Section].*

---

[1]  In support of this Memorandum of Points and Authorities, Plaintiff will cite to and has attached its Exhibits in Support of Plaintiff's Motion for Preliminary Injunction.

[2] "Trading ahead" of a customer orders occurs when a broker holding an executable customer order executes a trade for himself before executing the trade for the customer.  As noted by the Seventh Circuit, futures brokers who trade ahead of their customers "commit fraud "in a classic sense" by causing the customers to lose additional profits that they would have made except for their improper execution of their orders." *U.S. v. Ashman*, 979 F.2d 469, 478 (7th Cir. 1992).

3

The January 19, 2007 disciplinary action was not the first such action brought against Sarvey. In 2001 and 2002, the CBOT also brought disciplinary actions against Sarvey for noncompetitive trading opposite Sklena. Sarvey jointly settled the 2001 and 2002 disciplinary actions and was sanctioned with a $25,000 fine and a 5-day trading suspension. *[Exhibit B, CBOT Notice to Sarvey, December 2002]*.

David Sklena is a resident of Skokie, Illinois. Sklena has been a member of the CBOT and registered with the Commission as a floor broker since 1987.

On January 19, 2007, the CBOT found that Sklena had engaged in noncompetitive trading and accommodation trading, among other violations of the CBOT rules and regulations, for the April 2, 2004 trading of the 2,274 June 2004 Five-Year Note contracts opposite Sarvey. *[Exhibit C, CBOT Notice to Sklena, March 2007]*. The CBOT fined Sklena $125,000 and suspended his trading privileges for 75 days. *[Id., page 4 of Amended Decision Section]*.

The CBOT's January 19, 2007 disciplinary action against Sklena was not the first disciplinary action taken against him. In 2001 and 2002, the CBOT brought disciplinary actions against Sklena for noncompetitive trading opposite Sarvey. Sklena settled the disciplinary actions and was sanctioned with a $25,000 fine and a 15-day trading suspension. *[Exhibit D, CBOT Notice to Sklena, February 2003]*.

## C.    Relief Defendants

Lawrence-Bonfitto Trading Company was registered with the CFTC as a futures commission merchant ("FCM") from December 1994 through November 2004. At all relevant times, Bonfitto Trading maintained its principal place of business in Chicago, Illinois and cleared the trading activity of Sklena and other local floor traders. The CBOT was Bonfitto Trading's designated self-regulatory organization.

4

Joseph James Bonfitto resides in Lemont, Illinois. J. Bonfitto was President and principal

of Bonfitto Trading from December 1994 through November 2004. He was registered with the

CFTC as a floor broker intermittently from April 1984 through May 2006.

### III. FACTS

A.   The Five-Year Note Futures Market and the BLS Jobs Report

Five-Year Note futures contracts are interest rate futures traded on the floor, or pit, of the

CBOT from the hours of 7:20 a.m. to 2:00 p.m., and on the CBOT's electronic trading platform,

known as the "e-cbot," from 6:00 p.m. to 4:00 p.m. The Five-Year Note futures contract unit of

trading is a Treasury Note having face value at maturity of one hundred thousand dollars

($100,000), or multiples thereof.[3] The price of the futures contract is quoted in points, with

"par" on the basis of 100 points. Each point equals $1,000. The minimum price fluctuation is a

trading increment, or "tick", of one-half of one thirty-second (1/32) of one point, equal to

$15.625 per contract.

The trade practice activities at issue concern futures trading in Five-Year Note futures

contracts during the morning of April 2, 2004, immediately following the release by the Bureau

of Labor Statistics ("BLS") of its "Employment Situation" report, also known as the "jobs

report," for March 2004. BLS releases this report for the previous month on the first Friday of

every month at 7:30 a.m. CST. Trading in the Five-Year Note pit is usually very active on BLS

jobs report release dates because payroll and employment data affect the market value, and

therefore prices, of Treasury notes.

---

[3] Treasury Notes are medium-term (more than one year but not more than ten years) obligations
of the U.S. government that pay interest semiannually until they mature, at which time the
principal and the final interest payment is paid to the investor. CBOT futures contracts on Five-
Year Notes are interest rate futures, identified under the CBOT rules as "Medium Term Treasury
Note Futures."

5

The March 2004 jobs report showed a surprise increase of 308,000 new jobs versus street expectations of 120,000 jobs. U.S. financial markets immediately reacted to the news, with Treasury bond yields increasing and bond prices dropping. The futures market also reacted, with open outcry pit trading in the nearby June 2004 Five-Year Note contract designated as "fast" from 7:27:52 a.m. through 7:53:33 a.m.[4]  *[Exhibit E, Time and Sales Price Detail 5 Year Notes].*[5]

B.    Sarvey and Sklena's Background

Sarvey and Sklena are registered floor brokers and dual traders[6] in the Five-Year Note futures pit. *[Exhibit F, Transcript of Jennifer Baum CBOT Testimony*[7]*,  page 47; Exhibit G, National Futures Association ["NFA"] Registration Certification for Edward Sarvey; Exhibit H, NFA Registration Certification for David Sklena].*  Sarvey and Sklena trade Five-Year Notes both in the pit and on the e-cbot.

During the relevant time through the present, Sarvey has stood on the top step of the Five-Year Note pit and handled a large deck of customer orders. When trading for his own account, Sarvey typically trades in the range of 10 to 200 contracts. *[Exhibit F, Baum Tr., pgs. 46-47; Exhibit I, Diagram of CBOT Five-Year Note Pit "Pit Diagram"].*

---

[4] A "fast market" is a designation used to describe trading conditions when transactions in the pit or ring take place in such volume and with such rapidity that price reporters insert "FAST" in their price quotations and show a range of prices.

[5] CBOT Time and Sales reports are the CBOT's official records of the time a particular price is prevailing in the market. Time and sales reports are kept both for pit trading and electronic trading.

[6] A dual trader is a registered floor broker who, trading in the same contract, executes customer orders and also trades for his own account or an account in which he has an interest.

[7] Jennifer Baum was Managing Director of the CBOT's Office of Investigations and Audits, until July 2006, when the CBOT merged with the Chicago Mercantile Exchange. She is currently Associate Director of Market Regulation for the CME Group.

Sklena, although registered as a floor broker, primarily trades as a "local," meaning that he primarily trades for his personal account. During the relevant time and through the present, Sklena has stood directly below Sarvey on the penultimate step in the pit and, when trading for his own account, typically trades in the range of 10 to 200 lots. *Id.*

On the first Friday in March 2004, exactly one month before the subject trade date, Sklena lost approximately $320,000 trading for his personal account in Five-Year Note futures trading during a BLS jobs report release day. *[Exhibit J, Sklena March 5, 2004 Daily Statement].* Sklena had insufficient capital to absorb those trading losses. As a result, Bonfitto Trading covered his debit, and Sklena had to sell his CBOT membership to repay Bonfitto Trading. *[Exhibit K, CBOT Membership Bulletin].* Without his CBOT membership, Sklena was unable to trade. Later that month, Sklena mustered sufficient resources to buy another seat. Upon resuming trading, Bonfitto-Trading warned Sklena that he should only carry positions of no more than 20 to 50 contracts, because he risked an inability to recover from losses if he were to trade larger quantities. *[Exhibit L, Transcript of J. Bonfitto CBOT Testimony, pages 27-30].* Entering the April 2, 2004 trading session, Sklena's total equity in his clearing firm's accounts was only $21,538. *[Exhibit M, Sklena April 2, 2004 Daily Statement].*

C. The Transactions Involved Sarvey's Mishandling of Sell Stop Orders

The April 2, 2004 trade at issue involved Sarvey's mishandling of customer "stop orders" to sell a total of 2,474 June 2004 Five-Year Note contracts. A "stop order" or "stop-loss order" is an order that becomes a market order when the market reaches a certain predetermined price (the price specified in the stop order). *Williams v. Lind-Waldock & Co.,* [1996-1997 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,111 at n.2 (CFTC July 10, 1997). When the stop price is reached, the order is "elected" and immediately becomes a market order, which means that the

order is to be filled at the best possible price. *[Exhibit N, CBOT Rule 331.02].* Stop orders can be buy stop or sell stop orders, and in the case of sell stop orders, once the orders are elected, they are to be filled at the highest possible price immediately upon receipt by the broker.

The CBOT's trade practice rules provide that if a broker misses executing a customer order, the broker must nevertheless execute the order in the market and adjust the customer by check if the customer is filled at a less favorable price. If the order is filled at a more favorable price, the customer is entitled to the better price. *[Exhibit O, CBOT Rule 350.04].* Therefore, if Sarvey did not execute the sell stop orders at the price specified in the order, he was obligated to execute the sell stop orders in the market and adjust the customers, or execute the order in the market and provide the favorable price to the customer.

D.    The April 2, 2004 Trade

April 2, 2004 was a BLS release date and, because the market was busy, Sarvey needed assistance in accepting customer orders. Sarvey's clerk, Michael Hallin ("Hallin"), and another floor broker, William Malek ("Malek"), were accepting the customers' orders. *[Exhibit F, Baum Tr. page 48].* Malek was also assisting Sarvey in executing customer orders. *Id.* That morning, Five-Year Note futures were trading in the pit at 112.260 at 7:29:24 a.m. and on the e-cbot at 112.265 at 7:29:59 a.m. *[Exhibit P, Time and Sales Report for Pit Trading; Exhibit Q, CBOT Time and Sales Reports for E-cbot Trading].* After the BLS jobs report release at 7:30 a.m., the following market activity took place:

(a)    prices in the June 2004 Five-Year Note broke sharply, and dropped down from 112.265 to 111.045 at 7:31:23 a.m. on the e-cbot and 111.050 at 7:31:35 a.m. in the pit. Id.

(b)    the 111.050 price at 7:31:35 a.m. was the market low in the futures pit after the BLS jobs report release. Id.

8

(c)    prices in the June 2004 contract then quickly reversed and began rallying off of its lows; by 7:31:26 a.m. the e-cbot was trading at 111.115, and by 7:31:51 a.m., the pit was trading at 111.135. *Id.*

Meanwhile, at or about the release of the BLS report at 7:30 a.m., through an electronic clerk ("EC")[8] device registered to him, Sarvey held customer orders to sell 2,474 contracts with sell stops prices ranging from 112.195 to 111.065. *[Exhibit R, List of Sarvey Customer Orders]*. The sell stop orders Sarvey held were elected and became immediately executable when the June 2004 Five-Year Notes market broke sharply after the BLS jobs report release, dropping more than a point (*i.e.*, more than $1,000 per contract) from 112.260 to 111.050 in the pit and 112.265 to 111.045 on the e-cbot platform, shortly after 7:31 a.m. However, the market quickly reversed and rallied to higher prices before Sarvey filled the orders. Instead, Sarvey defrauded the customers by engaging in the following scheme. After the market had begun rallying, Sarvey:

(a)    sold his customers' orders to an accommodating broker (Sklena), in noncompetitive trades (not submitted by open outcry) at prices near the market low established during the market break that elected the orders rather than at prevailing market prices at the time of the sales;

(b)    bought opposite his customers' orders for his personal account noncompetitively at the lowest or near lowest market price previously established, rather than buying at the prevailing higher market prices at the time he sought to acquire a long position;

(c)    offset his low-priced buys for his personal account by selling at the higher prices in the prevailing market.

Specifically, Sarvey:

(a)    sold 2,274 contracts on behalf of customer sell stop orders opposite Sklena at the near market low of 111.065 *[Exhibit S, Sarvey Brokerage Card; Exhibit T, Sklena Trading Card # 916]*;

---

[8] EC's are electronic devices that brokers and their clerks use to receive customer orders that are placed electronically.

(b)    sold 200 contracts on behalf of customer sell stop orders to two other traders in the pit, also at the near market low of 111.065[9] *[Exhibit S, Sarvey Brokerage Card; Exhibit U, Flannery Trading Card; Exhibit V Flannery Trading Card];*

(c)    bought back 485 contracts from Sklena at 111.070 for his personal account, *[Exhibit S, Sarvey Brokerage Card; Exhibit T, Sklena Trading Card # 916];* and

(d)    having established a profitable long position of 396[10] contracts at 111.070, Sarvey realized his $357,000 profits by selling the 485 contracts for his personal account in the rallying market at prices ranging from 112.020 to 112.050 on e-cbot. *[Exhibit S, Sarvey Brokerage Card; Exhibit W, Sarvey Personal Trading Activity Report].*

*See also, Exhibit F, Baum Tr., pages 124-126.*

In short, Sarvey failed to sell his customers' orders in open outcry at the highest prevailing market immediately after the orders were elected. By the time Sarvey ascertained how many contracts he had to sell for his customers, the market had rallied higher. Nevertheless, Sarvey sold his customers' orders noncompetitively at or near the market low that had traded several minutes earlier. Further, Sarvey bought for himself at the low opposite his customers and then offset in the rallying market for a profit.

On the morning of April 2, 2004, Sarvey had learned from his clerk that he had an undetermined number of contracts to fill on behalf of his sell stop customer orders. The sale of the orders wasn't consummated until the price and quantity were agreed upon. At 7:33:20 a.m., Sarvey began a discussion with Hallin about how many sell stop contracts he needed to sell. At that time, the e-cbot was trading in the range of 111.210-111.220 and the pit market was trading in the range of 111.230-111.240. *[Exhibit X, Chronology of Contract Execution].* At 7:37:14 a.m. Sarvey and Sklena agreed to the 2,274 sale. At 7:37:14 a.m., the e-cbot was trading at

---

[9] The two other traders were John Flannery and Steven Foertsch. The CBOT also brought disciplinary actions against Flannery and Foertsch. Both settled the charges with the CBOT. *[Exhibit U1, Flannery Settlement; Exhibit V1, Foertsch Settlement].*
[10] Sarvey was short 89 contracts before he recorded the purchase of the 485 contracts from Sklena.

112.020 to 112.025 and the pit was trading at 112.010 to 112.020. *Id.* Because Sarvey's customers' orders were executed at near the market low at a time when the prevailing market was trading nearly a point higher, the customers were disadvantaged in excess of $2 million. *[Exhibit F, Baum Tr., page 177].*

Both Sarvey and Sklena offset the long positions they had acquired from the "pit" trades by selling on e-cbot. When Sarvey offset his low-priced buys of 485 contracts in the rallying market, he reaped a profit of $357,000 from the trades. *[Exhibit W, Sarvey Personal Trading Activity, Exhibit F, Baum Tr., page 171].* When Sklena, who had bought the 2,274 contracts from Sarvey at the 111.065 near market low price, offset his low-priced buys (a net of 1,789 contracts)[11] in the rallying market, he reaped a profit of approximately $1.65 million. *[Exhibit Y, Sklena Profits, Exhibit F, Baum Tr., page 154].* In other words, both Sarvey and Sklena unjustly received windfall profits while investors were disadvantaged.

E.    Sarvey and Sklena Defrauded Customers Through Non-Competitive Trades

     1.    Audio Tapes Of Conversation Carried Over The Headsets Worn By Sarvey's Clerk and Others Demonstrate That Sarvey and Sklena Executed The 2,274 x 485 Trades At Off-Market Prices

Hallin and Malek were wearing CBOT audio headsets while they were assisting Sarvey in accepting customer orders. The audio headsets permit clerks to communicate with the order desk when customer orders are coming in. They also pick up background market activity, such as other bids, offers and trades that are taking place. The CBOT retained the April 2, 2004 audio tapes that contain conversations between Hallin, Malek and Sarvey, and conversations on a phone line registered to Sklena.

---

[11] Sklena's net is reached by subtracting the 485 contracts he sold back to Sarvey from the 2,274 he bought from Sarvey.

Sarvey's sale of 2,274 contracts to Sklena and purchase of 485 contracts back from Sklena were noncompetitively executed after the market had rallied above 111.065 and 111.070, as demonstrated by CBOT audio tapes of conversation carried over Hallin and Malek's headsets. Audio tapes from the morning of these trades do not contain any dialogue about Sarvey and Sklena's trade at the time the 111.065 price was active, which was between 7:31:28 a.m. and 7:31:51 a.m. *[Exhibit F, Baum Tr., page 120; Exhibit X, Chronology of Contract Execution]*. In fact, the audio taped dialogue about Sarvey and Sklena's 2,274-contract sale and 485-contract purchase took place between 7:33:20 a.m. to 7:38:00 a.m.

The first time any discussion is heard on the audio tape headsets is at 7:33:20 a.m., when Hallin can be heard starting to add up the customer sell stop orders that comprised the 2,274 contracts Sarvey needed to sell. *[Exhibit F, Baum Tr., page 131; Exhibit X, Chronology of Contract Execution]*. By 7:33:20 a.m., however, the market had already rallied off of its post-release low and was trading at 111.230 to 111.240 in the pit and 111.210 and 111.220 on the e-cbot. *[Exhibit P, CBOT Pit Time and Sales; Exhibit X, Chronology of Contract Execution]*.

It took Hallin almost two minutes to add up the number of contracts that comprised the sell stop orders. By the time he concluded adding up the number of contracts at 7:34:10 a.m., the pit and e-cbot markets were trading at 111.225. *Id.* Nearly another two minutes later, at 7:35:59 a.m., Sarvey asked Hallin to identify the price of his lowest stop. *Id.* At time Sarvey asks about the price of his lowest sell stop order, the pit was trading at 112.015 to 112.050 and the e-cbot was trading at 112.040 to 112.050. Hallin responded at 7:36:11 a.m. by telling Sarvey that the lowest stop was at 111.065. At that time, the pit was trading between 112.050 and 112.045 and the e-cbot was trading at 112.050. At 7:36:59 a.m., Hallin asked Sarvey whether or not he should fill the sell stop orders at 111.065. At that time, the pit was trading between 112.030 to

12

112.020 and the e-cbot was trading between 112.025 and 112.030. At 7:37:14 a.m., Hallin repeated the 111.065 price and then at 7:37:27 a.m. Hallin quick filled the sell stop orders at 111.065 on Sarvey's EC.[12]  At 7:37:14 a.m., the pit was trading at 112.010 to 112.020 and the e-cbot was trading in the range of 112.020 to 112.025. *Id.* In essence, the audio tapes worn by Sarvey's clerk and his assistant captured Sarvey selling his customers' stop orders at the lowest elected stop price when, in fact, the prevailing market was trading higher.

The audio tapes also capture Sklena's sale of 485 contracts back to Sarvey immediately thereafter. At 7:37:28 a.m., one second after Hallin quick-filled Sarvey's sell stops , a voice on a line registered to Sklena can be heard saying, "Dave 2274 by, ah, 485." At that time, the pit was trading at 112.025 to 112.020 and e-cbot was trading at 112.025.[13]  Sklena began offsetting his 2,274 low-priced purchases on c-cbot at 7:37:23 a.m. just a few seconds before the 7:37:28 a.m. sale of 485 contracts back to Sarvey. *[Exhibit X, Chronology of Contract Execution]*.

    2.    Audit Trail Irregularities Demonstrate That Sarvey and Sklena
             Executed The 2,274 x 485 Trades At Off-Market Prices

When a broker trades for his own account, as Sklena was doing, he is required to record his trades on consecutively numbered trading cards. *[Exhibit Z CBOT Rule 332.04]*. Sklena recorded his purchase of 2,274 contracts from Sarvey at 111.065 and sale of 485 contracts to Sarvey at 111.070 ("2,274 x 485") on Card #916. This was out of sequence on his trading cards, which is an audit trail irregularity consistent with noncompetitive trading. *[See Exhibit F, Baum Tr., pages 140-141]*.

The first card Sklena used on April 2, 2004 was Card # 913. By the time Sklena began using Card #915, the market had begun rallying. This is evidenced by the fact that Sklena

---

[12] Quick filled orders are those that are filled on the e-cbot.

[13] Notably, Sklena, apparently acting against his economic interests, sold the 485 contracts back to Sarvey at the near market low of 111.070 even though the pit and e-cbot were trading higher.

13

recorded trades on Card #915 with prices of 111.135 to 111.230. *[Exhibit AA, Sklena Trading Card #915].* As reflected in pit and e-cbot time and sales records, prices of 111.135 and 111.230 were traded after 111.065 and 111.070 were active in the market. *[Exhibit P, CBOT Pit Time and Sales; Exhibit Q, E-cbot Time and Sales].*

Sklena recorded both the 2,274 purchase at 111.065 opposite Sarvey at 111.065 and the 485 sale at 111.070 opposite Sarvey on Card #916. However, Sarvey had already recorded trades at prices of 112.030 and 112.050 on Card #916. *[Exhibit BB, Sklena Trading Card #916].* These higher prices of 112.030 and 112.050 traded only after 111.065 and 111.070 were active in the market. *[Exhibit P; Exhibit Q].* Thus, prices had already rallied by the time Sklena commenced using Card #916. Sklena's recording of 2,274 x 485 trades on Card #916 at near the market lows of 111.065 and 111.070 is therefore out of sequence with the ascending prices in the rallying market.

3.    Sklena Did Not Possess Sufficient Equity to Purchase
      The 2,274 Contracts in a Competitive Transaction

A competitive purchase of 2,274 futures contracts would have been beyond Sklena's ability to support, given that he possessed less than $25,000 in equity in his trading account at the start of the trading day on April 2, 2004. For a trade as large as over 2000 contracts, every tick movement in price would result in over $30,000 in profit or loss. Thus, Bonfitto Trading would have required Sklena to have equity of between $500,000 to $600,000, in addition to the value of his CBOT membership to engage in trading of that magnitude.

4.    Trading Patterns Demonstrate That Sarvey and Sklena
      Executed The 2,274 x 485 Trades At Off-Market Prices

Until the time Sklena agreed to the 2,274 x 485 trade opposite Sarvey, Sklena had traded in lot sizes of 25 contracts during the morning of April 2, 2004. Specifically, from 7:29:16 a.m.

14

to 7:35:02 a.m., Sklena executed approximately 121 consecutive 25-lot Five-Year Note buys and

sells on e-cbot. *[Exhibit BB, E-cbot Orders Entered by Sklena]*. By 7:35:02 a.m., Sklena's was

short 6 Five-Year Note futures contracts. Sklena then bought 6 contracts at 7:35:24 a.m. to

become "flat." The purchase of 6 contracts suggests that Sklena was well-aware of his net

position. The largest long position Sklena acquired from 7:29:16 a.m. to 7:35:24 a.m. was 438

contracts. His largest short position was 465 contracts. Between 7:36:14 a.m. and 7:36:27 a.m.,

Sklena bought and sold a small number of contracts. At 7:36:27 a.m., he was long 83 contracts.

At 7:37:25 a.m., dialogue about Sklena's 485 sale back to Sarvey is heard on the CBOT's

audio tapes. *[Exhibit X, Chronology of Contract Execution]*. Sarvey's clerk, Hallin, filled

Sarvey's 2,274 sale to Sklena at 7:37:27 a.m. *Id.* From 7:37:23 a.m. to 7:39:34 a.m. – virtually

coincident with Hallin's 7:37:27 a.m. quick fill of Sarvey's 2,274 contracts – Sklena began

offsetting the 2,274 contracts by executing approximately thirty-nine 50-lot sales on e-cbot.

*[Exhibit BB, E-cbot Orders Entered by Sklena]*. Thus, Sklena was no longer buying and selling.

Now, he was just selling – at a trade size double his previous activity.

One can infer that Sklena changed his trading pattern due to the fact that he knew he had

purchased 2,274 contracts from Sarvey at a locked in profit when the market was trading above

111.065 and not earlier when 111.065 was actually an active price in the market. Sklena would

have had no need to execute numerous 50 lot sales from 7:37:23 a.m. to 7:39:34 a.m. unless he

was offsetting the 2,274 contracts he bought from Sarvey because just prior to 7:37:23 a.m., he

was only long by 83 contracts. When Sklena offset his large quantity of low buys in the rallying

market, he ultimately profited approximately $1.65 million. *[Exhibit Y, Sklena Profits]*.

## IV. LEGAL DISCUSSION

The Seventh Circuit held in *US. v. Ashman*, 979 F.2d 469 (7th Cir. 1992), that brokers and

traders defraud customers when they noncompetitively execute customer orders by picking

15

customer prices and opposing traders without the benefit of the competitive market place, which

guarantees profits to the broker or trader, but denies the customer the opportunity to obtain better

prices in the marketplace. Specifically, *Ashman* set forth the harm caused when customer orders

are filled noncompetitively, not by open outcry as follows:

> By picking customer prices and opposing traders, the defendants removed their customers
> from the pit's competitive marketplace and forced the customers to accept the results they
> selected, guaranteeing profits to the local and denying the customer the opportunity to
> obtain a better price. In previous cases, we have held that shifting or altering the
> economic risk or opportunity to affect a person's financial position adversely deprives
> that person of money or property....

> The selection of prices without competition deprived customers ... of a clear market
> opportunity to obtain the best price for their orders. It does not matter if the defendants'
> customers were not harmed financially because of the scheme....

> [W]e have no difficulty concluding that the defendants' scheme to deprive CBOT
> customers of orders filled by the competitive market falls within the purview of the mail
> and wire fraud statutes. We reject the defendants' assertion that the instant scheme did
> not rob any customer of a tangible interest. Our case law makes clear that even though
> the customers may not be entitled to any specific prices, deliberate refusal to pursue the
> best price the broker could obtain can constitute a scheme to defraud.

*Ashman*, 979 F.2d at 477-78.

In *Ashman*, CBOT brokers and traders in the soybean pit engaged in a system of profiting

that included buying opposite customer orders for their personal accounts at self-selected prices

and reselling the contracts at higher prices in the market. *See, e.g., id.*, at 477. The Seventh

Circuit affirmed the convictions of a number of the brokers and traders who were found by their

actions to have committed violations including violations of the Act's anti-fraud provision and

the Act's prohibition against accommodation trading. *Id.*, at 474.

In the instant matter, similar conduct involving noncompetitively executing customer

orders for personal gain is at issue. The principal difference between the facts of this case and

the facts of the *Ashman* case is that here far greater customer harm resulted from the trade

16

practice activity.  Here, the sheer magnitude of customers' having been disadvantaged – at least $2 million  warrants the injunctive, ancillary and civil monetary relief sought by Plaintiffs.

A.  Sarvey Defrauded Customers in Violation of Sections 4b(a)(1)(i) and (iii) of the Act

Sections 4b(a) (1)(i) and (iii), 7 U.S.C. §  6b(a)(1)(i) and (iii),[14] of the Act prohibit any person, in connection with any order to make or the making of a futures contract for or on behalf of any other person, to cheat, defraud or deceive, or attempt to cheat, defraud or deceive such other person.  "A floor broker executing customer orders is a fiduciary that acts 'on behalf of' his customers, and thus is subject to the anti-fraud provisions of section 4b of the Act."  *In re Murphy*, [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,798 at 31,351 (CFTC Sept. 25, 1985).  Floor brokers act as fiduciaries to their customers, and, as such, "implicitly represent to [their customers] that they would try to get the best possible price."  *Ashman*, 979 F.2d at 478 (7th Cir. 1992) (non-competitive trading in the CBOT soybean pit defrauded customers by depriving the customer of the opportunity to obtain a better price in the market).

Sarvey cheated and defrauded customers in violation of Sections 4b(a)(1)(i) and (iii) by non-competitively executing trades involving his customers' orders at prices worse than those in the prevailing market at the time of execution.  Stop orders, once elected become market orders and are to be filled at the best available price.  *[Exhibit N, CBOT Rule 331.02]*.  At 7:37:14 a.m., when Sarvey noncompetitively filled his customer sell stop orders at the price of 111.065 – only

---

[14]  Sections 4b(a)(1)(i) and (iii) provide in pertinent part:

It shall be unlawful for any member of a registered entity . . . in or in connection with any order to make . . . any contract of sale of any commodity . . . made subject to the rules of any registered entity, for on behalf of any other person . . .

(i) to cheat or defraud or attempt to cheat or defraud such other person; [or]

(iii) willfully deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract . . .

17

one-and-one-half ticks above the post release market low of 111.050 – the CBOT's Time and

Sales Reports and e-cbot screens reflect higher prices were being offered and traded at 112.010

to 112.020 and 112.020-112.025, respectively. *[Exhibit F, Baum Tr. pages 135-136; Exhibit P,*

*CBOT Pit Time and Sales; Exhibit Q, E-cbot Time and Sales; Exhibit X, Chronology of Contract*

*Execution]*. Here, Sarvey failed to fill the stop orders when the market declined. Although in

the ordinary course, Sarvey's customers could not necessarily expect a fill at prices higher than

the stop prices in their orders, once the market had rebounded from its loss without having been

filled, they were entitled to the windfall. By not competitively executing his customer sell stop

orders by open outcry, Sarvey deprived his customers of the opportunity to have their orders

filled at higher prices prevailing in the market.

## B.     Sarvey Acted with Scienter

Scienter is an element of a Section 4b violation. *In re Staryk,* [1996-1998 Transfer

Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,206 at 45, 810 (CFTC Dec. 18, 1997). Scienter "refers

to a mental state embracing intent to deceive, manipulate or defraud," *CFTC v. Rosenberg*, 85 F.

Supp. 2d 424, 448 (D.N.J. 2000), and it is established when a respondent commits a wrongful act

intentionally or with reckless disregard to his duties under the Act. *Hammond v. Smith Barney,*

*Harris Upham & Co.,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at

36,659 (CFTC Mar. 1, 1990). In determining whether a broker acted with scienter, direct

evidence is not required. Rather the requisite knowing conduct can be inferred from "all the

attendant circumstances." *In re Western Financial Management,* [1984-1986 Transfer Binder]

Comm. Fut. L. Rep. (CCH) ¶ 22,814 at 31,401 (CFTC Nov. 1985). *Accord In re Lincolnwood*

*Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,986 at 28,255

(CFTC Jan. 1984). ("Given the difficulties in probing the minds of men, the Commission is not

18

foreclosed from inferring knowledge from the evidence adduced; . . . knowledge may be circumstantial . . . or may be implied though notice of facts and circumstance from which guilty knowledge may be inferred.").

Sarvey's scienter is evidenced by several factors. First, Sarvey clearly had a financial motive for noncompetitively trading opposite his customers. By buying opposite his customers and obtaining a long position for himself in noncompetitively executed trades at near market low prices, he was virtually guaranteed profits when he offset the low-priced buys for his personal account in the market he already knew was rallying. *Ashman*, 979 F.2d at 480 (evidence of a financial motive is compelling evidence of intent); *In re Buckwalter*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995 at 37,684 (CFTC Jan. 25, 1991) (suspicious conduct takes on additional meaning where there is both a likely motivation for participants to engage in a trade practice and a likely role for noncompetitive executions in the achievement of a plausible arrangement).

Second, Sarvey had to have known that when he executed the customers sell stop orders, the market had already rebounded from the 111.050 price. When Sarvey asked Hallin the price of his lowest sell stop order at 7:35:59 a.m., the Five-Year Note market had already began trading above the 111.065. In fact, the market had been trading at above 111.065 for at least four minutes before Sarvey inquired about the price of his lowest sell stop order. Sarvey was in the pit and trading on e-cbot and had to have seen the market rallying for before he executed the customers' orders at the near market low price.

C.    Sarvey Indirectly Bucketed Customer Orders In Violation of
      Section 4b(a)(1)(iv) of the Act

Section 4b(a)(1)(iv) of the Act, 7 U.S.C. § 6b(a)(1)(iv)[15] prohibits bucketing customer

orders and trading opposite customer orders without prior customer consent. Indirect bucketing

of customer orders violates the Act. *Reddy v. CFTC*, 191 F.3d 109, 114 (2nd Cir. 1999).

"Bucketing" is defined by the Commission as "[d]irectly or indirectly taking the opposite side of a

customer's order into a broker's own account or into an account in which a broker has an interest,

without open and competitive execution of the order on an exchange." *See CFTC Glossary*

*[http://www.cftc.gov/ educationcenter/glossary/glossary_b.html]*.

Sarvey indirectly bucketed a portion of his customers' orders when he sold 2,274 June

2004 contracts to Sklena at 111.065 and bought back 485 of the contracts at 111.070. As the

CBOT audio tapes reveal, Sarvey's sale to Sklena of 2,274 June 2004 contracts at 111.065 took

place at 7:37:14 a.m., and Sarvey's purchase from Sklena of 485 contracts at 111.070 took place

a few seconds later. Thus, one side of Sarvey's trade was for his customers and the other side was

for his own account. The two trades took place not only at essentially the same time, and at

nearly the same price, but well after those prices were last active in the pit. *Reddy,* 109 F.3d at

115 (finding virtually simultaneous buys and sells between a floor broker and an accommodating

trader at substantially the same price to be indirect buckets when floor broker executes one trade

for his customer and the other trade for his own account). Of course, Sarvey's motivation in

---

[15]  Section 4b(a)(1)(iv) provides, in pertinent part:

It shall be unlawful for any member of a registered entity . . . in or in connection with any
order to make . . . any contract of sale of any commodity . . . made subject to the rules of
any registered entity, for on behalf of any other person . . .

(iv) to bucket such order . . or to willfully and knowingly and without the prior consent
of such person, to become the buyer in respect to any selling order of such person , or
become the seller in respect to any buying order of such person.

doing this was that he profited financially while appearing to fill his customers' orders within the stop range.

The practice of indirectly bucketing customer orders enabled Sarvey to establish or offset positions for his own account at better, more advantageous prices than he could have achieved through the competitive process. The benefit Sarvey enjoyed was a function of both time and price volatility, meaning that, Sarvey had the benefit of the time to watch the price rally, buy at the past price, and then take advantage of the upward price volatility by selling in the rallying market. By indirectly bucketing his customer orders at a past price, as Sarvey did in the transaction opposite Sklena, Sarvey enjoyed an advantage of several ticks that guaranteed him a profit.

D.    Sklena Aided and Abetted Sarvey's Violations of Sections 4b(a)(1)(i), (iii) and (iv)

Under Section 13(a) of the Act, 7 U.S.C. § 13c(a), "any person who aids or abets the commission of a violation of the Act, or any of the rules, regulations or orders thereunder, or who acts in combination or concert with any other person in such violation . . . may be held responsible for such violation as a principal." In the Commission's seminal aiding and abetting opinion *In re Richardson Securities*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,145 at 24,646 (CFTC Jan. 21, 1981), the Commission held that, in order to violate Section 13(a), "one must knowingly associate oneself with an unlawful venture, participate in it as something that he wished to bring about, and seek by his actions to make it succeed." *See also, In re Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28, 129 at 49,879 n. 28 (CFTC May 12, 2000). Knowing participation in satisfaction of this standard may be inferred for all the facts and circumstances. *Western Financial Management*, ¶ 22,814 at 31,401; *Reddy*, 191 F.3d at 121.

Sklena knowingly aided and abetted Sarvey's fraud. First, Sklena had a powerful financial motive to knowingly engage in fraudulent noncompetitive trading. In March 2004, just one month before the trades at issue, Sklena had suffered over $300,000 in trading losses, causing him to have to sell his seat, lose his trading privileges, and thereby lose his livelihood. *[Exhibit J, Sklena March 2, 2004 Daily Statement; Exhibit K, CBOT Membership Bulletin]*. His account at his clearing firm had only $21,538 in equity before Sklena began trading on April 2, 2004. *[Exhibit M, Sklena April 2, 2004 Daily Statement]*. It would make no sense for Sklena, who had just suffered trading losses which almost cost him his livelihood to risk everything again on a trade the size of 2,274 contracts, unless he knew that he was guaranteed to profit.

Sklena's use of a clearly out of sequence trading card to record prices that were no longer active in the market in order to complete the transactions opposite Sarvey and his change of trading pattern to profit from the fraudulent trading is further evidence that he knowingly participated in fraudulent noncompetitive trading and that he wished for the fraudulent scheme to succeed. *In re Gilchrist*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,993 at 37,652 n.22 (CFTC Jan. 25, 1991) (audit irregularities may play an important part in the proof that a respondent was a knowing participant in a trade practice violation, especially where there is a plausible connection between the irregularity at issue and the alleged trade practice violation).

Further, Sklena and Sarvey stood near in each other in the Five-Year Note pit and have traded in the pit for at least a decade. Sklena agreed to purchase a quantity of contracts that was beyond what he and Sarvey typically would trade – i.e., trades of 10 to 200 contracts. *See Reddy*, 191 F.3d at 123 (longtime friendship or close relationship of traders standing next to each other in the pit is a factor that can be considered as evidence to infer defendant's intent). The

22

2,274 x 485 trades were out of the range of either of their personal trading capabilities, but for the fact that the two traders were guaranteed to profit from them through a fraudulent act involving customer orders.

E.    Sklena Accommodated Sarvey's Trading In Violation of Section 4c(a) of the Act

Section 4c(a) of the Act, 7 U.S.C. § 6c(a),[16] prohibits any person from entering into "accommodation trades."  Accommodation trades involve cooperation by one trader with another that enables the other to achieve his trading objectives though unlawful means.  *In re Buckwalter*, [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,782 at 31,251 (ALJ Sept. 27, 1985), *aff'd in part and vacated in part*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995 (CFTC Jan. 25, 1991).  The absence of an intent to undertake a *bona fide* trading transaction is an essential characteristic of all the fictitious trading techniques proscribed in Section 4c(a).  *Gilchrist*, ¶ 24,993 at 37,653 n.23.  The "absence of intent to undertake a bona fide trading transaction" refers to the state of mind that the alleged accommodator must have in order to be held liable, and it means that the participant must "knowing[ly] participate in a transaction structured in a manner to negate price competition or market risk."  *Id.*  There is no liability if a trader in fact believes that he is bargaining faithfully and intends to make a *bona fide* trade.  *CFTC v. Savage*, 611 F.2d 270, 284 (9th Cir. 1979).

Sklena's trades opposite Sarvey enabled Sarvey to achieve his trading objectives though unlawful means.  Specifically, Sklena's purchase of the 2,274 contracts opposite Sarvey and his sale to Sarvey of the 485 contracts at prices that were no longer active at the time enabled Sarvey to profit from noncompetitively traded customer orders.  Sklena possessed the relevant state of

---

[16] Section 4c(a) of the Act provides in pertinent part:

> It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of . . .[a] transaction that is of the character or, or is commonly known to the trade as , [an] . . . 'accommodation trade.'

mind – he did not intend to take a good faith position in the market that entailed price competition or market risk - because he intentionally entered into trades with Sarvey at prices that were not active in the market. Moreover, both the purchase of the 2,274 contracts and sale of the 485 contracts were for his personal account. So, not only was Sklena able to negate market risk, but the prices of the purchase and sale were structured so as to guarantee Sklena a profit. *In re Gorski*, [2003-2004 Transfer Binder] (CCH) ¶ 29,726 at 56,068 n.15 (CFTC March 24, 2004) (accommodation trading may be arranged in a manner that permits not only negating market risk but also earning a profit).

F.    Sarvey and Sklena Violated Commission Regulation 1.38(a) by
      Failing to Execute Trades Openly and Competitively

Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2007), requires that all trades "shall be executed openly and competitively by open outcry . . . ." A broker who does not execute trades by open outcry violates the Regulation. *In re Bear Stearns*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,994 at 37,644 (CFTC Jan. 25, 1991) (an arrangement between floor participants may substantially affect their execution of a trade rendering it unlawful under Rule 1.38). As with their violations of Sections 4b(a)(i) and (iii) of the Act described above, because Sarvey and Sklena, executed purchases and sales of June 2004 Five-Year Note futures contracts in a manner other than openly and competitively by open outcry in the trading pit during trading hours and acted with scienter, they also violated Regulation 1.38.

## V. RELIEF SOUGHT

Section 6c of the Act, 7 U.S.C. § 13a-1, authorizes the Commission to seek injunctive relief and asset freezes in federal district court against any person "whenever it shall appear to the Commission that a person has engaged . . . in any act or practice constituting a violation of

24

any provision of the Act, or any rule, regulation or order thereunder."[17]  Therefore, the CFTC

seeks: (1) a preliminary injunction prohibiting Defendants Sarvey and Sklena from further

violations of the Act and preventing them from directly or indirectly destroying, any of their

books, records, documents, and correspondence; and (2) an asset freeze against Defendants in

order to preserve funds for ancillary relief in the form of restitution and disgorgement.

A.  Preliminary Injunction

The Commission is entitled to preliminary injunctive relief upon a showing that a

violation has occurred and that there is a reasonable likelihood of future violations.  *CFTC v.*

*Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), *cert denied*, 442 U.S. 921 (1979) (once a violation is

demonstrated, the moving party need show only that there is some reasonable likelihood of

future violations).  *Accord, CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir, 1978); *CFTC v.*

*British American Commodity Options Corp.*, 560 F.2d 135, 142 (2nd Cir. 1977).  Here, the

Commission has established both prongs of the preliminary injunctive test.

First, the Commission has demonstrated that Sarvey violated Sections 4b(a)(1)(i) and (iii)

of the Act, 7 U.S.C. § 6b(a)(1)(i) and (iii), and Commission Regulation 1.38, 17 C.F.R § 1.38, by

noncompetitively executing customer orders, and Section 4b(a)(iv)of the Act, 7 U.S.C.

§ 6b(a)(iv), by indirectly bucketing customer orders.  The Division has also demonstrated that

Sklena aided and abetted Sarvey in those violations of the Act, and, pursuant to Section 13(b) of

the Act, 7 U.S.C. § 13c(b), is also liable them.  Finally, the Division has demonstrated that

---

[17] Section 6c of the Act, 7 U.S.C. § 13a-1, provides in pertinent part:

(a)     Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation, or order thereunder . . . the Commission may bring an action in the proper district court of the United States . . .

(b)     Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

Sklena violated Section 4c(a), 7 U.S.C. § 6c(a), by engaging in accommodation trading with Sarvey.

Second, the determination of whether there is a reasonable likelihood of future violations is based upon the "totality of the circumstances" surrounding the proposed defendant's violations. *Hunt*, 591 F.2d at 1220. In this regard, past misconduct is "highly suggestive of future violations." *British American*, 560 F.2d at 141; *Hunt*, 591 F.2d at 1220; *CFTC v. Midland Rare Coin Exchange*, 1999 U.S. Dist Lexis 20977 *28 (S.D. Fl. 1999) (once unlawful conduct is established, the law will presume a likelihood of future violations absent proof to the contrary). Other factors which may be considered in determining whether injunctive relief is appropriate include the egregiousness of the proposed defendant's actions, the isolated or recurrent or systematic nature of the violations, the degree of *scienter* involved, and the likelihood that the proposed defendant's customary business activities will present opportunities for future violations. *Hunt*, 591 F.2d at 1220; *CFTC v. Rosenberg*, 85 F.Supp.2d 424, 454 (D.N.J. 2000).

Sarvey and Sklena's actions were particularly egregious because they engaged in defrauding customers – a core violation of the Act. *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at n. 28 (CFTC Dec. 10, 1996), citing, *In re Premex*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,890 (CFTC Feb. 17, 1988). Their fraud caused harm to customers of at least $2 million.

Nor was their conduct an isolated incident. Both Sarvey and Sklena were both previously sanctioned by the CBOT in 2002 for noncompetitive trading opposite each other. Because Sarvey and Sklena are still registered floor brokers and are able to handle customer orders, absent an injunction, they will remain in a position to commit additional violations of the Act.

B. Asset Freeze

An asset freeze is warranted in cases such as this where the CFTC seeks ancillary relief in the form of restitution and disgorgement to public customers. *CFTC v. Trading Cycles for Commodities, Inc.*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,013 at 23,970 (S.D. Fla. 1980), *citing Muller*, 570 F.2d at 1300. *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979).

Restitution, which is a remedy designed to make customers economically whole, is appropriate here because customers who placed orders with Sarvey, and whose orders were traded opposite Sklena, have been adversely deprived of money or property. *Ashman*, 979 at 478; *CFTC v. Noble Wealth Data Information Services, Inc.*, 90 F.Supp.2d 676, 693 (D. Md. 2000), *aff'd in part, rev'd in part on other grounds, CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

Disgorgement is a remedy designed to deprive a defendant of the fruit of their illegal conduct. Orders of disgorgement of ill gotten gains are therefore appropriate where a defendant has profited through wrongdoing. *CFTC v. Hunt*, 591 F.2d 1211, 1221-1223 (7th Cir. 1979), *cert denied*, 442 U.S. 921 (1979) (reversing district court's denial of disgorgement; allowing a violator to retain profits from illegal activity would frustrate the regulatory purpose of the Act); *Accord, CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 583 -584 (9th Cir. 1982), *citing Porter v. Warner*, 328 U.S. 395 (1946). As the court in *CFTC v. U.S Metals Depository Co.*, 468 F. Supp. 1149, 1163 (S.D.N.Y 1979), *citations omitted*, stated in ordering disgorgement of profits from a fraud:

> [T]o permit defendants to retain even a portion of their illicit profits would impair the full
> impact of the deterrent force hat is essential if adequate enforcement of (the Act) is to be
> achieved. One requirement of such enforcement is a basic policy that those who have
> engaged in proscribed conduct surrender all profits flowing there from.

27

Disgorgement is appropriate here because Sarvey and Sklena derived their profits through fraudulent means, specifically, noncompetitively trading customer orders. They should not be permitted to retain such illegally gotten gains.

Because restitution and disgorgement are appropriate in this case, an order freezing Defendants' assets to preserve such assets for restitution and disgorgement should be issued.

## VI. CONCLUSION

The CFTC respectfully requests that the Court issue the CFTC's proposed Preliminary Injunction Order to (1) issue an order of preliminary injunction against Sarvey and Sklena, prohibiting them from further violations of the Act and preventing them from directly or indirectly destroying, mutilating, concealing, altering, or disposing of any of their books, records, documents, and correspondence; and (2) issue an order freezing Sarvey and Sklena's assets in order to preserve such assets to satisfy ancillary and equitable relief in the form of restitution and disgorgement.

Date: January 9, 2008                         Respectfully submitted,

Camille M. Arnold
Senior Trial Attorney [carnold@cftc.gov]
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
[312] 596-0524
[312] 596-0714 (facsimile)