**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) | No. 08  C O192 |
| | ) | |
| Plaintiff, | ) | Judge Kendall |
| | ) | |
| v. | ) | Magistrate Judge Ashman |
| | ) | |
| EDWARD C. SARVEY and DAVID G. SKLENA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| LAWRENCE-BONFITTO TRADING COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOSEPH J. BONFITTO, | ) | |
| | ) | |
| Relief Defendants. | ) | |

_____)

**DEFENDANT DAVID SKLENA'S ANSWER TO COMPLAINT**
**FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL**
**MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Defendant David G. Sklena ("Sklena"), by and through his attorneys, Foley & Lardner LLP, answer Plaintiff U.S. Commodity Futures Trading Commission's ("CFTC") Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties Under the Commodity Exchange Act (the "Complaint") as follows:

## SUMMARY

1.    On April 2, 2004, Defendant Edward C. Sarvey, a floor broker at the Chicago Board of Trade ("CBOT"), engaged in a series of non-competitive trades in the Five-Year Treasury Note ("Five-Year Note") futures pit that resulted in defrauding customers of at least $2 million dollars.  Sarvey reaped approximately $357,000 in profits from these trades. Defendant David G. Sklena, a floor broker trading for his own account, traded opposite Sarvey in most of the trades and reaped approximately $1.65 million in profits while accommodating and aiding and abetting Sarvey's illegal trade practices.

**ANSWER**:    Sklena admits that he earned approximately $1.65 million in trading profits on April 2, 2004 while trading on the floor of the CBOT.  Sklena lacks knowledge or information sufficient to form a belief, and therefore denies, the allegation that Sarvey earned approximately $357,000 in trading profits.  Sklena denies the remaining allegations contained in this paragraph.

2.    Sklena's clearing firm, Relief Defendant Lawrence-Bonfitto Trading Company ("Bonfitto Trading"), and the firm's principal, Relief Defendant Joseph J. Bonfitto ("J. Bonfitto"), took approximately $640,000 of the illegal trading profits in Sklena's account as compensation for purportedly exposing the clearing firm to risk.  Neither Bonfitto Trading nor J. Bonfitto has any legitimate equitable or legal claim to the trading profits.  They are joined to aid recovery of relief for customers defrauded by Sarvey and Sklena.

**ANSWER**:    Sklena admits that Bonfitto Trading and J. Bonfitto took trading profits from Sklena's account and that neither Bonfitto nor J. Bonfitto has any legitimate equitable or legal claim to the trading profits.  Sklena denies the remaining allegations contained in this paragraph.

3.    Accordingly, the CFTC brings this action pursuant to Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-1 (2002), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks restitution, disgorgement, civil monetary penalties and such other equitable relief as this Court may deem necessary or appropriate.

**ANSWER**:    Sklena denies the allegations contained in this paragraph because, among other things, Plaintiff has stated legal conclusions.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper District Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

**ANSWER**:    Sklena admits the allegations contained in this paragraph.

5.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants and Relief Defendants reside in this jurisdiction and the acts and practices in violation of the Order have occurred within this District.

ANSWER:    Sklena admits the allegations contained in this paragraph.

6.    Unless restrained and enjoined by this Court, Defendants are likely to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

ANSWER:    Sklena denies the allegations contained in this paragraph.

## THE PARTIES

### A.    Plaintiff

7.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007).

ANSWER:    This paragraph alleges facts which are a matter of public record as contained in the Act and to which no answer is required.  The Act speaks for itself, and Sklena denies any characterizations that vary from the Act itself.

### B.    Defendants

8.    Defendant Edward Charles Sarvey, 45, resides in Lemont, Illinois and has been registered with the CFTC as a floor broker since 1988.  At all relevant times, Sarvey was an Associate Member delegate and a dual trader in the Five-Year Note pit at the CBOT.  Sarvey stands on the top step of the Five-Year Note pit and handles a large "deck" of customer orders.

ANSWER:    Sklena admits that Defendant Edward Charles Sarvey is a trader in the Five-Year Note pit at the CBOT and stands on the top step in the pit.  Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations in this paragraph.

9.    Defendant David George Sklena, 47, resides in Skokie, Illinois and has been registered with the CFTC as a floor broker since 1987.  At all relevant times, Sklena was an Associate Member delegate and a dual trader in the Five-Year Note pit at the CBOT, where he stood a step below Sarvey.  Sklena primarily traded for his personal account and cleared his trades through Bonfitto Trading.

**ANSWER**:    Sklena admits the allegations contained in this paragraph, except that Sklena further answers that he ceased clearing his trades through Bonfitto Trading in April 2004.

**C.    Relief Defendants**

10.    Relief Defendant Lawrence-Bonfitto Trading Company was registered with the CFTC as a futures commission merchant from November 1994 through November 2004.  At all relevant times, Bonfitto Trading maintained its principal place of business in Chicago, Illinois and cleared the trading activity of Sklena and other local floor traders.

**ANSWER**:    Sklena admits that Bonfitto Trading cleared Sklena's trades on April 2, 2004.  Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the remaining allegations contained in this paragraph.

11.    Relief Defendant Joseph James Bonfitto resides in Lemont, Illinois.  Bonfitto was President and principal of Bonfitto Trading at all relevant times.  He was registered with the CFTC as a floor broker from April 1984 through May 2006.

**ANSWER**:    Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

## OTHER RELEVANT ENTITIES

12.    The Chicago Board of Trade, Inc. is a registered entity and a designated contract market for trading Five-Year Note futures contracts pursuant to Section 5 of the Act, 7 U.S.C. § 7.  The CBOT is now part of CME Group, Inc. and maintains its principal place of business in Chicago, Illinois.

**ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

## RELEVANT FUTURES MARKET BACKGROUND

**A.    Five-Year Notes**

13.     Treasury Notes are medium-term (more than one year but not more than ten years) obligations of the United States government that pay interest semiannually until they mature, at which time the principal and the final interest payment is paid to the investor.

      **ANSWER**:     This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required. The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

14.     CBOT futures contracts on Five-Year Notes are interest rate futures, identified under the CBOT rules as "Medium Term Treasury Note Futures." The Five-Year Note futures contract unit of trading is a Treasury Note having face value at maturity of One Hundred Thousand Dollars ($100,000), or multiples thereof. The price of the futures contract is quoted in points, with "par" on the basis of 100 points. Each point equals $1,000. The minimum price fluctuation is a trading increment, or "tick", of one-half of one thirty-second (1/32) of one point, which is equivalent to $15.625 per contract.

      **ANSWER**:     This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required. The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

15.     The trading venues for the Five-Year Note futures contracts include the CBOT's trading floor in Chicago, Illinois and the CBOT's electronic trading platform called the e-cbot. Five-Year Notes are traded on the CBOT trading floor from 7:20 a.m. to 2:00 p.m., and on e-cbot from 6:00 p.m. to 4:00 p.m. the next day. Five-Year Note futures contracts are traded concurrently in the pit and on e-cbot during pit trading hours.

      **ANSWER**:     This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required. The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

**B.**    **Order Instruction Terminology**

16.     There are several types of order instructions that a customer can place to buy or sell commodity futures contracts, including market orders, limit orders, and stop orders.

**ANSWER**:     Sklena admits the allegations contained in this paragraph.

17.     A "market order" is an order to buy or sell a futures contract at the best available price obtainable at the time it is entered in the pit.  The prevailing price is known as "at the market."

**ANSWER**:     This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

18.     A "stop order" is an order that becomes a market order when the market price reaches the price specified in the order.  A stop instruction on a price order means that the order cannot be executed until that price level is reached, but once the specified price is touched, the stop order is "elected" and becomes immediately executable.  Thus, once elected, a stop order can be executed at the specified stop price, or at a price lower or higher than the specified stop price, depending upon market conditions.

**ANSWER**:     This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

**C.     Relevant Market Participants and Trading Practices**

19.     A "floor broker" is a person with exchange trading privileges, who, in any pit, executes for another person (e.g., customer) orders for the purchase or sale of any commodity for future delivery.

**ANSWER**:     This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

20.     A "floor trader" is a person with exchange trading privileges, who, in any pit, executes trades for his own personal account by being personally present in the pit or ring for futures trading.  Floor traders are often referred to as "locals."

**ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves, except that Sklena admits that floor traders are often referred to as "locals".

21.    "Dual trading" occurs when a floor broker executes orders for customers and, on the same day, and in the same contract, trades for his own personal account or for an account in which he has an interest.

**ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

22.    Commission Regulations and exchange rules require that all purchases and sales of commodity futures submitted for execution to the trading pit shall be executed "openly and competitively," by "open outcry" or posting of bids and offers or by other equally open and competitive methods of public auction, regardless of market conditions.

**ANSWER**:    Sklena denies the allegations in this paragraph because, among other things, Plaintiff has stated legal conclusions.

23.    The hectic trading conditions that often accompany volatile markets are neither unusual nor unforeseeable.  A "fast market" is a designation used to describe trading conditions when transactions in the pit or ring take place in such volume and with such rapidity that price reporters insert "FAST" in their price quotations and do not necessarily report every price change.

**ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

24.    "Bucketing" or "trading against" is the practice of a floor broker directly or indirectly taking the opposite side of a customer's order into the broker's own account or into an

account in which the broker has an interest without the open and competitive execution of the order on an exchange by open outcry.

> **ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

25.    An "indirect bucket" occurs when a floor broker trades for his personal account opposite his customer, while appearing to trade opposite another trader, known as an "accommodator."  The practice of indirectly bucketing customer orders can enable a floor broker to establish or offset positions for his personal account at larger quantities and better prices than he could have achieved through the competitive process.  Moreover, if a floor broker indirectly buckets his customer order at a price better than at the market, the floor broker can immediately offset the trade at a profit for his personal account at current market prices.

> **ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

26.    An "accommodation trade" is a trade that one broker or trader enters into with another broker or trader that enables the first broker (trader) to achieve his trading objectives through noncompetitive means.

> **ANSWER**:    This paragraph alleges facts which are a matter of public record as contained in the Act and in CBOT rules and regulations and to which no answer is required.  The Act and the CBOT rules and regulations speak for themselves, and Sklena denies any characterizations that vary from the Act and CBOT rules and regulations themselves.

## FACTS

**A.    Five-Year Note Futures Contract Market Conditions On April 2, 2004**

27.    With limited exceptions, the Department of Labor's Bureau of Labor Statistics ("BLS") releases its monthly "Employment Situation" report of payroll and unemployment figures for the previous month (hereafter "number release") on the first Friday of each month at 7:30 a.m. Central Standard Time.

**ANSWER**:   Sklena admits the allegations contained in this paragraph.

28.   The BLS number release is considered one of the most closely watched of the federal government's economic indicators.   Trading in the Five-Year Note futures contract frequently is very active on BLS number release dates because the employment data is a fundamental factor that affects the market value, and therefore prices, of Treasury Notes and Treasury Note futures contracts.

**ANSWER**:   Sklena admits that the BLS number release is one of the federal government's economic indicators and admits that trading in the Five-Year Note futures contract pit frequently is active on BLS number release dates.  Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the remaining allegations contained in this paragraph.

29.   Friday, April 2, 2004 was the BLS number release date for March 2004 payroll and unemployment figures.

**ANSWER**:   Sklena admits the allegations contained in this paragraph.

30.   As reflected in the CBOT price quotes, the June 2004 Five-Year Note futures contract market was quoted at 112.260 (*i.e.*, 112 and 26/32nds points) in the pit at 7:29:24 a.m. and at prices ranging up to 112.285 (*i.e.,* 112 and 28-1/2/32nds points) on ecbot by 7:29:31 a.m. on April 2, 2004.

**ANSWER**:   Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

31.   From 7:27:52 a.m. through 7:53:33 a.m. on April 2, 2004, the open outcry pit trading in the June 2004 Five-Year Note futures contract market was designated "FAST".  The CBOT did not record all price changes at which trades occurred in the pit during this period.

**ANSWER**:   Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

32.   BLS issued the March 2004 number release at 7:30 a.m.  After the number release, June 2004 Five-Year Note futures contract prices broke sharply, and dropped more than a point in approximately one and one-half minutes.  The pit's low of 111.050 was quoted at 7:31:35 a.m. and the e-cbot low of 111.045 occurred at 7:31:23 a.m.

**ANSWER**:    Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

33.    The June 2004 Five-Year Note futures contract market subsequently rallied off its lows and was quoted a point higher at 112.050 at 7:36:07 a.m. in the pit and at 112.055 at 7:36:03 a.m. on e-cbot.

**ANSWER**:    Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

34.    Sarvey was dual trading in the Five-Year Note futures contract pit and on e-cbot immediately prior to and following the number release.

**ANSWER**:    Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

35.    Sklena was trading for his personal account in the Five-Year Note pit and on e-cbot immediately prior to and following the number release.

**ANSWER**:    Sklena admits that he was trading for his personal account in the Five-Year Note pit and on e-cbot before and after the BLS number release.  Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the remaining allegations contained in this paragraph.

**B.    The Stop Orders to Sell 2,474 Contracts**

36.    On April 2, 2004, Sarvey possessed orders to sell a total of 2,474 June 2004 Five-Year Note futures contracts at stop prices ranging from 112.195 to 111.065.  These sell stop orders were all elected and became immediately executable when the June 2004 Five-Year Note futures contract market broke after the number release and declined to its lows of 111.050 in the pit and 111.045 on e-cbot shortly after 7:31 a.m.

**ANSWER**:    Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

37.    Once the sell stop orders for the 2,474 contracts were elected, Sarvey was obligated to fill the stop orders by open outcry in the prevailing market at his first opportunity.

**ANSWER**:    Sklena denies the allegations contained in this paragraph because, among other things, Plaintiff has stated legal conclusions.

38.    The June 2004 Five-Year Note futures contract market rallied to higher prices in both the pit and on e-cbot before Sarvey filled any of the elected sell stop orders.  That price move should have been beneficial to the customer sell orders.

**ANSWER**:    Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

39.    From 7:31:51 a.m. onward, the June 2004 Five-Year Note futures contract was quoted at 111.135 and higher in the pit and traded 111.145 and higher on e-cbot.

**ANSWER**:    Sklena denies the allegations contained in this paragraph.

40.    Between 7:33:20 a.m. and 7:37:14 a.m., Sarvey noncompetitively executed the sell stop orders by selling 2,274 contracts to Sklena and 100 contracts each to two other traders, all at 111.065, a price that was a few ticks above the market low and that was last active before 7:31:51 a.m.

**ANSWER**:    Sklena denies the allegations contained in this paragraph.

41.    At the time Sarvey sold the 2,274 contracts to Sklena and the 100 contracts each to the two other traders, the market was trading within a range of 111.230 to 112.055.

**ANSWER**:    Sklena denies the allegations contained in this paragraph.

42.    If Sarvey had competitively filled the stop orders for the 2,274 contracts by open outcry at the time he realized the orders had been elected, the orders would have been exposed to the higher prices prevailing in the market.  Instead, Sarvey deprived his customers of the opportunity to sell at these higher prices and sold them at a low price that was no longer active in the pit.  As a result, Sarvey's customers were disadvantaged by as much as $2.1 million.

**ANSWER**:    Sklena denies the allegations contained in this paragraph to the extent that they suggest that his trade with Sarvey was non-competitive.  Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the remaining allegations contained in this paragraph.

43.    At about the same time that Sarvey noncompetitively sold the 2,274 June 2004 Five-Year Note futures contracts to Sklena at 111.065 to fill his customers' stop orders, Sarvey noncompetitively bought back 485 contracts for his personal trading account from Sklena at 111.070, also a price near the market low.

**ANSWER**:      Sklena denies the allegations contained in this paragraph.

44.     Sklena offset the net 1,789 contracts that resulted from his purchase from and sale to Sarvey as set forth in paragraph 43 above, by selling at higher prices ranging from 112.015 to 112.065 in the prevailing market on April 2, 2004, turning a profit of approximately $1.65 million.

**ANSWER**:      Sklena denies the allegations contained in this paragraph to the extent that they suggest that his trade with Sarvey was non-competitive.  Sklena admits the remaining allegations contained in this paragraph.

45.     Sarvey's purchase of the 485 contracts from Sklena at the same time that he sold 2,274 contracts to Sklena constituted an indirect bucket of 485 of the 2,474 customer sell stop orders.

**ANSWER**:      Sklena denies the allegations contained in this paragraph.

46.     Sarvey offset the 485 contracts he purchased from Sklena at 111.070 by selling most at higher prices ranging from 111.070 to 112.270 in the prevailing market on April 2, 2004, at a profit of approximately $357,250.

**ANSWER**:      Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

47.     By picking customer prices and opposing traders on April 2, 2004, Sarvey willfully removed his customers' orders from the pit's competitive marketplace and forced the customers to accept the results he and the accommodating traders selected, guaranteeing profits to himself and the accommodating traders and denying the customers the opportunity to obtain a better price.  That shifting or altering of economic risk and opportunity to affect his customers' financial position adversely deprived the customers of money or property.

**ANSWER**:      Sklena denies the allegations contained in this paragraph to the extent that they suggest that his trade with Sarvey was non-competitive.  Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the remaining allegations contained in this paragraph.

48.     Sklena willfully aided and abetted and accommodated Sarvey's noncompetitive trading, trading opposite, and indirect bucketing of customer orders by noncompetitively purchasing customer orders from Sarvey and then selling a portion of the customer orders back to Sarvey at other than prevailing market prices.

**ANSWER**:     Sklena denies the allegations contained in this paragraph.

**C.     Bonfitto Trading and J. Bonfitto Received Funds That Were Obtained as a Result of the Defendants' Fraudulent Conduct**

49.     Sklena's clearing firm, Bonfitto Trading, and its president and principal, J. Bonfitto, took approximately $650,000 of Sklena's profits as compensation for Sklena purportedly exposing the clearing firm to risk, in that Sklena did not have sufficient margin to have purchased 2,274 contracts from Sarvey on April 2, 2004. This left Sklena with a net profit from the activity of approximately $1 million.

**ANSWER**:     Sklena admits that Bonfitto Trading and J. Bonfitto withheld Sklena's trading profits from his trading on April 2, 2004. Sklena further admits that Bonfitto Trading and J. Bonfitto's purported reason for withholding Sklena's trading profits was the alleged risk to which the clearing firm had been exposed by Sklena's purchase of 2,274 contracts from Sarvey on April 2, 2004. Sklena denies the remaining allegations contained in this paragraph.

50.     In fact, Sklena did not expose Bonfitto Trading to meaningful market risk, because at the time he undertook to purchase 2,274 June 2004 Five-Year Note futures contracts from Sarvey, the market was trading substantially above the 111.065 purchase price.

**ANSWER**:     Sklena denies the allegations contained in this paragraph.

51.     Neither Bonfitto Trading nor J. Bonfitto made any meaningful effort to determine whether the 2,274 contracts Sklena had purchased were competitively executed on the open market.

**ANSWER**:     Sklena lacks knowledge and information sufficient to form a belief as to the truth of, and therefore denies, the allegations contained in this paragraph.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

### VIOLATIONS OF SECTIONS 4b(a)(2)(i) and (iii) OF THE ACT: CHEATING, DEFRAUDING AND DECEIVING CUSTOMERS

52.     The allegations set forth in paragraphs 1 through 51 are re-alleged and incorporated herein.

**ANSWER**:     Sklena's answers to paragraphs 1 through 51 are hereby re-stated

and incorporated herein as Sklena's answer to this paragraph.

53.     Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, to cheat or defraud or attempt to cheat or defraud, or to willfully deceive or attempt to deceive such other person by any means whatsoever.

**ANSWER**:     Sklena denies the allegations contained in this paragraph because,

among other things, Plaintiff has stated legal conclusions.  Sklena further answers that Sections

4b(a)(2)(i) and (iii) of the Act speak for themselves.

54.     Sarvey violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), by cheating or defrauding or attempting to cheat or defraud, or willfully deceiving or attempting to deceive other persons on at least April 2, 2004, by noncompetitively executing and indirectly bucketing his customers' Five-Year Note futures contracts orders at prices lower than those prevailing in the market at the time such orders were executed.

**ANSWER**:     Sklena denies the allegations contained in this paragraph to the

extent that they suggest that his trade with Sarvey was non-competitive.  Sklena lacks knowledge

and information sufficient to form a belief as to the truth of, and therefore denies, the remaining

allegations contained in this paragraph.

55.     Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Sklena is liable for Sarvey's violations of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), in that, on at least April 2, 2004, he willfully aided and abetted Sarvey in noncompetitively executing and indirectly bucketing his customers' Five-Year Note futures contracts orders at prices lower than those prevailing in the market at the time such orders were executed.

**ANSWER**:     Sklena denies the allegations contained in this paragraph.

56.     Each and every transaction in which Sarvey cheated or defrauded or attempted to cheat or defraud other persons, or willfully deceived or attempt to deceive such other person by any means whatsoever, or in which Sklena aided and abetted Sarvey in cheating, defrauding and deceiving or attempting to cheat, defraud and deceive other persons, as described above, is

alleged herein as a separate violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii).

> **ANSWER**:    Sklena denies the allegations contained in this paragraph.

## COUNT TWO

### VIOLATIONS OF SECTION 4b(a)(2)(iv) OF THE ACT:
### INDIRECTLY BUCKETING CUSTOMER ORDERS

57.    The allegations set forth in paragraphs 1 through 56 are re-alleged and incorporated herein.

> **ANSWER**:    Sklena's answers to paragraphs 1 through 56 are hereby re-stated

and incorporated herein as Sklena's answer to this paragraph.

58.    Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.

> **ANSWER**:    Sklena denies the allegations contained in this paragraph because,

among other things, Plaintiff has stated legal conclusions.  Sklena further answers that Section

4b(a)(2)(iv) of the Act speaks for itself.

59.    Sarvey violated Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv), by indirectly bucketing customer orders and willfully and knowingly trading opposite his customers without such customers' prior consent in the Five-Year Note pit on April 2, 2004.

> **ANSWER**:    Sklena denies the allegations contained in this paragraph to the

extent that they suggest that his trade with Sarvey was non-competitive.  Sklena lacks knowledge

and information sufficient to form a belief as to the truth of, and therefore denies, the remaining

allegations contained in this paragraph.

60.    Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Sklena is liable for Sarvey's violations of Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv), by aiding and abetting Sarvey, within the meaning of Section 13(a) of the Act, 7 U.S.C. § 13c(a), in that, on at least April 2, 2004, he willfully aided and abetted Sarvey in noncompetitively executing and indirectly bucketing his customers' Five-Year Note futures contracts orders at prices lower than those prevailing in the market at the time such orders were executed.

ANSWER:    Sklena denies the allegations contained in this paragraph.

61.    Each and every transaction in which Sarvey indirectly bucketed customer orders or willfully and knowingly traded opposite his customers without such customers' prior consent, or in which Sklena aided and abetted Sarvey in indirectly bucketing customer orders, as described above, is alleged herein as a separate violation of Section 4b(a)(2)(iv) of the Act, 7 U.S.C. § 6b(a)(2)(iv).

ANSWER:    Sklena denies the allegations contained in this paragraph.

## COUNT THREE

### VIOLATIONS OF SECTION 4c(a) OF THE ACT: ACCOMMODATION TRADES

62.    The allegations set forth in paragraphs 1 through 61 are re-alleged and incorporated herein.

ANSWER:    Sklena's answers to paragraphs 1 through 61 are hereby re-stated

and incorporated herein as Sklena's answer to this paragraph.

63.    Section 4c(a) of the Act, 7 U.S.C. § 6c(a), makes it unlawful for any person to offer to enter into, enter into or confirm the execution of any transaction that is, is of the character of, or is commonly known to the trade as an "accommodation trade" involving the purchase or sale of any commodity for future delivery if such transaction is used or may be used to (a) hedge any transaction in interstate commerce in the commodity or the products or byproducts of the commodity, or (b) determine the price basis of any transaction in interstate commerce in the commodity, or (c) deliver any such commodity sold, shipped or received in interstate commerce for the execution of the transaction.

ANSWER:    Sklena denies the allegations contained in this paragraph because,

among other things, Plaintiff has stated legal conclusions.  Sklena further answers that Section

4c(a) of the Act speaks for itself.

64.    Sklena violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a), in that, on at least April 2, 2004, he offered to enter into, entered into or confirmed the execution of, Five-Year Note

futures contracts, where such transactions were commonly known to the trade as accommodation trades.

>    **ANSWER**:    Sklena denies the allegations contained in this paragraph.

65.    Each and every transaction in which Sklena entered into as an accommodation trade, as described above, is alleged herein as a separate and distinct violation of Section 4c(a) of the Act, 7 U.S.C. § 6c(a).

>    **ANSWER**:    Sklena denies the allegations contained in this paragraph.

## COUNT FOUR

### VIOLATIONS OF COMMISSION REGULATION 1.38(a):
### FAILURE TO EXECUTE TRADES OPENLY AND COMPETITIVELY

66.    The allegations set forth in paragraphs 1 through 65 are re-alleged and incorporated herein.

>    **ANSWER**:    Sklena's answers to paragraphs 1 through 65 are hereby re-stated

and incorporated herein as Sklena's answer to this paragraph.

67.    Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a), requires that all purchases and sales of commodity futures be executed "openly and competitively," by open outcry or posting of bids and offers or by other equally open and competitive methods.

>    **ANSWER**:    Sklena denies the allegations contained in this paragraph because,

among other things, Plaintiff has stated legal conclusions.    Sklena further answers that

Commission Regulation 1.38(a) speaks for itself.

68.    Sarvey and Sklena violated Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a), in that, on at least April 2, 2004, they knowingly executed purchases and sales of Five-Year Note futures contracts in a manner other than openly and competitively by open outcry in the trading pit during trading hours.

>    **ANSWER**:    Sklena denies the allegations contained in this paragraph.

69.    Each and every transaction in which Sarvey and Sklena failed to execute purchases and sales of Five-Year Note futures contracts openly and competitively by open outcry, as described above, is alleged herein as a separate and distinct violation of Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a).

>    **ANSWER**:    Sklena denies the allegations contained in this paragraph.

## COUNT FIVE,

## RELIEF DEFENDANTS

70.    The allegations set forth in paragraphs 1 through 69 are re-alleged and incorporated herein.

**ANSWER**:    Sklena's answers to paragraphs 1 through 69 are hereby re-stated and incorporated herein as Sklena's answer to this paragraph.

71.    The Defendants have engaged in fraudulent conduct and other violations of the Act resulting in a fraud against customers.

**ANSWER**:    Sklena denies the allegations contained in this paragraph.

72.    The Relief Defendants, Bonfitto Trading and J. Bonfitto, have received funds that were obtained as a result of the Defendants' fraudulent conduct.

**ANSWER**:    Sklena denies the allegations contained in this paragraph.

73.    The Relief Defendants have no legitimate entitlement to or interest in the funds received from the Defendants' fraudulent conduct.

**ANSWER**:    Sklena denies the allegations contained in this paragraph to the extent that they suggest that he engaged in fraudulent conduct.  Sklena further denies the allegations contained in this paragraph because, among other things, Plaintiff has stated legal conclusions.

74.    The Relief Defendants should be required to disgorge the funds they received from the Defendants' fraudulent conduct, or the value of those funds that the Relief Defendants may have subsequently transferred to third parties.

**ANSWER**:    Sklena denies the allegations contained in this paragraph to the extent that they suggest that he engaged in fraudulent conduct.  Sklena further denies the allegations contained in this paragraph because, among other things, Plaintiff has stated legal conclusions.

75.    By reason of the foregoing, the Relief Defendants hold funds in constructive trust for the benefit of Sarvey's customers who were victimized by Defendants' fraudulent conduct.

**ANSWER**:    Sklena denies the allegations contained in this paragraph to the extent that they suggest that he engaged in fraudulent conduct.   Sklena further denies the allegations contained in this paragraph because, among other things, Plaintiff has stated legal conclusions.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations in the Complaint, Sklena asserts and alleges the following separate and independent defenses.   By alleging the defenses set forth below, Sklena does not in any way agree or concede that Plaintiff has properly stated any cause of action therein or that Sklena has the burden of proof or the burden of persuasion with respect to any of the defenses.

## FIRST AFFIRMATIVE DEFENSE

(Statute of Limitations)

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitations.

## SECOND AFFIRMATIVE DEFENSE

(Intervening Cause)

Any injury, damage, or loss alleged was proximately caused by intervening events outside the control of Sklena, including but not limited to extraordinary market fluctuations and fast market conditions.

## THIRD AFFIRMATIVE DEFENSE

(Estoppel)

By its conduct, Plaintiff is equitably estopped from asserting any claim for relief against Sklena respecting the matters that are the subject of the Complaint.

## FOURTH AFFIRMATIVE DEFENSE

(Waiver)

Plaintiff's claims, as set forth in the Complaint, are barred in whole or in part by Plaintiff's waiver of such claims by word or by deed.

## FIFTH AFFIRMATIVE DEFENSE

(Laches)

Plaintiff's Complaint, and the claims alleged therein, are barred, in whole or in part, by laches due to the unreasonable delay in seeking the recovery requested in the Complaint, which delay has resulted in prejudice to Sklena.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL AFFIRMATIVE DEFENSES

Sklena reserves the right to assert any and all additional affirmative defenses about which Sklena currently has insufficient knowledge or information upon which to form a belief as to whether such defenses are available.

WHEREFORE, Sklena respectfully requests that this Court deny all claims alleged against it and enter judgment in his favor.

Dated:  January 29, 2008

Respectfully submitted,

**DEFENDANT DAVID G. SKLENA**

By:   s/ Lisa L. Tharpe
            One Of His Attorneys

Scott E. Early (No. 0706485)
Lisa L. Tharpe (No. 6256765)
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, Illinois  60601
Telephone:  312/832-4500

Facsimile:   312/832-4700