IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, )<br>        Plaintiff, )<br>)<br>v. )<br>)<br>EDWARD C. SARVEY )<br>  and )<br>DAVID G. SKLENA, )<br>        Defendants; )<br>)<br>LAWRENCE-BONFITTO TRADING )<br>COMPANY )<br>  and )<br>JOSEPH J. BONFITTO, )<br>        Relief Defendants. ) | No. 08 CIV 0192<br><br>Judge Kendall<br><br>Magistrate Judge Ashman |

## RELIEF DEFENDANTS, LAWRENCE-BONFITTO TRADING COMPANY AND JOSEPH J. BONFITTO'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM

Relief Defendants, Lawrence-Bonfitto Trading Company ("Bonfitto Trading") and Joseph J. Bonfitto ("Bonfitto"), by their undersigned attorneys and pursuant to Fed. R. Civ. P. 12(b)(1), hereby move this Court to dismiss the Complaint ("Complaint") of the U.S. Commodity Futures Trading Commission ("CFTC" or "Plaintiff") with respect to them, and in support thereof state as follows:

### PROCEDURAL POSTURE

The Complaint asserts claims against the Defendants David Sklena ("Sklena") and Edward Sarvey ("Sarvey") based on allegations that Sklena and Sarvey engaged in non-competitive trading that defrauded Sarvey's customers in violation of federal law. The Complaint asserts no claims against Bonfitto Trading or Bonfitto but, rather, names them only as relief defendants based on allegations that they received a portion of the proceeds from Sklena's and Sarvey's fraud to which they have no claim of ownership.

As no claims have been asserted against the relief defendants, there are obviously no claims asserted against them over which this Court has subject matter jurisdiction. Instead, the

CFTC relies on the rather obscure common law concept that a person or entity may be joined as a "nominal" or "relief" defendant to aid the recovery of without an assertion of subject matter jurisdiction if there is **no dispute** that the relief defendant has **no ownership interest** in the property that is the subject of the litigation. *SEC v. Cherif,* 933 F.2d 403, 414 (7th Cir. 1991). As will be demonstrated below, Bonfitto Trading and Bonfitto have considerably more than a colorable legitimate claim to ownership of the funds at issue. Therefore, the CFTC's Complaint against them should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

1. **RELEVANT FACTS**

The issue of whether Bonfitto Trading and Bonfitto have a legitimate ownership interest in the funds at issue was adjudicated and decided in their favor in a 2004 arbitration proceeding conducted by the Chicago Board of Trade ("CBOT"), entitled David Sklena v. Lawrence-Bonfitto Trading Company and Joseph Bonfitto. (Copies of the pleadings, relevant exhibits, transcript excerpts and arbitration award from that proceeding are attached as Exhibits as noted hereafter). The record from that proceeding as well as the CFTC's admissions in the Complaint and associated pleadings in this matter establish the following relevant facts:

2. **BACKGROUND**

Defendant David Sklena ("Sklena") has been registered with the CFTC as a floor broker since 1987. At all relevant times, Sklena was an Associate Member and a dual trader in the Five-Year Note pit at the CBOT. Sklena primarily traded for his personal account. During the period prior to May 2004, he cleared his personal trades through Bonfitto Trading. (Complaint, ¶ 9).

Bonfitto Trading was registered with the CFTC as a futures commission merchant from November 1994 through November 2004. (Complaint, ¶ 10). As Sklena's clearing firm, Bonfitto Trading guaranteed Sklena's trades and was obligated by contract and CBOT rule to pay whatever amount Sklena could not to the Clearing House to settle Sklena's losses. (CBOT Rule 333.00(a), a copy of which is attached as Exhibit 1).[1]

---

[1] Since the merger of the CBOT and the Chicago Mercantile Exchange under common ownership in July 2007, the CBOT rule book has been substantially revised. References to CBOT rules and regulations herein will reflect the numbering and wording that existed at the relevant time.

### 3. UNEMPLOYMENT NUMBERS

On the first Friday of every month, the U.S. Department of Labor releases information about the prior month's unemployment claims (the "unemployment number"). The unemployment number is closely watched by traders and the day that the unemployment number is released is typically an active, and often volatile, day in the CBOT's Five-Year Note pit. On April 2, 2004, the day on which the trades at issue occurred, the unemployment number for March was released. March 5, 2004 was the day on which the unemployment number for February was released. (Complaint, ¶¶ 27-29).

### 4. MARCH 2004 SKLENA DEBIT

On March 5, 2004, Sklena suffered large losses in his account resulting in a debit balance of approximately $300,000 at day's end. (Bonfitto Transcript, attached as Exhibit 2, p. 144, ll. 17-18). Sklena was only able to satisfy this debit by selling his CBOT seat. Subsequently, Sklena mortgaged his home in order to buy a new seat so that he could continue trading. (*Id.* at p. 145, ll. 4-10). Bonfitto met with Sklena during March 2004, and told Sklena to reduce the size of his trading. Bonfitto told Sklena, in particular, to stop taking 200 and 300 lot trades and to reduce the size of his trading to 20 or 50 lots. (*Id.* at p. 146, ll. 18-20). Bonfitto emphasized the necessity of reducing the size of Sklena's trades on days when reports were released, specifically including unemployment reports. Sklena indicated that he would do this. (*Id.* at p. 147, ll. 1-2).

### 5. APRIL 2, 2004 MARKET ACTIVITY

April 2, 2004 was the next day on which the unemployment number was announced. (Complaint, ¶ 29). At 7:27:52 a.m., two minutes and eight seconds before the announcement of the unemployment number, Five-Year Notes were trading at 113.040 (113 and 4/32's) in the CBOT pit where Sklena was trading. (CBOT Time & Sales - Price Detail for April 2, 2004, attached as Exhibit 3). At 7:29:24 a.m., approximately 30 seconds before the unemployment number was released, Five-Year Notes were trading at 112.260 (112 and 26/32nds). (Complaint, ¶ 30). This is a sharp drop in Five-Year Note prices. It is highly unusual for a sharp move to occur **prior** to release of the unemployment number. This led to rumors that the unemployment number had been leaked. (*Wall Street Journal* article dated April 15, 2004, attached as Exhibit

3

4). By 7:31:35 a.m., one minute and 35 seconds after the unemployment number was announced, the price fell to 111.050, a drop of 1 and 31/32's, or $1,968.75 per contract, in approximately three and a half minutes or of 1 and 21/32's ($1,656.25 per contract) in two minutes.[2]

### 6. APRIL 2, 2004 TRADING BY SKLENA AND SARVEY

Between 7:33:20 a.m. and 7:37:14 a.m., Sarvey is alleged to have noncompetitively sold 2,274 contracts to Sklena at 111.065, a price that was a tick and a half above the market low. (Complaint, ¶ 40). At the time Sarvey is alleged to have sold these 2,274 contracts to Sklena, the market was trading within a range of 111.230 to 112.055. (*Id. at* ¶41). As part of this transaction, Sarvey is alleged to have noncompetitively bought back 485 of the 2,274 contracts from Sklena at 111.070. (*Id. at* ¶43). Sklena offset the remaining 1,789 contracts by selling an equal number of contracts, at prices ranging from 112.015 to 112.065, turning a profit of approximately $1.65 million. (*Id. at* ¶44). An analysis of Sklena's trading records shows that it required 82 separate sale transactions, ranging from 10 to 150 contracts, both in the CBOT pit and on the CBOT's electronic trading platform ("e-cbot"), and approximately two and a half minutes (from 7:37:23 a.m. to 7:39:57 a.m.) to fully offset these 1,789 contracts. (McLean Arb. Testimony, attached as Exhibit 5, p. 206, l. 21- p. 209, l. 23 and Arb. Exhibit 20, attached as Exhibit 5A, at p. 211 – 213). While Sklena profited from these transactions, if the market had dropped 1 and 21/32's, as it did earlier in a similar amount of time, he could have lost $2,515,781.[3]

### 7. JOE BONFITTO LEARNS OF THE SIZE OF SKLENA'S TRADING

Bonfitto was in California at the time the subject trades occurred. Relatively soon after the trades occurred, however, Bonfitto learned that Sklena had taken a long position of at least 2,200 contracts, in direct contravention of Bonfitto's instructions to Sklena that he could not

---

[2] Price movements occur by "ticks" or "half ticks". A tick equals 1/32 of a point (dollar). A half tick equals 1/64th's of a point. A movement of a half tick in price equals a movement of $15.625 in the value of one contract; a full tick move equals a change of $31.25 in the value of a contract. Complaint ¶ 14.

[3] This maximum loss was figured by: subtracting 1 and 31/32's from 111.230 (the lowest price prevailing while Sklena was purchasing the contracts from Sarvey); subtracting that result from the 111.065 price Sklena paid to determine the number of "ticks" (1/32's of a point) difference; multiplying the number of ticks by $31.25 and multiplying that product by the number of contracts Sklena had to offset (1,789).

4

trade large size, particularly on a day when the unemployment number was announced. (Ex. 2 at pp. 154-155, ll. 22-24; 1-5). Bonfitto also learned that, at the start of the trading day, Sklena had only $21,000 in his trading account. (Sklena Daily Account Statement for April 2, 2004, attached as Exhibit 6). Bonfitto believed that Sklena had placed Bonfitto Trading in jeopardy by assuming such a large position, with a risk of loss far exceeding his financial resources. (Ex. 2 at p. 154, ll. 13-15). Bonfitto forcefully informed his employees to direct Sklena to be in Bonfitto's office first thing Monday morning (April 5). (*Id.* at p. 155, ll. 16-23).

### 8.  EVENTS ON APRIL 5, 2004

Bonfitto contacted Thomas Cargie of the CBOT Legal Department on April 5th. (Ex. 2 at p. 157, ll. 11-20). Cargie informed Bonfitto about CBOT Regulation 333.03, which authorizes a CBOT clearing firm to freeze funds in the event of reckless activity by a broker.[4] (*Id.* at p. 158, ll. 1-8). Later that day, Bonfitto met with Sklena and told him that, by taking such a large position in such an active and volatile market with only $21,000 in his account, Sklena was essentially betting with Bonfitto Trading's money. (*Id.* at p. 160, ll. 6-8). Sklena did not have the financial resources to pay for the potentially large losses he could have incurred had the market turned against him and, thus, had recklessly exposed Bonfitto Trading to a potentially large loss. As a result, Bonfitto maintained that Bonfitto Trading was entitled to all of the profits realized on Sklena's reckless trading. (*Id.* at p. 160, ll. 1-8). Bonfitto stated, however, that he was willing to negotiate the amount that Bonfitto Trading would retain if Sklena presented him with a reasonable proposal. (*Id.* at p. 162, ll. 6-8). Sklena said that he would think about it.

Bonfitto and Sklena talked again about an hour later. Bonfitto suggested that Sklena agree to split the profits of his April 2nd trading with Bonfitto Trading. (Ex. 2 at p. 162, ll. 15-17). Sklena immediately countered that he should retain $1,000,000 of the profits and Bonfitto Trading would retain the balance as payment for Sklena having exposed it to such a potentially large risk of loss. (*Id.* at pp. 162, l. 24 – 163, l. 6). Bonfitto accepted Sklena's counteroffer. Bonfitto and Sklena stood up and shook hands to seal their agreement. (*Id.* at p. 163, ll. 3-6). Bonfitto and Sklena further agreed that Sklena could withdraw $500,000 immediately to pay off

---

[4] CBOT Regulation 333.03(a) provides that a clearing firm may freeze a trader's account if the trader exceeds written trading limits or engages in reckless trading activity inconsistent with just and fair principles of trade and that the CBOT Arbitration Committee shall determine how the funds shall be apportioned between the firm and the trader. A copy of Regulation 333.03(a) is attached as Exhibit 7.

the loans he had taken out to finance his seat purchase but would maintain the remaining $500,000 in his trading account at Bonfitto Trading to provide sufficient capital to secure any future trading activity.  (*Id.* at p. 163, ll. 13-17).  It was also agreed that Bonfitto would have their agreement memorialized so that Sklena could sign it.  (*Id.* at p. 163, ll. 17-22).  Bonfitto then transferred the funds to be paid to Bonfitto Trading from Sklena's account and had a written agreement prepared memorializing the agreement, which he gave to one of his employees to tender to Sklena for signature.  (*Id.* at pp. 168, ll. 21-24 and 169, ll. 5-13).

### 9. SKLENA'S ACTIONS ON APRIL 29, 2004

Over the next two weeks or so, Bonfitto asked Bonfitto Trading employees several times if Sklena had signed the agreement.  (Ex. 2 at p. 170, l.1).  Sklena put the Bonfitto Trading employees off.  On April 29, 2004, Bonfitto learned that Sklena had again taken large positions in his account, including two separate trades of 1000 contracts each.  (*Id.* at, p. 170, ll. 17-19).  Bonfitto told the operations manager that Sklena should see Bonfitto immediately.  Shortly thereafter, Sklena told Bonfitto that he did not intend to sign the memorandum memorializing the agreement that they had reached on April 5, 2004.  (*Id.* at p. 171, ll. 4-6).  Bonfitto immediately terminated Sklena's clearing privileges with Bonfitto Trading and froze the balance remaining in Sklena's account (approximately $160,000).  (*Id.* at p. 171, ll. 18-20).  Several days later, Bonfitto learned that Sklena, prior to the date his account was frozen, had surreptitiously withdrew $450,000, contrary to his agreement with Bonfitto.  (*Id.* at p. 172, ll. 7-18).

### 10. SKLENA FILES ARBITRATION CLAIM

On or about May 4, 2004, Bonfitto received a letter from Sklena's attorney demanding that Bonfitto Trading release its status as Primary Clearing Member for Sklena so that Sklena could clear through another firm and further, that Bonfitto Trading release the funds remaining in Sklena's account.  (A copy of this letter is attached as Exhibit 8.).  By letter dated May 5, 2004, Bonfitto Trading's attorney responded that Bonfitto Trading would release its status as Primary Clearing Member for Sklena so that he could continue trading at another firm.  The letter also informed Sklena that Bonfitto Trading acted within its rights by freezing Sklena's account balance under CBOT Regulation 333.03(a) because of Sklena's reckless trading in violation of fair and equitable practices of trade and would continue the freeze until the matter was finally

6

resolved by the CBOT's Arbitration Committee as provided for by that Regulation. (A copy of this letter is attached as Exhibit 9.)

On or about May 14, 2004, Sklena filed an arbitration claim against Bonfitto Trading seeking the return of the approximately $778,000[5] of Sklena's April 2, 2004 profits that Bonfitto Trading had retained for its own account pursuant to the agreement reached on April 5, 2004. (Sklena's May 14 Statement of Claim is attached as Exhibit 10.) In his Statement of Claim, Sklena alleged that Bonfitto Trading was not entitled to retain the funds because it was not put at significant risk of loss by Sklena's trading activity on April 2, 2004.[6] On approximately July 16, 2004 and August 11, 2004, Sklena filed amended Statements of Claim that added a claim for the return of the approximately $160,000 in additional funds that Bonfitto Trading had retained when it terminated Sklena's clearing privileges and froze his account on April 29, 2004. (A copy of Sklena's Amended Statement of Claim and Second Amended Statement of Claim are attached as Exhibits 11 and 12.)

**11. THE ARBITRATION PROCEEDING**

On or about July 23, 2004, Bonfitto Trading filed an Answer maintaining that it was placed at a considerable risk of loss as a result of the large positions Sklena established in his account when he did not have the financial resources to pay for significant losses had the market turned against him. (Bonfitto Trading's Answer is attached as Exhibit 13, with exhibits omitted.) On or about October 4, 2004, after two days of hearings, a CBOT Arbitration Panel issued an order requiring Bonfitto Trading to return approximately $80,000 of the approximately $938,000 of Sklena's profits ($778,000 from April 2, 2004 and $160,000 from April 29, 2004) that Bonfitto Trading had received or otherwise held. (A copy of the CBOT Order is attached as Exhibit 14). This order established Bonfitto Trading's legal right to retain the remaining approximately $858,000 in profits from Sklena's trading under CBOT Regulation 333.03(a) due

---

[5] Sklena's total profits on April 2, 2004 were approximately $1,778,683.38, (Ex. 10 at ¶¶ 11 and 16), of which approximately $1,650,000 was associated with the trades that the CFTC alleges operated as a fraud on customers of Sarvey's. (Complaint, ¶44).

[6] Specifically, Sklena alleged that he noticed that Five-Year Notes were trading at a higher price on e-cbot than they were in on the CBOT floor when he purchased the 2,274 contracts from Sarvey. Therefore, Sklena maintained that he was engaged in essentially "riskless" arbitrage by buying on the floor and selling into the higher priced e-cbot market. (Ex. 10 at ¶¶ 7-8; Ex. 11 at ¶¶ 8-9 and 31; Ex. 12 at ¶¶ 8,9 and 31.)

to the risk of loss to which Sklena's reckless trading activity had exposed Bonfitto Trading. In effect, the arbitration panel approved Bonfitto's receipt of $778,000 of Sklena's April 2nd profits and furthergranted Bonfitto Sklena's profits from the date Sklena withdrew $450,000 from his account in violation of his April 5, 2004 agreement with Bonfitto Trading.

## ARGUMENT

I. **Under Rule 12(b)(1), A Defendant May Challenge The Facial Or Factual Adequacy Of A Complaint's Allegations of Subject Matter Jurisdiction. When The Factual Basis For Subject Matter Jurisdiction Is Questioned, The Plaintiff Bears the Burden Of Proving, By A Preponderance Of The Evidence, That Jurisdiction Exists.**

Preliminary jurisdictional matters are appropriately addressed by motions to dismiss under Fed. R. Civ. P. 12(b)(1). *Barnhart v. United States,* 884 F.2d 295, 296 (7th Cir. 1989). A 12(b)(1) motion is regarded as a speaking motion and may be supported by documents and other evidence extrinsic to the complaint. *Id.; Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir. 1993). When jurisdiction has been challenged as a factual matter, the plaintiff has the burden of establishing jurisdictional facts by competent proof. *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979). This burden has been interpreted to mean proof by "a preponderance of the evidence or 'proof to a reasonable probability that jurisdiction exists.'" *NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 237 (7th Cir. 1995) (cites omitted).

II. **Relief Defendants Are Properly Joined Only If: 1) They Have Received Ill-Gotten Funds From The Actual Defendants; And 2) There Is No Dispute That They Have No Legitimate Claim Of Ownership To Those Funds**

The CFTC has neither alleged any wrongdoing by nor asserted any claims against Bonfitto Trading or Bonfitto over which this Court has subject matter jurisdiction. Instead, the CFTC relies on an exception to the requirement that a Court have subject matter jurisdiction to enter any relief against a party by naming Bonfitto Trading and Bonfitto as "relief defendants."

To avail itself of the obscure common law concept of naming a "nominal" or "relief" defendant to avoid establishing subject matter jurisdiction, the CFTC must establish that the proposed relief defendant has no ownership interest in the funds that are the subject of the litigation. *SEC v. Cherif,* 933 F.2d 403,414 (7th Cir 1991), *cert. den.,* 502 U.S. 1071 (1992) A relief defendant is person or entity that (1) has received ill-gotten funds; **and** (ii) does not have a legitimate claim to those funds. *SEC v. Cavanagh,* 155 F.3d 129, 136 (2nd Cir. 1998). To be a

properly named relief defendant, that person or entity must hold the allegedly ill-gotten funds "in a subordinate or possessory capacity **as to which there is no dispute**." *SEC v. Cherif, supra,* 933 F.2d at 414 (emphasis added) (cite omitted). The "paradigmatic [relief] defendant is a 'trustee, agent, or depository … [who is] joined purely as a means of facilitating collection.'" *SEC v. Colello,* 139 F.3d 674, 676 (9th Cir. 1998) (cite omitted).

While, in appropriate cases, a court may reach funds held by relief defendants, that "power is not entirely boundless." *CFTC v. Hanover Trading Corp.,* 34 F. Supp. 2d 203, 207 (S.D. N.Y. 1999). If the relief defendant has a colorable claim to ownership of the funds in dispute, the court does not have jurisdiction to reach the funds in the relief defendant's hands absent the assertion of a cognizable claim of wrongdoing by the relief defendant that is within the subject matter jurisdiction of the court. *See Id.* at 207-208; *SEC v. Cherif, supra,* 933 F.2d at 415; *SEC v. Ross,* 504 F.3d 1130, 1141-42 (9th Cir. 2007). As Bonfitto Trading and Bonfitto have a more than colorable claim to ownership of the funds at issue, they are not properly named as relief defendants and the Complaint against them should be dismissed.

### III.     Bonfitto Trading And Bonfitto Have A Legitimate Claim To The Subject Funds As Was Confirmed By A CBOT Arbitration Panel Under Rules Approved By The CFTC.

The CFTC alleges that Sklena realized approximately $1,650,000 in profits as a result of trades with Sarvey that operated as a fraud on customers of Sarvey. Complaint ¶44. The CFTC further alleges that Bonfitto Trading and Bonfitto took approximately $650,000 of these profits as compensation from Sklena because Sklena's trading activity had exposed Bonfitto Trading to risk at a time when Sklena had insufficient funds in his account to support the size of his trade (2,274 contracts) with Sarvey. *Id.* at ¶49. Nonetheless, the CFTC maintains that Bonfitto Trading and Bonfitto do not have a legitimate claim to these funds based on the allegation that Sklena did not expose Bonfitto Trading to "meaningful" market risk because he purchased the

2,274 contracts at a price that was from $33/64^{th}$'s to $31/32^{nd}$'s points below the price prevailing in the Five-Year Note pit at the time of the transaction. *Id.* at ¶¶41&50.[7]

The CFTC's contention that Sklena's purchase of 2,274 Five-Year Note contracts exposed Bonfitto Trading to no "meaningful" risk is contradicted by admissions the CFTC makes in other allegations of the Complaint. In the approximately two minutes between 7:29:24 a.m. and 7:31:35 a.m. on April 2, 2004, the price of Five-Year Note contracts fell from 112.260 (112 and $26/32^{nd}$'s) to 111.050, a drop of 1 and $21/32^{nd}$'s points.[8] Complaint ¶¶30, 32. This drop translates to a decrease in value of $1,656.25 per Five-Year note contract. *See n.2, supra.* This kind of price movement could have overwhelmed the 16.5 to 31 tick edge that Sklena allegedly had in his trade with Sarvey and, by itself, establishes the significant risk inherent in Sklena's establishing such a large long position.[9]

Indeed, an analysis of Sklena's trading records for April 2, 2004 shows that Sklena engaged in 83 separate transactions (including the transaction in which he sold 485 of the contracts back to Sarvey, Complaint ¶43), over a period of approximately two and a half minutes (from 7:37:23 a.m. to 7:39:57 a.m.), to sell the contracts he had purchased from Sarvey. (Ex. 5 at, p. 206, l. 21- p. 209, l. 23 and Ex. 5A at p. 211 – 213)). Thus, if the market had behaved as it had but a few minutes earlier after Sklena purchased the 2,274 contracts from Sarvey and dropped 1 and 21/32's points in two minutes, Sklena could have lost from $2,593,781 to

---

[7] The CFTC also alleges that Bonfitto Trading and Bonfitto made no "meaningful" effort to determine whether Sklena purchased the 2,274 contracts competitively in the open market. Complaint ¶51. This allegation does not address whether they have an ownership interest in the funds. Rather, it is a half-hearted attempt to suggest negligence. Absent allegations that the Relief Defendants owed some duty, **under federal law,** to undertake making such a determination, this allegation provides neither a basis for subject matter jurisdiction nor any basis for allowing the CFTC to rely on the "relief defendant" exception to establishing subject matter jurisdiction. *See SEC v. Cherif, supra,* 933 F.2d at 415-16. (Plaintiff cannot rely on naming someone a relief defendant to excuse establishing subject matter jurisdiction, while at the same time implying strongly that that person is a wrongdoer.)

[8] In the previous minute and a half (from 7:27:52 a.m. to 7:29:24 a.m.), the price had dropped another $10/32^{nd}$'s, from 113.040 to 112.260, for a total drop of 1 and $31/32^{nd}$'s, or $1,968.75per contract, in approximately the three and a half minutes from 7:27:52 a.m. to 7:31:35 a.m.. Ex.3.

[9] Accordingly, even if this Court did not dismiss on the basis of jurisdiction, dismissal is appropriate under Fed. R. Civ. P. 12(b)(6) on the basis the CFTC has pled itself out of court by showing that there was indeed risk in the transaction at issue. *See Xechem v. Bristol-Meyers Squibb Company*, 372 F. 3d 899, 901 (7th Cir. 2004) ("... when a plaintiff pleads itself out of court – that is admits all the ingredients of an impenetrable defense – … a complaint that otherwise states a claim [may] be dismissed under Rule 12(b)(6)").

$1,563,375 despite the alleged cushion of from $33/64^{th}$'s to $31/32^{nd}$'s points that he had in his trade with Sklena.

While, in hindsight, it is easy for the CFTC to minimize the risk to which Sklena exposed Bonfitto Trading as not "meaningful" because that risk did not materialize, this is not the appropriate measure. On April 2, 2004, Sklena started the day with a $21,000 balance in his trading account, an amount wholly insufficient to cover his potential losses from assuming a large position in a volatile market. (Ex. 6). The only reason he could engage in a transaction of this size on the floor of the CBOT was because he had the financial backing of his clearing firm, Bonfitto Trading. *See U.S. v. Catalfo,* 64 F.3d 1070, 1073 (7th Cir. 1995) ("In order to trade on the floor of the CBOT, a trader needs a clearing firm.") While Sklena no doubt intended to make money as a result of his transaction with Sarvey, it was certainly possible for him to lose money. "Sure things" do not always cross the finish line first. Since Sklena had little money in his account, any loss would have been borne by Bonfitto Trading.

Sklena essentially put himself in a no lose proposition. If the market rose, stayed flat or did not drop by more than the cushion in the trade with Sarvey, he stood to make a considerable amount of money. If the market turned against him and dropped precipitously (as it had just a few minutes earlier), Bonfitto Trading would be left holding the bag as Sklena had insufficient capital to pay the potentially huge losses that would have resulted. Just because the risk of loss did not materialize does not mean that Bonfitto Trading was not illegitimately exposed to that risk and entitled to redress as a result. *See U.S. v. Catalfo*, 64 F.3d at 1076-77. "In essence, Catalfo [or Sklena] is not too much different from a clerk who "borrows" money out of the register [that he could not otherwise pay back] to place a bet on a "sure thing" at the track. Catalfo [or Sklena] just operated with a deeper till and wagered at a more sophisticated course." *Id. at* 1077.

Not only was Bonfitto Trading entitled to redress for the risk of loss to which Sklena exposed the firm, Bonfitto Trading obtained that redress (and its legitimate claim of ownership to the funds at issue) through the appropriate legal process. In response to the events underlying the *U.S. v. Catalfo, supra,* 64 F.3d 1070, decision (where a clearing firm was bankrupted in one morning by a trader taking large positions with only minimal capital in his account), the CBOT adopted Regulation 333.03(a), which specifically authorizes a clearing firm to freeze the funds in the account of trader if the trader has traded "in excess of written limits or has engaged in

reckless and unbusinesslike dealing inconsistent with just and equitable principles of trade … ." Ex. 7. The rule further provides that ultimate disposition of the funds will be determined by the CBOT's Arbitration Committee. *Id.*[10] When Bonfitto learned that Sklena had taken huge positions (the face value of the Five-Year Notes represented 2,274 futures contracts is $227,400,000) on an employment number day in direct violation of specific instructions he had been given just the month before, Bonfitto immediately spoke with Sklena, reminding Sklena that he had the right to freeze the funds in Sklena's account under Regulation 333.03(a). Initially, Bonfitto negotiated with Sklena and reached an agreement with Sklena governing the appropriate allocation of Sklena's April 2, 2004 trading profits between Sklena and Bonfitto Trading. (*See* Relevant Facts, at ¶ 10, *supra*). When Sklena reneged on this deal, Bonfitto froze the funds remaining in Sklena's account. Sklena filed a claim that was submitted to arbitration before a panel appointed by the CBOT Arbitration Committee.

In the arbitration conducted on September 29th and September 30th, 2004, Sklena raised essentially the same contention that the CFTC asserts here – that his trading did not actually expose Bonfitto Trading to a "meaningful" risk of loss. (Sklena's claim asserted that the "edge" that made his trading essentially riskless was a price difference between trading in the pit and trading on the CBOT's electronic trading platform, e-cbot (Exhibit 12, ¶¶9 and 31), rather than that he had purchased the contracts in a non-competitive trade with Sarvey. Complaint ¶¶40-43.) After considering the evidence adduced over two days, the Panel issued an award confirming Bonfitto Trading's right to ownership of approximately $850,000 by requiring Bonfitto Trading to return approximately $85,000 of the approximately $930,000 Bonfitto Trading had retained from Sklena's account balances on April 2nd and April 29th.[11]

The arbitration award in their favor clearly establishes that Bonfitto Trading and Bonfitto have a legitimate ownership interest with respect to the $650,000 the CFTC is seeking from them

---

[10] This rule was adopted on or about April 21, 1994, at a time when all such rules had to be submitted to and scrutinized by the CFTC. *See* 7 U.S.C. §7a(a)(12)(A) (repealed 2000). Under the Commodity Futures Modernization Act of 2000, the regulatory framework has changed so that exchanges self-certify that their rules are consistent with certain "core principles", one of which is protecting the financial integrity of market participants.

[11] Bonfitto Trading retained approximately $778,000 of Sklena's profits from April 2, 2004 pursuant to Sklena's agreement (approximately $650,000 of which were attributable to Sklena's trade with Sarvey, Complaint ¶49) and approximately $160,000 that was in his account on April 29, 2004 when Sklena once again took large positions and informed Bonfitto that he did not intend to abide by the agreement that they had reached on April 5, 2004. Ex. 12 at Prayer for Relief, ¶6.

in this action. Indeed, it is more than a little ironic for the CFTC to maintain to the contrary when this ownership interest was confirmed pursuant to rules and a legal process expressly authorized and approved by the CFTC. Because Bonfitto Trading and Bonfitto have a clear and legitimate ownership interest in the funds at issue, they are not appropriate relief defendants and this Motion to Dismiss for lack of subject matter jurisdiction should be granted.

## CONCLUSION

The common law concept of naming a "nominal" or "relief" defendant allows a party to employ a summary procedure to facilitate collection of ill-gotten gains that are being held by a trustee, other depository or one who received the funds gratuitously and who otherwise is, for all intents and purposes, a non-party with no real stake in the subject matter of the litigation. *SEC v. Cherif, supra,* 933 F.2d at 413-14, & n.11. A person is only properly joined as a relief defendant if he or she "holds the subject matter of the litigation 'in a subordinate or possessory capacity **as to which there is no dispute**.'" *Id. at* 414 (cite omitted). Where the potential relief defendant does have a legitimate claim of ownership with respect to the funds or property at issue, then the plaintiff cannot continue to proceed against him or her without asserting a claim within the subject matter jurisdiction of the court. *Id. at* 415-16.

To defeat a motion under Fed. R. Civ. P. 12(b)(1), the CFTC must prove, by a preponderance of the competent evidence, that subject matter jurisdiction, or some exception to this jurisdictional requirement, exists. *NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 237 (7th Cir. 1995). Under the "relief defendant" exception on which the CFTC is relying, this burden is particularly high because it must prove that there is **no dispute** that Bonfitto and Bonfitto Trading have **no ownership interest** in the funds at issue. *SEC v. Cherif, supra,* 933 F.2d at 414. Because Bonfitto and Bonfitto Trading's rights to these funds were confirmed by a CBOT arbitration panel action pursuant to CBOT rules and procedures authorized and approved by the CFTC, the CFTC cannot possibly meet this burden. Indeed, for the CFTC to blandly assert that Bonfitto and Bonfitto Trading have no legitimate entitlement to funds without even acknowledging the arbitration award is at least disingenuous and, perhaps, frivolous. If the CFTC believes that it has some superior claim to the funds at issue, then it should assert that claim. Otherwise, the law and fairness require that Bonfitto and Bonfitto Trading be dismissed from this litigation.

WHEREFORE, the Relief Defendants Bonfitto Trading and Bonfitto respectfully request that this Court enter an order dismissing the Complaint in its entirety with respect to them and awarding such other, further and different relief as this Court deems just, equitable and proper.

Dated: February 15, 2008

`                                        Respectfully submitted,

**LAWRENCE-BONFITTO TRADING COMPANY AND JOSEPH J. BONFITTO**

By:   s/Charles J. Risch
         One of their attorneys

John D. Ruark, Esq. (6209905)
Charles J. Risch, Esq. (6183465)
Mitchell B. Goldberg, Esq. (6269823)
Jennifer M. Tryzna, Esq. (6276858)
LAWRENCE, KAMIN, SAUNDERS &UHLENHOP, L.L.C.
300 S. Wacker Drive, Suite 500
Chicago, Illinois
(312)-372-1947