# EXHIBIT 1

Ch3 Floor Practices

C.   Recordkeeping and Clearing

1.   An order for a changing transaction must be documented and time-stamped in the same manner as a customer order, in accordance with Regulation 465.01.

2.   A changer shall clear its changing transactions through an account exclusively designated for such purpose. This changing account at all times shall be evenly spread between the relevant mini-sized contracts and their full-sized counterparts. However, changer accounts which have e-cbot transactions pending for clearing on the next trade date are exempted from the evenly spread requirement.

3.   All changing transactions shall be clearly identified as such by appropriate accounts or symbols on all records of the changer and on the records submitted for clearing.

D.   Fees – Changers may be obligated to pay changer transaction fees to the Exchange, in such amounts, at such times, and in such manner as the Exchange may prescribe.

E.   Miscellaneous

1.   No changer's representative shall enter into a changing transaction in which he appears as the executing member on each side of the transaction.

2.   If applicable, a member futures commission merchant shall disclose to its customers that the price at which a trade is executed on the Exchange may include a changer's fee, and, that the amount of the changing fee, if included in a transaction price, shall be disclosed to a customer upon request.

3.   No member or employee of a member shall require, induce or attempt to induce, either directly or indirectly, a floor broker or member to execute any transaction through a changing transaction or to utilize the services of a particular changer or changer's representative.

4.   No member may give a market order, a priced order, or a discretionary order, to a changer's representative except by open outcry, nor without first seeking a bid or offer, nor without executing as much as possible in the pit at prices which such member reasonably expects to be the best available. Members may not enter priced orders with a changer that are off the current market in both the mini-sized contract and its corresponding full-sized contract.

5.   No member shall give orders to a changer's representative for quantities that he could reasonably expect to execute in the pit for the relevant mini-sized contract. (04/01/03)

**333.00   Trades of Non-Clearing Members -**

(a)   **PRIMARY CLEARING MEMBER.** Each non-clearing member who executes trades on Change must have one and only one Primary Clearing Member who will accept and clear the member's personal trades. A written authorization must be on file with the Member Services Department authorizing such non-clearing member, without qualification, to submit trades through such Primary Clearing Member, and designating such clearing member as the non-clearing member's Primary Clearing Member. Such Primary Clearing Member acts as Commission merchant for the non-clearing member. Such Primary Clearing Member, acting as commission merchant, shall be liable upon all trades made by the non-clearing member for the account of the Primary Clearing Member (unless authorization is revoked as provided in (c) below) and shall be a party to all disputes arising from trades between the authorized non-clearing member and another member or member firm made for the account of the Primary Clearing Member.

(b)   **OTHER CLEARING MEMBERS.** A non-clearing member may have one or more clearing members, in addition to his Primary Clearing Member, through whom he may also clear his trades, provided he has written permission to do so from his Primary Clearing Member. However, as provided in Rule 252.00, such clearing member's claims shall be subordinated to the claims of the Primary Clearing Member(s). Such written permission of the Primary Clearing Member must be filed with the Member Services Department. Written authorization from the other clearing member,

# EXHIBIT 2

1

2                    JOSEPH BONFITTO,

3  having been previously duly sworn, was examined and

4  testified as follows:

5                    DIRECT EXAMINATION

6                    BY

7                    MR. RUARK:

8     Q.    Mr. Bonfitto, could you state your name and

9  spell your name for the record, please.

10    A.    Joe Bonfitto, J-o-e B-o-n-f-i-t-t-o.

11    Q.    Are you a member of the Chicago Board of

12  Trade?

13    A.    I am.

14    Q.    Could you give a brief summary of your

15  background at the Chicago Board of Trade, how you

16  came to the Exchange, and what you did over your

17  career here.

18    A.    I was working at a country club in

19  Flossmoor, my hometown back in the early 80s, and I

20  met a guy named Sandy Bank, who was a member at the

21  Board of Trade at the time.  I became friendly with

22  him and his family, and he ended up giving me a job

23  as a runner.  He and John Muso (phonetic) were

24  starting a brokerage group in the bond pit and he

1  gave me a job as a broker assistant and I started

2  clerking for him on my 21st birthday, which would

3  have been August 29th of '82.

4            I did that for about a year-and-a-half,

5  two years, and then I got -- I leased a membership

6  and began filling.  They brought me into their

7  group.  I started filling some very small paper and

8  trading very small.  I continued to trade and

9  develop a little bit of a nack for trading

10 throughout '85, and I left the group in '86 to trade

11 on my own, and I stayed in the 30-year pit trading.

12            I became affiliated with Kriasty (sic),

13 Henning and Lawrence as a local in the late 80s.  In

14 the early 90s there was a breakup of the ownership.

15 Steve Lawrence and his partner had a split.  I left

16 that firm to go with Steve Lawrence to LIT America

17 as a subgroup.  Steve and I began discussions about

18 maybe being our own primary, and he said '93, but I

19 want to say we started in February of '95, might

20 have been '94.  We got primary clearing.  We became

21 50/50 partners, and I was the president; he was the

22 CEO, and we had a clearing firm that I became sole

23 proprietor of through a buyout about a

24 year-and-a-half ago, and until recently, I think

1  today might have been my last day of clearing, we

2  moved the book of business.  We had Lawrence

3  Bonfitto move its book of business --

4      MR. SCHWARTZ:  I can't hear.

5      THE WITNESS:  I sorry.  I think today might have

6  been my formal last day of clearing.  We moved that

7  book of business to Dorman (sic) Trading, so I'm not

8  in the clearing business any longer.

9          I traded in the 30-year pit all up

10 until '01 or '02, and then I went to the 10-year pit

11 and traded in the 10-year pit for '03 and '04.  Up

12 until April of '04, I stopped trading April of this

13 year. I briefly traded in the bean pit in the summer

14 of '88, found out not to go in there.  I also

15 briefly made an appearance this spring and learned

16 again not to go in.

17     MR. RUARK:  Q.  I would like to know how long had

18 David Sklena been trading at Lawrence Bonfitto by

19 say April of this year.

20     A.    Since we began.

21     Q.    So about nine years?

22     A.    Right.

23     Q.    Could you briefly describe what his history

24 at Lawrence Bonfitto had been first in terms of his

                                                      143

1  profitability.  Did you have a sense of how

2  profitable a trader he had been over that period of

3  time?

4     A.   I never really looked at guys' years, how

5  they did.  I knew from talking with Bob O'Burn Joe

6  had had a good year and once in awhile I'd be

7  leafing through statements I would peek and I knew

8  that he made money and I knew that he was a broker.

9  I assumed he made money doing that.  I never really

10 looked to see his checks, but I knew he had done

11 well --

12    Q.   Okay.

13    A.   -- pretty well over the years.

14    Q.   Okay.  Did you have -- in March of 2004, did

15 something happen to Mr. Sklena following the March

16 5th unemployment number?

17    A.   He had a bad unemployment number and lost

18 $300,000.

19    Q.   Following that, did you find out that

20 Mr. Sklena was going to sell his seat to resolve his

21 debit?

22    A.   I found out that afternoon from Postel.

23    Q.   Now did you direct Mr. Sklena to sell his

24 seat to resolve this debit?

1    A.   No.

2    Q.   Were you surprised to learn that Mr. Sklena

3  had to sell a seat to resolve a $300,000 debit?

4    A.   I was surprised to learn that he had to sell

5  his seat to cover the debit.  I didn't know the

6  exact number of the debit.  I knew he lost 300,000.

7  I didn't know what he started the day out at.  All

8  I had heard he had a bad unemployment and he lost

9  300 grand and he was selling a seat to cover his

10  debit.  That's what I was told.

11    Q.   That was on that Friday, March the 5th?

12    A.   Correct.

13    Q.   Did you have a meeting with Mr. Sklena

14  following that day in March -- did you have a

15  meeting?

16    A.   Yes.  It wasn't right away.  It was within a

17  week or two weeks, 10 days, somewhere in there.

18    Q.   Do you recall where that meeting was?

19    A.   In my office.

20    Q.   Do you recall about how long the meeting

21  lasted?

22    A.   Twenty minutes maybe.

23    Q.   Was there anyone else present --

24    A.   No.

1    Q.    -- with you and Mr. Sklena?

2    A.    No.

3    Q.    What did you talk about at that meeting?

4    A.    I talked about the fact that, you know,

5  given market -- current market conditions the way

6  profitability was in the financial room that, you

7  know, it wasn't prudent to be taking big sizes,

8  especially on numbers or especially unemployment

9  numbers.

10          I didn't want to embarass him and ask

11  him what happened to his money, you know, I felt

12  bad, you know, Dave and I had been friends for a

13  long time.  I feel bad he had to sell his seat, and

14  I basically was trying to be as firm but come from

15  both the trader's perspective, and the owner's

16  perspective and clearing perspective.  Dave, you

17  have got to watch out.  You can't do anything stupid

18  on these numbers.  You should be trading 20 and 50

19  lots.  You shouldn't be taking 2 and 300 lots

20  because you can't recover from a loss like this any

21  longer in these markets.  You can't.  One bad trade

22  is going to take you out of this business.  You have

23  got a family.  You have got to think about them,

24  things like that nature.  That's how the

1  conversation went.  He agreed with what I was

2  saying.

3      Q.    Okay.  After that conversation, was there

4  any doubt in your mind that Mr. Sklena understood

5  that he was to keep his size small?

6      MR. EARLY:  Mr. Chairman, I object to the form of

7  the question.  It calls to speculation as to what's

8  the state of mind of Mr. Sklena.  Mr. Sklena was

9  here to testify.

10     MR. RUARK:  Mr. Chairman --

11     CHAIRMAN RIECHERS:  Go ahead and ask the

12 question.  Would you ask it again.

13     MR. RUARK:  Yes.

14     MR. RUARK:  Q.  After that conversation, was

15 there any doubt in your mind that Mr. Sklena

16 understood that he was to keep his size small,

17 particularly on number days.

18     A.    I made it clear.

19     Q.    Following this conversation, did you tell

20 anybody about what had transpired?

21     A.    Yes.  I told Dave, Joe Postel, and I told my

22 brother Jim.

23     Q.    Do you recall what you told Mr. Postel?

24     A.    I said, "I met with David," because David --

                                                    147

1  I had told Joe that David wasn't to go back into the

2  pit until I had met with him, so after I met with

3  David, I walked into Joe's office.  I said, "I met

4  with him.  I talked to him.  I told him to keep his

5  size down, told him not to do anything stupid,

6  especially numbers, don't take any adverse risk, you

7  know, let him back in there to trade," because I

8  told Joe "Don't let him in there until I talk to

9  him.  Let him back in to trade and keep an eye on

10 him."

11     Q.  Did you expect Mr. Postel to devote

12 additional time to monitoring Mr. Sklena's trading

13 after that?

14     A.  I did.

15     Q.  Following this meeting in March with

16 Mr. Sklena, do you recall looking at any reports or

17 statements from Mr. Sklena?

18     A.  I don't think I did physically.  I would ask

19 almost on a daily basis, you know, is everybody

20 okay.  I would ask in particular about David.  David

21 okay?

22     Q.  Okay.  I'm going to ask you to turn to Tab

23 12, Page 130 in the black exhibit book.  Do you

24 recognize what that document is?

1    A.   This is his March monthly.

2    Q.   Yes.  Could you take a look at the equity

3  swings in his account after mid-March and read a few

4  of them off to the panel.

5    A.   After mid-March he -- his P & S debit of a

6  hundred ticks or so.

7    Q.   Just --

8    A.   Is that what you are asking for?

9    Q.   Could you just look at the actual numbers,

10  credit or debit, maybe starting with March 16

11  there's, I think, a 996 number there.

12    A.   Credit of $996.19.

13    Q.   Okay.  And then --

14    A.   The next day he makes $8,110.65.

15    Q.   Okay.  And then on the 18th?

16    A.   He loses $3363.06 plus $16.  Looks like a

17  price change.

18    Q.   Okay.  And then just really quick round off

19  and say the number.

20    A.   Seven thousand, 8,000, 7,000.

21    Q.   Do you feel those kinds of equity returns

22  would be consistent with somebody who was following

23  the instructions you had given them?

24    A.   Yeah, and I remember getting P&Ss like that

1    when I ask Dave, okay, he's, fine, he made a hundred

2    ticks.  He's fine, you know, he lost 90 ticks.

3    Those were the numbers I was getting.

4        Q.    I want to move forward to April 2, 2004, and

5    that was the day of another unemployment number.

6    Were you in the office that day?

7        A.    No, I was in California.

8        Q.    Okay.  If you were in California, how did

9    you find out what happened in the market that day

10   and when did you find out?

11       A.    My brother called me.

12       Q.    And that's your brother Jim?

13       A.    On my cell phone, my brother Jim.

14       Q.    Do you know about what time he called?

15       A.    Somewhere around 8 o'clock Chicago time I

16   guess.

17       Q.    You were in California, but do you know

18   where specifically you were?

19       A.    I was in Palm Springs on spring break with

20   my 12-year old son.

21       Q.    Were you -- do you know what you were doing

22   when the phone call came through?

23       A.    I was driving the car.

24       Q.    What did your brother Jim tell you?

1    A.    He asked me if I had seen the tape or heard

2  what happened in the treasury market, and I said,

3  "No, I hadn't."   He goes there was a 5 tick or 5

4  point break in the 30 year, or something like that.

5  It was a humungus break and the number had come out

6  way out of whack.

7    Q.    Did you ask your brother about how the firm

8  was?

9    A.    That's the first thing I asked, "Are we

10  okay?"

11    Q.    What did he say?

12    A.    "Everything's fine."

13    Q.    Now did you talk to anyone else after you

14  talked to Jim?  Did you ask to be transferred to

15  anyone?

16    A.    Well, yeah. There was more conversation with

17  Jim.

18    Q.    I'm sorry?

19    A.    I immediately asked about David.

20    Q.    And what did Jim say?

21    A.    He's great.  He did well.

22    Q.    Okay.

23    A.    And I said, "What does that mean?"  I said,

24  "Did he get back the money that he lost?"  And he --

1  I said, "Did he get back the money that he lost in

2  March?"  And he said, "And then some," and I said,

3  "What does that mean?"  And he said, "And then

4  some," and I said, "Transfer me to Joe Postel."

5      Q.    What did you talk about with Joe Postel?

6      A.    As soon as he picked up the phone, I said,

7  "What happened with Sklena?"

8      Q.    What did Mr. Postel say?

9      A.    "He did great," and I said, "What does that

10  mean?"  He said, "He made a million and seven," and

11  I said, "Oh, really.  How did he do that?"  And he

12  said, "All on the screen," and I said, "Bullshit.

13  Go get his trading cards," and he said, "Hold on,"

14  pause, came back on the phone.  He goes, "Yeah, here

15  it is.  He bought 2200 and -- I forget the number he

16  gave me.

17      Q.    Okay.  Did that conversation with Mr. Postel

18  continue?  Did you have anything else to say to him

19  at that point?

20      A.    It didn't go well from there.

21      Q.    When you say it didn't go well --

22      A.    I was extremely upset.

23      Q.    Did you yell at Mr. Postel?

24      A.    I did.

1    Q.    Were you upset with Mr. --

2    A.    I did.    The first thing I said was "How

3  could you say things went well.  How do you not

4  grasp the gravity of what just happened to our firm

5  or what could have happened?

6    Q.    Did Mr. Postel have any response to that?

7    A.    No.

8  CHAIRMAN RIECHERS:  Joe, what day -- was this the

9  day of?

10  THE WITNESS:  Yes, it was. It was Friday, April

11  5th or April 2nd.

12  CHAIRMAN RIECHERS:  About, John -- I'm sorry --

13  what time in the afternoon was this?

14  THE WITNESS:  This was in the morning.

15  CHAIRMAN RIECHERS:  In the morning?

16  THE WITNESS:  Early in the morning.

17  MR. RUARK:  Q.  After you completed that

18  conversation with Mr. Postel, what happened then?

19    A.    I called my brother back and I yelled at

20  him.

21    Q.    Did your brother have anything to say?

22    A.    Not a whole lot, except, you know, sorry.  I

23  should have gone and looked.  You know, it's now my

24  job since you are out of town.  I should have gone

153

1   to look and I'm sorry, things of that nature.

2       Q.    At this time was your brother deeply

3   involved in risk management in the firm?

4       A.    No, he was getting retail business from me,

5   but he would help me at times when I would ask him

6   to specifically with different things.

7       Q.    After you had finished your conversation

8   with Mr. Postel and with your brother, what happened

9   then?

10      A.    I pulled over on the side of the road and

11  cried.

12      Q.    Why did you cry?

13      A.    Because I very much felt like both my

14  clearing firm and my personal life had been put in

15  jeopardy, very much felt that way.

16              I've been down here a long time and I

17  have traded every kind of possible market that there

18  is, and there is no more violent thing than to be

19  trading an unemployment number, especially when a

20  number comes out of that magnitude, and the insanity

21  of the number that I heard still sends chills to me,

22  and I really felt that a 2,200 lot because of the

23  market conditions being so volative and because the

24  screen and the pit gets so thin and so crazy, much

154

1  like what was going on in the bean pit this summer,

2  that that 2200 lot was more like a 20,000 lot, much

3  in the way when I was in the bean pit this summer, I

4  felt like a 10 lot was a hundred lot, too thin, you

5  know not to take a big size when things are too

6  crazy, because bad things happen very quickly, and I

7  knew he didn't have any money, so I knew -- two

8  things I thought of, and I still think of today now

9  even more convinced of, the trade had gone against

10 him, I don't think he would get out of the trade and

11 I think he might have added to it.  I don't think he

12 would have gotten out.  I don't think when he's out

13 of money that he's going to stop and say I've got to

14 do the right thing for Joe Bonfitto.  I just don't

15 think that would happen.

16    Q.    When you spoke to Mr. Postel, did you tell

17 him to get Mr. Sklena out of the pit?

18    A.    I did.

19    Q.    Did you tell him not to let Mr. Sklena back

20 in the pit --

21    A.    I did.

22    Q.    -- until you talked to him?

23    A.    I did.

24    Q.    Let's move forward to April 5th, which is

155

1   the Monday following that Friday.  Did you talk to

2   anyone about this over the weekend?

3        A.    My wife.

4        Q.    And but no one else from the firm?

5        A.    No.

6        Q.    What were your thoughts as you were driving

7   that morning?

8        A.    I was sad and I was mad.  I was sad because

9   I reached a black and white area in my mind where I

10  knew I was going to be out of the clearing business.

11       Q.    Why did you know you were going to be out of

12  the clearing business?

13       A.    Because I was never going to allow myself to

14  have the feeling that someone could take everything

15  from me ever again.

16       Q.    As you were driving, did you have any

17  thoughts about how you might resolve what

18  Mr. Sklena's activities on Friday were?

19       A.    I kind of did.  The closer I got to work, I

20  kind of came up with the idea in my mind that I

21  didn't feel like I was any different than Lee Stern,

22  that what happened to Lee Stern, except I had gotten

23  lucky, and I thought that just because it didn't

24  cost me everything I had, because I didn't get

1  killed by it, I didn't think I deserved any

2  different consideration, I thought the trade

3  belonged to me, because the whole loss would have

4  been mine, except for $21,000.

5      Q.    Now you had a meeting -- you were going to

6  meet with Mr. Sklena that morning -- this Monday

7  morning.  Did you speak with anyone before you met

8  with Mr. Sklena?

9      A.    I did.

10      Q.    Could you tell us who that was?

11      A.    Tom Cargie.

12      Q.    Is  --

13      A.    Did I get the last name right?

14      Q.    Is  --

15      A.    Sean's assistant or the guy that works in

16  legal.

17      MR. SCHWARTZ:  Cargie.

18      THE WITNESS:  Cargie.  I'm sorry.

19      MR. RUARK:   Q.  With the CBOT legal department?

20      A.    Correct.

21      Q.    What you did you talk to Mr. Cargie about?

22      A.    I explained to him what had happened and I

23  wanted to know if there were rules on the books

24  about these types of things.

1    Q.    What did he tell you?

2    A.    He said that there is a rule that does, you

3    know, point to this, that the situation you are

4    describing may apply, we have had a few instances

5    like this, not anything recently this large, and,

6    you know, we usually always urge the two parties,

7    the member and the clearing firm, to try to reach an

8    agreement if they can.

9    Q.    Okay.  Was there anything else or was that

10   pretty much what was --

11   A.    That's pretty much it.

12   Q.    Did you return to your office at this time?

13   A.    Yes.

14   Q.    Is that when you met with Mr. Sklena in your

15   office?

16   A.    Shortly thereafter, he came up.

17   Q.    And about what time was that?

18   A.    I don't know, 8:45.

19   Q.    Okay.

20   A.    Nine o'clock, between 8:30 and 9 maybe.

21   Q.    Do you recall what you said when Mr. Sklena

22   walked in?

23   A.    Yes, I think something to the effect of, you

24   know, what the fuck were you thinking.  Excuse me,

1  girls.

2      Q.    What did Mr. Sklena respond to that?

3      A.    He asked -- he looked around and said is the

4  room bugged.

5      Q.    Did he say anything after that?

6      A.    Did he?

7      Q.    Yes.

8      A.    He said, "Joe, I had a good cushion on the

9  trade or I had some ticks."  He basically told me --

10     MR. SCHWARTZ:  I can't hear.

11     THE WITNESS:  He basically told me he had money

12  in the trade.  He couldn't pass it up because he had

13  money in the trade.  I can't remember if he told

14  me -- he did tell me ticks.  I don't know if it was

15  10 ticks, 12 ticks, 15 ticks.  He told me the

16  computer was running higher and he had a cushion.

17     MR. RUARK:  Q.  Would it have mattered to you how

18  many ticks were on the trade?

19     A.    No.

20     Q.    Why wouldn't it matter?

21     A.    Because there's a multitude of things that

22  can go wrong when you take a trade that size, that's

23  (A); (B) and what I told him and what I believe to

24  this day, is that a trade that size belongs to a

1   pension fund, or a bank, or somebody that has 60,

2   70, $80 million in equity.  It doesn't belong to a

3   local with $20,000 in equity.  It doesn't belong to

4   a local who has 3 or $4 million in equity.  It's for

5   the biggest of the biggest, especially on the

6   unemployment number, and there's all kinds of

7   possible ramifications that can come both to him and

8   to me for taking a trade that size.

9           When I was a big trader in the 10-year

10  pit, I didn't see it any different.  If the broker

11  next to me had offered the market down and I said

12  sold at the bottom and he said 50,000 and I took it,

13  I can't take a trade like that, and he can't take

14  that trade, and I told him the reason why he can't

15  take a trade like that, the possible bad things that

16  come from that, and that are going to come from

17  that, and may come from that.

18      Q.   Okay.  Did you tell Mr. Sklena that Lawrence

19  Bonfitto had been contacted by the Exchange or by

20  the clearing house?

21      A.   No.

22      Q.   Did you tell him anything in reference to

23  the Exchange or clearing house?

24      A.   When we were discussing possible

1   ramifications of taking a trade that size, I did say

2   to him if I got audited or if I got looked at for

3   risk and the clearing firm saw that I was having

4   guys trade 2700 contracts with 20 grand in their

5   account, they very well might ask me to put up

6   additional deposit money.  I had gotten that from

7   Bob Dern (sic).  He had gotten a phone call,

8   especially about Steve and my trading.  It was one

9   of a multitude of thoughts that were going through

10  my head.

11      Q.   Now did you discuss Mr. Sklena's profits for

12  that day?

13      A.   I did.  I don't even know if we even at that

14  point we were talking about how much he made.  I

15  wasn't really focused on it, but I'm sure we did.

16  It was an alarming number.

17      Q.   You were still focused on the risk of it

18  all?

19      A.   Yeah.

20      Q.   Did you ultimately move over to the profits

21  that he made that day?

22      A.   Yes.  As we were -- we were going back and

23  forth, it became obvious to him it seem that I was

24  angry toward it, that I was looking to make a deal

1  on it.  I was, obviously, saying I didn't feel he

2  was entitled.  I think at one point I said I had

3  been to legal, I've talked to them, I believe I'm

4  entitled to this whole trade, and I immediately

5  said, "But I don't want to do that, because you have

6  been a customer and a friend.  I believe I'm

7  entitled to the whole thing, but I'm willing to be

8  accommodating and make a deal with you."

9     Q.   Okay.  And you said you were willing to make

10  a deal.  What was -- did you propose a deal?

11     A.   At that point I think we took a break.  He

12  said he wanted to take a cigarette break.

13     Q.   When you came back, what did you talk about?

14  Did you make a proposal to him?

15     A.   I did I thought.  I said, "In light of

16  everything that has happened, I think that, you

17  know, we should at least split this trade."

18     Q.   Now did you insist that Mr. Sklena agree to

19  that --

20     A.   No.

21     Q.   -- immediately?

22     A.   No.

23     Q.   What did Mr. Sklena say?

24     A.   He immediately said to me "How about if I

162

1  keep a million."

2     Q.    What did you say to that?

3     A.    I said, "I think that's a terrible deal for

4  my company, but I'm going to do it because I want to

5  get this over with," and I stood up, he stood up,

6  and we shook hands.

7     Q.    Did you say anything to him at that time

8  about putting --

9     A.    He said -- at that point he said, "I'm

10 sorry" and I said, "I'm sorry, too."

11    Q.    Did you say anything at that time about

12 putting the deal into writing?

13    A.    He asked me if he could take a check for

14 $500,00 if he could pay down his mortgage he had

15 just taken on his seat loan, and I said, "Yes."  I

16 also said "the rest of the money's got to stay in

17 that account.  I'm going to have a simple legal

18 release drawn up that I want you to sign so that my

19 company doesn't suffer any future claimants, that

20 they don't come back and try to back out of this

21 deal."  He said, "I'm sure my guy wants to do the

22 same thing.  No problem."

23    Q.    When he said "my guy," did you understand

24 that to mean his attorney?

163

1      A.    Lawyer.

2      Q.    So let me just summarize where you are.  The

3  deal you just made, and correct me if I got it

4  wrong, Mr. Sklena would keep a million dollars of

5  his profits and would give up $778,000 to you?

6      A.    To the Lawrence Bonfitto error account.

7      Q.    Yes.  Mr. Sklena would get to withdraw

8  $500,000 that day and Mr. Sklena would keep $500,000

9  on deposit.  And now would you have let

10  Mr. Sklena --

11     A.    He also at that point -- I forgot.  Is it

12  okay to --

13     Q.    It is.

14     A.    He did at that point.  I wanted him to leave

15  the clearing firm and I told him, "No."  I said,

16  "I'd prefer you stay put until I can move this book

17  of business.  I don't want a bunch of people running

18  out the door after you.  I think it's in your best

19  interest not to talk about this trade, that another

20  clearing firm may ask you for a lot of money, and,

21  you know, to clear you.  If they find out about this

22  trade, I don't think it's in your best interest to

23  be talking about the trade."

24     Q.    Would you have let Mr. Sklena return to the

1  trading floor if you hadn't reached this

2  accommodation?

3     A.    No.

4     Q.    Did you tell Mr. Sklena anything about

5  whether you were going to stay in the clearing

6  business?

7     A.    I told him that he scared me out of the

8  clearing business.  I told him he scared me out of

9  the clearing business.

10     MR. SCHWARTZ:  I'm a little hard of hearing.  I

11  don't mean to keep --

12     MR. RUARK:  Q.  Now you believed at this point

13  that this issue was resolved; is that correct?

14     A.    Correct.

15     Q.    Did you do anything else?  Did you make any

16  kind of gesture to Mr. Sklena?

17     A.    Well, he asked me for the check and I walked

18  with him to the cash thing.  I instructed my girl

19  Diane that does the checks on the ledger to write

20  him a check for 500,000, and at the same time she

21  has our Cub tickets.  I had two tickets left for

22  opening day.  I was always planning on giving them

23  to -- I was going with my son Nick.  I said, "Dave,

24  I've got these two tickets for opening day.  Do you

1  want them?"  You know, "I can only use two.  I'm

2  going with my kid.  Do you want the other two?"

3      Q.   Did he take the tickets?

4      A.   He took the tickets.

5      Q.   At that point did Mr. Sklena leave?

6      A.   He left.

7      Q.   Now did you go to talk to Mr. Postel at this

8  point?

9      A.   I went right into his office.

10     Q.   What did you tell Mr. Postel?

11     A.   I walked in.  I shut the door.  He was

12 sitting at his desk.  I said, "I met with David.  We

13 have resolved the issue and I want you to transfer

14 779," whatever the number was, and didn't say check.

15 I said, "I want to transfer that money from his

16 account into our company error account."

17     Q.   I'm going to ask you to turn to Tab 13 of

18 the black exhibit book and turn to 134.  Do you see

19 a line Item 4, $778,683?

20     A.   Yes.

21     Q.   Does the notation and the description of

22 that indicate it was transferred or does it indicate

23 that it was a check?

24     A.   Right next to the 5151, John?

1    Q.   If you go under the description, there's a

2    TRF to 87003?

3    A.   Yes.  I mean, I don't do the books.  I take

4    that to mean it was transferred just the way I asked

5    it to be.

6    Q.   There's actually a line item farther down

7    that says check issued.

8    A.   Right.

9    Q.   So there's -- I take it that there's

10   separate notations for checks and for transfers.

11          In fact, I see that the transfer is on

12   Mr. Sklena's statement on the next day on April 6.

13   Do you know why it looks like there's something

14   called reclass and then there's a reclass?  Do you

15   understand what that would be?

16   A.   No.  I know there was a discussion.  He had

17   asked me something about whether ramifications for

18   tax purposes, you know.  That's why I said it would

19   go from his trading error account and not off his

20   error account so he wouldn't be libel for tax, maybe

21   my bookkeeper did it wrong.  I don't know.

22   Q.   Did you go to the Cubs game?

23   A.   I did.

24   Q.   Was Mr. Sklena there the next day?

1    A.    He was.

2    Q.    Do you recall how long you were there with

3  your son, correct?

4    A.    I was --

5    Q.    And Mr. Sklena was there with his brother?

6    A.    With his brother.

7    Q.    Do you recall how long everybody stayed

8  together?

9    A.    We stayed till the end, me and my son.  He

10  stayed about half the game.

11   Q.    And then --

12   A.    It was -- weather was not good, and he said

13  "We are going to go to the bar.  Thanks for the

14  tickets.  See you, Nick," and left.

15   Q.    Nick is your son?

16   A.    Yes.

17   Q.    Now back when you were resolving your

18  meeting with Mr. Sklena, you mentioned a written

19  agreement?

20   A.    Correct.

21   Q.    Correct?  Did somebody draw up a written

22  agreement at this point?

23   A.    I have a good friend that's a lawyer.

24   Q.    And he drew it up for you?

1    A.    He did.

2    Q.    Do you have any sense of how many days after

3 April 5th you would have gotten it?

4    A.    A day or two, I think.

5    Q.    Did you give that agreement to Mr. Sklena?

6    A.    No.

7    Q.    Who did you give it to?

8    A.    Joe Postel.

9    Q.    What did you tell Mr. Postel?

10    A.    I want you to give this to Dave Sklena and

11 have him sign it and get it back to me.

12    Q.    Did Mr. Postel agree to do it?

13    A.    He did.

14    Q.    Now at this point were you coming into the

15 office every day?

16    A.    I was.

17    Q.    Mr. Sklena never signed that agreement.

18 Were you staying on top of it?  Were you following

19 with Mr. Postel to find out about the agreement?

20    A.    I asked him several times.

21    Q.    And what did Mr. Postel tell you?

22    A.    He hasn't given it back to me.

23    Q.    Do you have any sense of how often you asked

24 Mr. Postel about whether --

1    A.    Two or three times a week.

2    Q.    Were you looking at Mr. Sklena's trading

3 during this period?

4    A.    I was and my trade checker Andy was looking

5 at it.

6    Q.    What did you think about his trading during

7 that period?

8    A.    It was too large.

9    Q.    Why did you permit it then?

10    A.    I had about 500,000 in the account to work

11 with.  At that point I felt like I had some -- you

12 know, some leeway in case something bad happens.  I

13 was a little more comfortable with some of the

14 trades.

15          I also felt that, you know, the written

16 release was very prudent for my company and I wanted

17 to have it signed and given back to us; however, on

18 the last day when he traded two separate 1,000 lot

19 orders I told my trade checker, Andy, when he showed

20 me those trades, that he wasn't going to trade with

21 me any more.  That was too big for me.

22    Q.    Then did you confront Mr. Sklena about those

23 thousand lots?

24    A.    I got a message a couple of minutes after

1  that, within 15 minutes, that he wanted to see me,

2  that he was coming up to see me.

3     Q.   What happened once he got up to your office?

4     A.   He came into my office and said "I had time

5  to think about it.  I think I made a bad deal.  I'm

6  not going to sign the release."

7     CHAIRMAN RIECHERS:  What date was that?

8     MR. RUARK:  Q.  Was this April 29th.

9     A.   Yes.

10     Q.   So he told you that he wasn't going to sign

11  the release.  What did you say then?

12     A.   I said, "Dave, I think that that's, you

13  know, a bad move," and I said, "Now you are going to

14  force me to have to go after the rest of that trade

15  and I'm going to," and he said "Do what you have to

16  do," and he walked out.

17     Q.   What did you do at that point?

18     A.   I walked over to my girl Diane and gave

19  her -- given her instructions to not release any

20  funds from David's accounts, and the phone rang

21  while I was telling her that, and it was him

22  requesting a check.

23     Q.   Was he talking to Diane?

24     A.   He was calling Diane.

1      Q.   Did you take the phone?

2      A.   I took the phone.  I said, "David, I can't

3    release any funds on this account until we settle

4    this matter."

5      Q.   What did Mr. Sklena say?

6      A.   "Fine."

7      Q.   Now on April 22nd there was a check that had

8    been made out to Mr. Sklena that was signed by

9    Mr. Postel.

10     A.   Correct.

11     Q.   Did you know about that check on the

12   22nd?

13     A.   I did not.

14     Q.   When did you find out about it?

15     A.   Early May.

16     Q.   Was that before or after Mr. Postel left the

17   firm?

18     A.   After.

19     Q.   I just want to shift gears and ask you a

20   couple of questions about the company.  You said

21   that you thought today was your last day in

22   existence as a clearing firm.

23     A.   We are pretty close to the last day.

24     Q.   And did I understand you to say that you

1  transferred the business to --

2      A.    Most of the accounts went to Dennis Dorman

3  (phonetic), Charlie Carrie took some accounts, but

4  my retail business that my brother had been building

5  up all went to Dennis Dorman.

6      Q.    Why did you transfer the business to Dorman?

7      A.    It was the easiest transfer option for me,

8  because we share a computer infrastructure.  It

9  would cause the least interruption for the

10  electronic trader, which is still the bulk of our

11  business.  I felt it was the best avenue for our

12  customers.  It would cause the least amount of

13  duress.  Most of the customers would probably go

14  with Dorman because of that and most of the

15  employees would be able to keep their jobs.

16      Q.    On kind of a big picture question though,

17  why did you transfer business?  You don't have

18  any -- do you have any role now with a clearing firm

19  right now?

20      A.    I don't.

21      Q.    So you personally are entirely out of the

22  clearing business?

23      A.    Correct.

24      Q.    So the big picture question, why did you

173

1  transfer the business?

2      A.    Why did I transfer the business?

3      Q.    Why did you get out of the clearing

4  business?

5      A.    Because now I never have to worry about

6  somebody taking all my equity from me.

7      Q.    Do you recall when you began talking with

8  Dennis Dorman about this transfer?

9      A.    Yes, about two days after I met with Dave.

10  It may be the next day.  I actually met with Bob

11  Sheridan (sic) with his office manager.

12      Q.    Did you make any money on transferring this

13  business over to Mr. Dorman?

14      A.    No.  It's costing my company a lot of money.

15      Q.    So he --

16      A.    We are not making any money and I'm not

17  taking anything.  I wasn't really offered much, the

18  little bit I was offered, I would have to put in a

19  lot of -- I would have to put in some time and I'm

20  not prepare to do that.

21      MR. RUARK:  No further questions.  Oh, excuse me.

22      MR. RUARK:  Q.  Okay.  I'm sorry.  I do have one

23  follow-up question about Mr. Postel's resignation.

24      A.    Yes.

1    Q.   Now back on April 5th you had gone into

2  Mr. Postel's office to tell him about the resolution

3  of this matter with Mr. Sklena?

4    A.   Correct.

5    Q.   And you told him what?

6    A.   I told him that David and I reached an

7  agreement.  I wanted him to transfer $779,000,

8  whatever it was, out of David's account into our

9  company's error account.

10   Q.   Okay.  What did Mr. Postel say?

11   A.   He didn't say anything for a second.  He

12 hung his head, and I said, "Is there a problem?  Are

13 you going to do this for me?"  And he handed me --

14 he put a white envelope upon his shoulder and he

15 says, "I can't.  I can't do this any more," and he

16 said, "I'm giving you my two-week's notice," so the

17 letter was already typed.

18   Q.   Did Mr. Postel refuse to transfer the money?

19   A.   No.

20   MR. RUARK:  Okay.  I think that does conclude.

21 No further questions.

22   THE WITNESS:  As a matter of fact, I said to him

23 "Are you going to do this for me?"  He said, "Yeah."

24 Begrudgingly, "yes."

1       CHAIRMAN RIECHERS:  Mr. Early.

2                       DIRECT EXAMINATION

3                       BY

4                       MR. EARLY:

5       Q.   Mr. Bonfitto, my name is Scott Early and I

6  represent Mr. Sklena.  We have not met before.

7       A.   No, we have not met.

8       Q.   Now I want to ask you a few questions about

9  what you said on direct.  You talked on direct about

10  the conversations you had with Dave Sklena after the

11  March 5th trading day.  Do you recall that

12  testimony?

13      A.   I do.

14      Q.   Now when you said in your testimony that you

15  talked to David about what size he should trade, did

16  you put any written limits on his trading?

17      A.   I didn't.

18      Q.   Did you put any restrictions on his

19  computer?

20      A.   No.  It doesn't make any sense to do that.

21  You can put a 25 limit on someone, then they can do

22  25, 25, 25, 25.

23      Q.   So it's your testimony that trading

24  technology and the system doesn't make a failsafe

                                                    176

1  system whereby you can put restrictions on a

2  person's trading?

3      A.    That's not my testimony.  I didn't put any

4  written limits.  I didn't put any limit on his

5  computer.

6      Q.    Now at the same time, March of '05, you were

7  the principal owner of Lawrence Bonfitto, correct --

8      A.    Correct.

9      Q.    -- if not the sole owner, correct?

10     A.    I was the sole owner.

11     Q.    You were the sole owner?

12            So this is your money that's at risk?

13     A.    Correct.

14     Q.    And you are saying you were concerned about

15  David's trading, but you didn't put any written

16  limits on; is that correct?

17     A.    Correct.

18     Q.    Did you monitor his trading on a daily

19  basis?

20     A.    I asked.

21     Q.    Did you personally go check?

22     A.    No, I had somebody do that for me.  I had a

23  risk manager.

24     Q.    So you had somebody else do it?

1    A.    I did.

2    Q.    So it's your money and you asked somebody

3 else to do it?

4    A.    I did.

5    Q.    Did you tell him that he couldn't trade a

6 certain size?

7    A.    Did I tell David?

8    Q.    Did you tell Joe Postel, your risk manager,

9 that David couldn't trade a certain size?

10    A.    I told him I met with him.  He's to keep his

11 size down.

12    Q.    You didn't tell him to limit him to 50 or 20

13 lot?

14    A.    I don't recall if I said that to Joe.

15    Q.    I'm going to read you from your submission

16 in this case at Page 4, Paragraph 2, quote, and this

17 is in reference to the March 5th time frame,

18 "Bonfitto (sic) told Sklena in particular that he

19 had to stop taking 200 and 300 lot trades and reduce

20 the size of his trading to 20 or 50 lot."

21         And your testimony here is today you

22 don't recall whether you said that to David?

23    A.    I said that to David.

24    Q.    You said to start trading at 20 or 50 lots?

178

1      A.    I told him to trade 20 and 50 lots,

2  especially unemployment.

3      Q.    Did you tell that to Joe Postel?

4      A.    I may have.

5      Q.    Did you put it in writing?

6      A.    I did not.

7      Q.    Had you ever in the nine years that you had

8  been running Lawrence Bonfitto fired a local trader?

9      A.    Fired a local trader?

10     Q.    Yes, told him you weren't going to clear him

11  any more.

12     A.    I know our company had.  I don't know if I

13  had personally.

14     Q.    Your company had, the company in which you

15  were a major shareholder, if not the sole

16  shareholder?

17     A.    Yes.

18     Q.    So you knew that was an option you had?

19     A.    To let guys go?

20     Q.    Yes.

21     A.    Sure.

22     Q.    And you knew if you didn't when you put

23  people down on the floor you were at risk for trades

24  that they made.  That's what a clearing member does,

1  right?

2      A.    I'm solely at risk.

3      Q.    That's right.  You knew that?

4      A.    I did.

5      Q.    So you knew if you couldn't take anybody's

6  trading, you could fire them?

7      A.    I'm sorry.

8      Q.    If you didn't like the way one of your

9  customers were trading, you would let them go,

10  right?

11      A.    Right.

12      Q.    You didn't do that with David in March?

13      A.    Did I let him go in March?

14      Q.    Correct.

15      A.    No.

16      Q.    You didn't let him go in April either, did

17  you?

18      A.    No.

19      Q.    Now you referred to some discussions on the

20  morning of April 5th with Mr. Tom Cargie, a member

21  of the Exchange legal staff.  Do you recall that

22  testimony?

23      A.    I do.

24      Q.    Did Mr. Cargie tell you that Exchange

1  Regulations 33303A requires written trading limits

2  in order to freeze a customer's account?

3      A.    I don't recall that.

4      Q.    You don't recall that?

5      A.    I don't recall him telling me that.

6      Q.    Did you ask him?

7      A.    Did I ask him?

8      Q.    Right.

9      A.    No.

10      Q.    I think you also said you felt like Lee

11  Stern.  Do you recall that testimony?

12      A.    I felt like what happened to me it was the

13  same thing happened to Lee Stern.  I did say that.

14  I did feel that way.

15      Q.    Do you recall that on your direct testimony?

16      A.    Correct.

17      Q.    So you are familiar with what happened to

18  Lee Stern?

19      A.    I'm not familiar with all the details.  I

20  was in the pit when it happened, so I'm familiar

21  with the general story that has gone through the

22  Board of Trade.

23      Q.    So you don't know whether Gistolfo

24  (phonetic) Zimmerman, and Mr. Catalpa (phonetic)

1  were trading through Mr. Stern at that time had been

2  over at the CBOE in the trading room cooking up a

3  scheme months in advance of the time they pulled it

4  off in the pit?

5      A.    I didn't know that.

6      Q.    And you didn't know whether Marvin Barstoff

7  (phonetic), who was the risk manager for Lee Stern &

8  Company, got fooled into letting them on the floor

9  by a $50,000 check that was no good?

10     A.    I didn't know that.

11     Q.    You didn't know any of that?  Okay.  But you

12 still felt like Lee Stern, right?

13     A.    I did.

14     Q.    On the April 5th conversation you had with

15 David Sklena, who was in the room?

16     A.    Just me and him.

17     Q.    Just you two?

18     A.    Just me and him.

19     Q.    Both times?

20     A.    Both times.

21     Q.    Both times?

22            Now why don't you turn to the blue book

23 of the exhibit in front of you on your right.  Turn

24 if you would to Exhibit No. 9 I believe is the same

1  exhibit as in your book, except I just don't know

2  the number.

3           Is this the general lease you talked

4  about that you had your friend draw up after the

5  meeting you had with Dave Sklena?

6      A.    It is.

7      Q.    The second paragraph speaks of agreeing to

8  split 778, a million respectively between the two of

9  you.  Do you see that in the second sentence?

10     A.    On the second paragraph?

11     Q.    Second sentence in the second paragraph,

12  just read that to yourself if you would.

13     A.    (Witness read document.)  Okay.

14     Q.    Now the next sentence says "Set amounts were

15  disbursed on April 5, 2004."  Did David Sklena

16  receive a million dollars out of his trading account

17  on April 5th?

18     A.    He had -- well, 500,000 was in his trading

19  account.  A check for 500,000 was given to him.

20     Q.    So he didn't receive a check for a million.

21  He received a check for 500,000?

22     A.    He didn't receive a check for a million.  He

23  received a million dollars.

24     Q.    He couldn't withdraw cash from his trading

1    account without you permission, right?

2        A.    Could he withdraw cash?

3        Q.    He can't write checks on that account, he's

4    got to request them through you, correct?

5        A.    No.

6        Q.    He can request them -- he could write a

7    check on his own account?

8        A.    He requested them from either myself, or

9    Diane, or Joe.

10       Q.    He had to request it from someone at the

11   firm?

12       A.    He had to request them from someone at the

13   firm.

14       Q.    Now David Sklena never signed this, correct?

15       A.    He never signed it.

16       Q.    And you testified on direct you gave it to

17   Joe Postel to have him sign?

18       A.    Correct.

19       Q.    And you kept checking with Joe as to whether

20   or not he signed it?

21       A.    Correct.

22       Q.    Did you ever check with Dave?

23       A.    I didn't.

24       Q.    Now that between April 5th and the April 30

                                                    184

1    time when he left, that's almost the whole month of

2    April, you never checked with Dave as to whether or

3    not he was signing that?

4        A.    (Witness shook head.)

5        Q.    It is your money that was in the firm,

6    right?

7        A.    Correct.

8        Q.    And he's down there trading on the floor

9    every day?

10       A.    Correct?

11       Q.    You saw the trading that he was doing every

12   day?.

13       A.    Correct.

14       Q.    You saw the 500 lots, the 400 lots, the 300

15   lots repeatedly through the month of April after

16   this conversation with him, correct?

17       A.    I did.

18       Q.    And you never fired him?  You never told him

19   to leave?

20       A.    No.

21       Q.    You never cut off his clearing at that

22   point?

23       A.    No.

24       Q.    You never put written trading limits on him

1  after that, did you?

2    A.    No.

3    Q.    Joe Postel resigned on the 5th of April,

4  correct?

5    A.    Correct.

6    Q.    After the 5th of April, after Mr. Postel

7  resigned, did you review Dave's trading account

8  every day?

9    A.    I'm sorry?

10    Q.    After the 5th when Dave went back on the

11  floor, did you personally review his trading account

12  every day?

13    A.    Myself and Andy looked at his cards.  I

14  wasn't reviewing his statements.

15    Q.    You were looking at his cards?

16    A.    Yes.

17    Q.    So you saw his trading cards?

18    A.    I did.

19    Q.    Now you talked about when David left on the

20  last day you told him that he couldn't withdraw the

21  funds from his account, correct?

22    A.    I told him on the last day when he was at my

23  firm when he said that he was backing out of the

24  deal.

1    Q.    I think it was the 29th according to your

2  counsel's testimony.

3    A.    Yes.

4    Q.    You said you had a phone conversation with

5  David when he picked up -- and called to have his

6  funds transferred and you picked up the phone.  You

7  told him he couldn't have his funds, correct?

8    A.    Correct.

9    Q.    And that was about $168,000; is that

10  correct?

11    A.    Correct.

12    Q.    Where's the money today?

13    A.    It's sitting in his account in my firm.

14    Q.    Just could I have just a moment,

15  Mr. Chairman?

16    CHAIRMAN REICHERS:  Sure.

17                              (A brief pause.)

18              We're back on.

19    MR. EARLY:  Q.  Mr. Bonfitto, were you aware that

20  Lawrence Bonfitt was on daily reporting to the

21  clearing corporation?

22    A.    Was I aware that they were on daily

23  reporting?

24    Q.    Meaning your firm, Lawrence Bonfitt, was on

1  daily reporting to the clearing corporation?

2     A.   I knew at one point that when Steve and I

3  were having our disagreement that we were on daily

4  reporting.  I didn't know if we were on daily

5  reporting still.

6     Q.   You didn't know that?

7     A.   I didn't know that.

8     MR. EARLY:  I have no further questions.

9     CHAIRMAN RIECHERS:  Any redirect?

10     MR. RUARK:  Yes, I have just a few redirect

11  questions.

12                REDIRECT EXAMINATION

13                BY

14                MR. RUARK:

15     Q.   During the period between April 5th and

16  April 29th, you indicated that you didn't speak to

17  Mr. Sklena about the agreement.

18          Did Mr. Sklena tell you that he didn't

19  consent to the agreement or he didn't -- or that he

20  objected to the agreement at any time during that

21  same period?

22     A.   No.

23     Q.   Now in the period between April 22nd and

24  April 29th, did you believe that there was still

1    $450,000 or the -- excuse me.  Did you believe that

2    the $450,000 that was withdrawn from Mr. Sklena's

3    account on the 22nd was still in the account?

4        A.    Very much so.

5        Q.    So you didn't know that that was gone until

6    sometime in May?

7        A.    Correct.

8        Q.    I've got just a couple of items to show you.

9    First, I would like to point to Tab No. 32 in the

10   black exhibit book.  Down at the very bottom of that

11   on page -- it's actually -- there's a 322 page

12   number in the center, but there's a handwritten 304.

13           If you turn to the next page, to 305,

14   at the very top of the page there's a Subparagraph

15   A, it says, "A nonclearing member trading in excess

16   of written limits prescribed by the carrying (sic)

17   clearing member, and/or if a nonclearing member is

18   alleged to have engaged in reckless or

19   unbusiness-like dealing inconsistent with just and

20   equitable principles of trading, the disposition of

21   any and all funds of a principal trading account may

22   be suspended by the carrying clearing member or by

23   the association through the Board of Directors

24   Executive Committee, the Floor Governor's Committee,

1    or Arbitration Committee pending determination by

2    the Arbitration Committee regarding the

3    appropriateness of nonclearing member's conduct."

4            Is there anything in there, that in the

5    language I just read, that says you absolutely must

6    have written limits or is there an and/or, that says

7    "and/or if a nonclearing member is alleged to have

8    engaged in reckless or unbusiness-like dealing

9    inconsistent with just and equitable principles of

10   trading?"

11   A.    There's an and/or.

12   Q.    Okay.  Thanks.

13           Now Mr. Early asked a couple of

14   questions regarding Lee B. Stern and perhaps I could

15   go into that.

16   CHAIRMAN RIECHERS:  John --

17   MR. RUARK:  Yes.  I just want to point to one

18   item.  It won't take truly --

19   CHAIRMAN RIECHERS:  Number one, do we need the

20   handouts?

21   MR. RUARK:  Yes.

22   CHAIRMAN RIECHERS:  Off the record, please.

23                       (Off the record.)

24           We are back on the record.

1      MR. RUARK:  No further questions.

2      MR. EARLY:  One, Mr. Chairman, as a result of

3  redirect.

4      CHAIRMAN RIECHERS:  Well, okay, one, Mr. Early.

5      MR. EARLY:  Thank you.

6      CHAIRMAN RIECHERS:  Sure.  Redirect on redirect.

7  Go ahead.

8                    REDIRECT EXAMINATION

9                    BY

10                    MR. EARLY:

11     Q.   Your counsel asked you about not having any

12  knowledge that the $450,000 check was cut on

13  April 22nd, and you didn't know that until May,

14  correct?

15     A.   Correct.

16     Q.   So you didn't check Dave Sklena's account at

17  all between April the 22nd and May?

18     A.   I did not.

19     MR. EARLY:  No further questions.

20     CHAIRMAN RIECHERS:  Okay.  Andy.

21     MR. WALLACE:  Not right now.

22     CHAIRMAN RIECHERS:  Sure.

23

24

EXAMINATION

BY

MS. DAVIS-ROGERS:

Q.   I'm just curious.  The relationship -- how would you categorize the relationship between you and Mr. Sklena between March and April?

A.   Between March and April?

Q.   Yes, the general relationship.

A.   The same as it has always been as far as being friends and customer.

Q.   So you categorize your relationship as friends as well?

A.   We were friends.

Q.   So I guess my next question would be, what, during the course of these events, would you say is the best explanation you have for not restricting or limiting his trading --

A.   During --

Q.   -- between March and April, the time he had the debit up until the occurrence of the alleged trade?

A.   I felt his trading was being monitored by Joe Postel and I told David that I wanted him to

1  trade small, and take it easy, and not do something

2  stupid, especially on unemployment.

3      Q.   After the trade, up until the time that he

4  left, you had no problem with the numbers he was

5  trading?

6      A.   I had a problem with the numbers he was

7  trading.

8      Q.   Why didn't you restrict his trading at that

9  point?

10     A.   Because I had over 500,000 in the account to

11  work with and I wanted to get the release signed for

12  my company.  I felt like if I limited trading, you

13  know, or I'm going to -- I don't want to clear the

14  firm any more, we were going to end up here.

15     MS. DAVIS-ROGERS:  No further questions.

16     CHAIRMAN RIECHERS:  George.

17     MR. BAKOURIS:  Nothing.

18     CHAIRMAN RIECHERS:  Jimmy.

19     MR. SCHWARTZ:  (Shaking head.)

20     CHAIRMAN RIECHERS:  Jimmy.

21     MR. SCHWARTZ:  Nothing.

22     CHAIRMAN RIECHERS:  I can't see your face.

23     MR. SCHWARTZ:  I'm sorry.

24     CHAIRMAN RIECHERS:  I'm sounding like Scott Early

1  now.

2                        EXAMINATION

3                        BY

4                        CHAIRMAN RIECHERS:

5      Q.    Joe, a couple of questions.  I'm curious

6  about the conversations that you and Dave had alone.

7      A.    Yes.

8      Q.    Did you condition Dave's return on the

9  floor, his access to the trading pit, as part of

10 your "deal" with him?

11     A.    Yes.  Well, the condition was that the rest

12 of the money had to stay in the account.

13     Q.    The rest of the money had to stay in the

14 account, $778,000 Lawrence Bonfitto; he could keep

15 the million; you'd cut him a check right away was

16 part of the benefit of this agreement, you had him

17 return to the floor to trade?  Could he go to the

18 floor and trade?

19     A.    Yes.

20     Q.    In your mind if he -- you had testified that

21 you were waiting for him to sign the release?

22     A.    Right.

23     Q.    So, in your mind if he would have said at

24 this point I'm not going to sign the release, you

1  would have said you are out of here?

2      A.    Correct.

3      Q.    You would not have let him go back to the

4  floor?

5      A.    No.

6      Q.    For two weeks then you were expecting him to

7  return the release.  And did you assume that his

8  lawyer was -- you know, you are waiting for the

9  clearing from his lawyer?

10     A.    I assumed the first week I was going to get

11 it back.  As time went on, I became to be a little

12 suspect that it wasn't coming.  I was hopeful it was

13 coming.  As longer time went on, I was starting to

14 get a little suspect.

15     Q.    When you saw the days he was trading

16 thousand lots, they were not unemployment?

17     A.    That was just the last day that he was with

18 me, the two separate 1,000 lots, and that's when I

19 told my trade checker Andy I don't care about the

20 release, that's it for me.  He's gone.

21     Q.    Where is the $778,000 now?

22     A.    In the company's error account.

23     Q.    Dorman?

24     A.    No, I still have my books.  They're

1  segregated.

2      Q.    They are?

3      A.    I have to add to that, Rick.  After the

4  negotiations had taken place and after Joe Postel

5  had resigned -- my sister works for me, and knows

6  everything about the gossip that goes on the floor,

7  came to me and said I think you should be careful.

8  I heard Dave Sklena offered Joe Postel a job.  I

9  began to suspect that there might be something going

10  on behind my back within my own firm.  I transferred

11  $800,000 from my company error account to my

12  personal bank so nobody could steal it.

13      CHAIRMAN RIECHERS:  Okay.  What's the total

14  amount of customer segregated funds at Bonfitto now?

15      THE WITNESS:  We are at about --

16      CHAIRMAN RIECHERS:  Would it be at Dorman?

17      THE WITNESS:  No, we are still overcapitalized.

18  We are over about 2.6 million.

19      CHAIRMAN RIECHERS:  That's all I have.

20              Jimmy, did you have something?

21                  EXAMINATION

22                  BY

23                  MR. SCHWARTZ:

24      Q.    So, in essence, you somewhat backed off on

# EXHIBIT 3

## Time and Sales - Price Detail

### 5 Year Treasury Notes 04Jun for April 2, 2004

| Date | Time | Contract | Type | Price | Correction | Seq # |
|---|---|---|---|---|---|---|
| Apr 2 | 07:20:10 | FV 04Jun | | 113055 | | 1 |
| Apr 2 | 07:20:12 | FV 04Jun | | 113050 | | 2 |
| Apr 2 | 07:20:28 | FV 04Jun | | 113055 | | 3 |
| Apr 2 | 07:20:52 | FV 04Jun | | 113050 | | 4 |
| Apr 2 | 07:21:35 | FV 04Jun | Open | 113055<br>113050 | | 5 |
| Apr 2 | 07:23:12 | FV 04Jun | | 113045 | | 6 |
| Apr 2 | 07:23:41 | FV 04Jun | | 113040 | | 7 |
| Apr 2 | 07:23:48 | FV 04Jun | | 113045 | | 8 |
| Apr 2 | 07:23:49 | FV 04Jun | | 113040 | | 9 |
| Apr 2 | 07:25:01 | FV 04Jun | | 113045 | | 10 |
| Apr 2 | 07:25:10 | FV 04Jun | | 113040 | | 11 |
| Apr 2 | 07:27:17 | FV 04Jun | | 113035 | | 12 |
| Apr 2 | 07:27:26 | FV 04Jun | | 113030 | | 13 |
| Apr 2 | 07:27:31 | FV 04Jun | | 113035 | | 14 |
| Apr 2 | 07:27:52 | FV 04Jun | Fast | 113040 | | 15 |
| Apr 2 | 07:28:50 | FV 04Jun | Fast | 111220 | Cancelled at 07:29:33 | 16 |
| Apr 2 | 07:29:04 | FV 04Jun | Fast | 112220 | | 17 |
| Apr 2 | 07:29:24 | FV 04Jun | Fast | 112260 | | 18 |
| Apr 2 | 07:30:34 | FV 04Jun | Fast | 112060 | | 19 |
| Apr 2 | 07:30:46 | FV 04Jun | Fast | 112090 | Cancelled at 09:05:00 | 20 |
| Apr 2 | 07:30:49 | FV 04Jun | Fast | 112135 | Cancelled at 09:05:10 | 21 |
| Apr 2 | 07:30:53 | FV 04Jun | Fast | 111135 | | 22 |
| Apr 2 | 07:31:03 | FV 04Jun | Fast | 111150 | | 23 |
| Apr 2 | 07:31:06 | FV 04Jun | Fast | 111170 | | 24 |
| Apr 2 | 07:31:12 | FV 04Jun | Fast | 111150 | | 25 |
| Apr 2 | 07:31:28 | FV 04Jun | Fast | 111070 | | 26 |
| Apr 2 | 07:31:35 | FV 04Jun | Fast | 111050 | | 27 |
| Apr 2 | 07:31:46 | FV 04Jun | Fast | 111035 | Cancelled at 07:35:04 | 28 |
| Apr 2 | 07:31:51 | FV 04Jun | Fast | 111135 | | 29 |
| Apr 2 | 07:32:09 | FV 04Jun | Fast | 111150 | | 30 |
| Apr 2 | 07:32:25 | FV 04Jun | Fast | 111200 | | 31 |
| Apr 2 | 07:32:31 | FV 04Jun | Fast | 111220 | | 32 |
| Apr 2 | 07:32:38 | FV 04Jun | Fast | 111230 | | 33 |
| Apr 2 | 07:32:44 | FV 04Jun | Fast | 111240 | | 34 |
| Apr 2 | 07:32:47 | FV 04Jun | Fast | 111250 | | 35 |
| Apr 2 | 07:33:06 | FV 04Jun | Fast | 111230 | | 36 |
| Apr 2 | 07:33:08 | FV 04Jun | Fast | 111250 | | 37 |
| Apr 2 | 07:33:11 | FV 04Jun | Fast | 111230 | | 38 |

141

| Apr 2 | 07:33:29 | FV 04Jun | Fast | 111240 | | 39 |
|---|---|---|---|---|---|---|
| Apr 2 | 07:33:38 | FV 04Jun | Fast | 111250 | | 40 |
| Apr 2 | 07:33:58 | FV 04Jun | Fast | 111240 | | 41 |
| Apr 2 | 07:33:59 | FV 04Jun | Fast | 111245 | | 42 |
| Apr 2 | 07:34:06 | FV 04Jun | Fast | 111235 | | 43 |
| Apr 2 | 07:34:09 | FV 04Jun | Fast | 111230 | | 44 |
| Apr 2 | 07:34:51 | FV 04Jun | Fast | 111255 | | 45 |
| Apr 2 | 07:35:08 | FV 04Jun | Fast | 111260 | | 46 |
| Apr 2 | 07:35:28 | FV 04Jun | Fast | 111300 | | 47 |
| Apr 2 | 07:35:48 | FV 04Jun | Fast | 112000 | | 48 |
| Apr 2 | 07:36:02 | FV 04Jun | Fast | 112020 | | 49 |
| Apr 2 | 07:36:03 | FV 04Jun | Fast | 112040 | | 50 |
| Apr 2 | 07:36:07 | FV 04Jun | Fast | 112050 | | 51 |
| Apr 2 | 07:36:51 | FV 04Jun | Fast | 112045 | | 52 |
| Apr 2 | 07:37:03 | FV 04Jun | Fast | 112030 | | 53 |
| Apr 2 | 07:37:10 | FV 04Jun | Fast | 112010 | | 54 |
| Apr 2 | 07:37:23 | FV 04Jun | Fast | 112020 | | 55 |
| Apr 2 | 07:37:24 | FV 04Jun | Fast | 112025 | | 56 |
| Apr 2 | 07:37:26 | FV 04Jun | Fast | 112020 | | 57 |
| Apr 2 | 07:38:09 | FV 04Jun | Fast | 112025 | | 58 |
| Apr 2 | 07:38:24 | FV 04Jun | Fast | 112030 | | 59 |
| Apr 2 | 07:38:56 | FV 04Jun | Fast | 112025 | | 60 |
| Apr 2 | 07:38:57 | FV 04Jun | Fast | 112020 | | 61 |
| Apr 2 | 07:39:15 | FV 04Jun | Fast | 112025 | | 62 |
| Apr 2 | 07:39:16 | FV 04Jun | Fast | 112030 | | 63 |
| Apr 2 | 07:39:30 | FV 04Jun | Fast | 112050 | | 64 |
| Apr 2 | 07:40:11 | FV 04Jun | Fast | 112060 | | 65 |
| Apr 2 | 07:40:12 | FV 04Jun | Fast | 112080 | | 66 |
| Apr 2 | 07:40:27 | FV 04Jun | Fast | 112070 | | 67 |
| Apr 2 | 07:40:40 | FV 04Jun | Fast | 112060 | | 68 |
| Apr 2 | 07:40:44 | FV 04Jun | Fast | 112055 | | 69 |
| Apr 2 | 07:41:14 | FV 04Jun | Fast | 112050 | | 70 |
| Apr 2 | 07:41:34 | FV 04Jun | Fast | 112030 | | 71 |
| Apr 2 | 07:42:11 | FV 04Jun | Fast | 112010 | | 72 |
| Apr 2 | 07:42:28 | FV 04Jun | Fast | 112005 | | 73 |
| Apr 2 | 07:42:30 | FV 04Jun | Fast | 112000 | | 74 |
| Apr 2 | 07:42:37 | FV 04Jun | Fast | 111315 | | 75 |
| Apr 2 | 07:42:51 | FV 04Jun | Fast | 111310 | | 76 |
| Apr 2 | 07:43:23 | FV 04Jun | Fast | 111305 | | 77 |
| Apr 2 | 07:43:29 | FV 04Jun | Fast | 111295 | | 78 |
| Apr 2 | 07:44:00 | FV 04Jun | Fast | 111300 | | 79 |
| Apr 2 | 07:44:32 | FV 04Jun | Fast | 111310 | | 80 |
| Apr 2 | 07:44:38 | FV 04Jun | Fast | 111305 | | 81 |

142

| Apr 2 | 07:44:39 | FV 04Jun | Fast | 111300 | | 82 |
|---|---|---|---|---|---|---|
| Apr 2 | 07:45:34 | FV 04Jun | Fast | 111280 | | 83 |
| Apr 2 | 07:45:57 | FV 04Jun | Fast | 111275 | | 84 |
| Apr 2 | 07:46:27 | FV 04Jun | Fast | 111270 | | 85 |
| Apr 2 | 07:46:55 | FV 04Jun | Fast | 111275 | | 86 |
| Apr 2 | 07:47:51 | FV 04Jun | Fast | 111250 | | 87 |
| Apr 2 | 07:48:27 | FV 04Jun | Fast | 111245 | | 88 |
| Apr 2 | 07:49:05 | FV 04Jun | Fast | 111250 | | 89 |
| Apr 2 | 07:49:50 | FV 04Jun | Fast | 111255 | | 90 |
| Apr 2 | 07:50:23 | FV 04Jun | Fast | 111260 | | 91 |
| Apr 2 | 07:51:01 | FV 04Jun | Fast | 111270 | | 92 |
| Apr 2 | 07:51:04 | FV 04Jun | Fast | 111275 | | 93 |
| Apr 2 | 07:51:15 | FV 04Jun | Fast | 111280 | | 94 |
| Apr 2 | 07:51:48 | FV 04Jun | Fast | 111275 | | 95 |
| Apr 2 | 07:52:28 | FV 04Jun | Fast | 111285 | | 96 |
| Apr 2 | 07:53:52 | FV 04Jun | Fast | 111290 | | 97 |
| Apr 2 | 07:53:55 | FV 04Jun | Fast | 111285 | | 98 |
| Apr 2 | 07:55:34 | FV 04Jun | | 111290 | | 99 |
| Apr 2 | 07:55:35 | FV 04Jun | | 111295 | | 100 |
| Apr 2 | 07:56:07 | FV 04Jun | | 111300 | | 101 |
| Apr 2 | 07:57:18 | FV 04Jun | | 111315 | | 102 |
| Apr 2 | 07:57:21 | FV 04Jun | | 112000 | | 103 |
| Apr 2 | 07:57:42 | FV 04Jun | | 112005 | | 104 |
| Apr 2 | 07:58:33 | FV 04Jun | | 112010 | | 105 |
| Apr 2 | 07:58:33 | FV 04Jun | | 112015 | | 106 |
| Apr 2 | 07:59:30 | FV 04Jun | | 112020 | | 107 |
| Apr 2 | 08:00:20 | FV 04Jun | | 112025 | | 108 |
| Apr 2 | 08:00:31 | FV 04Jun | | 112030 | | 109 |
| Apr 2 | 08:00:53 | FV 04Jun | | 112025 | | 110 |
| Apr 2 | 08:00:58 | FV 04Jun | | 112020 | | 111 |
| Apr 2 | 08:01:10 | FV 04Jun | | 112015 | | 112 |
| Apr 2 | 08:01:57 | FV 04Jun | | 112020 | | 113 |
| Apr 2 | 08:04:11 | FV 04Jun | | 112025 | | 114 |
| Apr 2 | 08:04:44 | FV 04Jun | | 112030 | | 115 |
| Apr 2 | 08:09:18 | FV 04Jun | | 112025 | | 116 |
| Apr 2 | 08:09:23 | FV 04Jun | | 112020 | | 117 |
| Apr 2 | 08:09:25 | FV 04Jun | | 112015 | | 118 |
| Apr 2 | 08:12:12 | FV 04Jun | | 112010 | | 119 |
| Apr 2 | 08:12:34 | FV 04Jun | | 112015 | | 120 |
| Apr 2 | 08:13:27 | FV 04Jun | | 112020 | | 121 |
| Apr 2 | 08:13:40 | FV 04Jun | | 112025 | | 122 |
| Apr 2 | 08:14:06 | FV 04Jun | | 112020 | | 123 |
| Apr 2 | 08:15:45 | FV 04Jun | | 112015 | | 124 |

143

# EXHIBIT 4



**THE WALL STREET JOURNAL.**
O N L I N E

**April 5, 2004**

# Get Ready, Get ... GO! Bond Slide Preceded Jobs Report by Minutes

**By GREGORY ZUCKERMAN**
**Staff Reporter of THE WALL STREET JOURNAL**
*April 5, 2004; Page C6*

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

It is Wall Street's multimillion-dollar mystery.

Minutes before the Labor Department released a surprisingly upbeat report Friday on March's employment situation, bond prices started tumbling. Traders, hunched over their computer screens counting down to the official release at 8:30 a.m. Eastern time of the data, jumped to a universal conclusion: Someone, somehow, got their hands on the crucial news and was dumping bonds.

Between 8:28 a.m. and 8:30 a.m., the June bond-futures contract, which allows investors to bet on the price of a basket of U.S. Treasury bonds, tumbled from a price of 113.12 to a low of 112.07. That is a big move for a full day in the bond market -- and a huge move for just a two-minute period.

"The number is leaked!" someone screamed on the floor of the Chicago Board of Trade, where futures contracts on bonds are traded. "What's going with the bond?" another trader yelled out.

On the bond trading floor at Credit Suisse Group's Credit Suisse First Boston in New York, traders furiously checked the newswires on their desks but couldn't figure out what was going on.

When the official announcement came out at 8:30 that 308,000 jobs were added in March, more than double what the market was expecting, bond prices fell still further. In less than five minutes the bond futures contract fell to just over 108. It was at 110 late in the afternoon. Anyone dumping bond holdings in the minutes before the 8:30 a.m. announcement saved big bucks. Anyone buying investments that go up when bonds fall in those few minutes put himself in a position to make a fortune.

Burned by the move, traders caught on the wrong side of the action searched for an explanation. Government officials also were hunting. They soon found what appeared to be the answer: A report written by **Reuters** PLC's newswire, with all the details of the jobs report, had appeared on the finance page of **Yahoo**'s Web site and some other Internet sites. And the story had a time stamp of 8:28 a.m. on it, the very same time bonds began collapsing.

It all made sense. Employment reports are one of the most closely held secrets in Washington. When it comes to the employment report, reporters usually are provided with all of the figures ahead of time, on an embargoed basis, to enable them to write stories that appear when the Labor Department makes its 8:30 a.m. announcement. Someone at Reuters must have pressed the button too early, investors concluded.

Not so fast, Reuters quickly said. The news service said it wasn't the one that leaked. It didn't send anything out

until 8:30 a.m. The reason the report was stamped with an 8:28 a.m. time on it? There was a "defective clock" in a London office. Reuters stories that appear on online sites such as Yahoo are sent through the company's London office. Due to a glitch in a clock over there, the 8:30 a.m. story was given an 8:28 a.m. time stamp.

"Markets moved ahead of the news. Reuters did not break the embargo," said Steve Naru, head of media relations at Reuters. "A Reuters clock in [London] wasn't set properly, and while the story was issued on time, it carried an early time stamp and went out to a few major online clients with the wrong time stamp."

So if the Reuters story didn't appear on Yahoo and other Web sites until 8:30, why did bonds start falling at 8:28 a.m.? A spokesman for Reuters was unsure. "Yes, it's a pretty big coincidence," said Reuters spokeswoman Samantha Topping.

A Yahoo spokesman late Sunday said the company received the report from Reuters at 8:30 a.m. and posted it immediately.

Meanwhile, the Labor Department said it didn't appear that there was a leak, at least from its offices. "We don't believe there was any leak from the news services," said a department spokeswoman.

"Markets sometimes take running starts, every once in a while they do this," said Robert Brusca, an economist at Fact and Opinion Economics, a research firm. "The atmosphere is charged and if someone makes like they know something, or makes a lucky guess, you can convince the rest of the market to go along."

Other traders weren't buying it though. "It just seems unlikely that someone would go on a wild-goose chase before very important data came out," says Lou Brien, strategist at DRW Trading, a Chicago-based trading firm.

By the end of the day the Securities and Exchange Commission and the Commodity Futures Trading Commission had launched investigations into the trading before the report.

For its part, Reuters says it will update its London clock more frequently.

**—Joseph Rebello, Aaron Lucchetti and Deborah Solomon contributed to this article.**

**Write to** Gregory Zuckerman at gregory.zuckerman@wsj.com[1]

URL for this article:
http://online.wsj.com/article/0,,SB108112465153873963,00.html

Hyperlinks in this Article:
(1) mailto:gregory.zuckerman@wsj.com

Copyright 2004 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

223