# EXHIBIT 11

**BEFORE THE ARBITRATION**
**EXECUTIVE COMMITTEE**
**OF THE CHICAGO BOARD OF TRADE**

DAVID SKLENA,               )
                                    )
          Claimant,            )
                                    )
       vs.                    )
                                    )
LAWRENCE-BONFITTO TRADING   )
COMPANY and JOSEPH BONFITTO   )
                                    )
        Respondents.        )
                                    )

## AMENDED STATEMENT OF CLAIM

Now comes Claimant, DAVID SKLENA ("Sklena"), by and through his attorneys, Foley & Lardner LLP, as and for his Amended Statement of Claim requests that this Committee enter a decision awarding Sklena all of the proceeds from his trading account at Respondent Lawrence-Bonfitto Trading Company ("L/B") which proceeds are being fraudulently withheld by the firm at the direction of Respondent Joseph Bonfitto ("Bonfitto"). In support thereof, Sklena states as follows:

### Factual Background

1.    David Sklena ("Sklena") has been a member of the Exchange since 1990. He currently owns an Associate Membership.

2.    For nine (9) years, Sklena has been a substantial broker and local trader in the Ten Year Treasury Note pit clearing his trades through L/B.

3.    Throughout that time, Sklena's trading has resulted in substantial profits and substantial debits with both profits and debits amounting to several hundred thousand dollars. All debits have been promptly and fully satisfied by Sklena.

4.    L/B and Sklena have never agreed to any written (or oral) limitations regarding Sklena's trading.

5.    For the month ending March 31, 2004, Sklena maintained a positive equity balance in excess of $160,000 in his trading account at L/B.

6.    On April 2, 2004, Sklena occupied his usual spot in the Ten Year Treasury Note pit at the opening of trade.  As has been his recent practice, Sklena had immediate access to his computer in the pit to allow him to trade electronically.

7.    That morning, rumors were circulating regarding a premature release of the unemployment data.  As a result, trading was active and prices began to move downward just prior to the release of the unemployment data at 7:30 a.m. CST.

8.    After the release of the unemployment data at 7:30 a.m. CST, the market continued to decline sharply.  As a consequence of this market activity, Sklena observed a significant difference develop between prices that were bid on the computer and those offers prevailing in the pit.

9.    Sklena noticed various brokers in the pit actively offering to sell below the prevailing bids on the computer screen.  In reliance upon these price differentials, Sklena lifted a broker's offer.  Upon lifting the broker's offer, the broker confirmed the quantity of the trade to be 2,274 contracts.

10.    Sklena immediately offset 500 contracts in the pit to limit his exposure.  He then proceeded to sell the remainder of his long position in 50-lot increments on the computer until he had evened out his position.  In total, Sklena flattened his position within eight (8) minutes.

2

11. All trades were promptly checked, confirmed without exception and cleared on the April 2, 2004 morning clearing run without any problems whatsoever.

12. On April 2, 2004 Sklena earned proceeds in his trading account at L/B resulting from these trades totaling in excess of $1,778,000.

13. In addition to the trading proceeds exceeding $1,778,000 from April 2, 2004, Sklena also continued to maintain a positive equity balance in excess of $160,000 in his trading account at L/B.

14. On April 5, 2004, David Sklena met with Joseph Bonfitto, President and principal shareholder of L/B, at Bonfitto's request.

15. Bonfitto told Sklena that Sklena's trades on April 12, 2004 were too large and that, as a result, Bonfitto was being forced by the Clearing Corporation to deposit additional funds to continue his clearing business. As a consequence, Bonfitto stated that he intended to close L/B as a clearing firm rather than have the Exchange "do it for him."

16. Bonfitto further told Sklena that all his trading profits were being confiscated by L/B to "pay all the people you [Sklena] just put out of work."

17. On information and belief, neither L/B nor Bonfitto has ever been told by the Exchange clearing officers that Sklena's trades had created a problem for L/B with regard to clearing.

18. After continued discussions on April 5, 2004, regarding Sklena's trading proceeds, Bonfitto stated that he would be willing to accept $778,683 of the $1,778,683 in Sklena's trading account and would allow Sklena to withdraw $1,000,000 of the trading proceeds that he had earned.

3

19.   Bonfitto subsequently offered Sklena a legal release in an attempt to legitimize his efforts to extract in excess of $778,000 from Sklena.  Sklena never signed the release that Bonfitto presented to Sklena.

20.   On April 29, 2004, after Sklena had an opportunity to seek counsel and observed the fact that Bonfitto was not being "forced to close his clearing firm," Sklena told Bonfitto that L/B had no right to any of Sklena's trading account proceeds or any of the prior equity balance maintained in Sklena's trading account.  Bonfitto consequently told Sklena he had confiscated all the existing proceeds (in excess of $938,683) from Sklena's trading account and he would sue Sklena for the entire amount (in excess of $1,938,683.00).

21.   On April 30, 2004, Sklena filed with the Exchange new primary clearing registration forms whereby First Futures Division of Refco Group Ltd., LLC ("First Futures") agreed to become Sklena's new primary clearing member.

22.   On May 4, 2004, Sklena demanded the release of all assets held in his trading account at L/B and the release of his primary clearing member status from L/B and Bonfitto. (Attached hereto as Exhibit A is a copy of Sklena's demand notice).

23.   On May 5, 2004, in response to Sklena's demand, counsel for L/B and Bonfitto stated that L/B and Bonfitto was refusing to release the assets in Sklena's trading account (funds that L/B and Bonfitto had wrongfully confiscated) but would release Sklena's primary clearing member status. (Attached hereto as Exhibit B is a copy of L/B and Bonfitto's response to Sklena's demand notice).

24.   On May 6, 2004, L/B and Bonfitto released Sklena's primary clearing member status allowing Sklena to trade through First Futures.  L/B and Bonfitto have continued to wrongfully withhold the release of Sklena's funds in excess of $983,683.

4

## CLAIM FOR RELIEF

25.   Sklena restates and incorporates by reference the allegations set forth in paragraphs 1

through 24 of the Amended Statement of Claim as though fully set forth herein.

26.   L/B and Joseph Bonfitto have refused to release the assets held in Sklena's trading

account at L/B by attempting to assert a right pursuant to Exchange Regulation 333.03(a).

27.   Regulation 333.03(a) provides, in pertinent part, that:

> "If a non-clearing member trades in excess of <u>written</u> limits
> prescribed by the carrying clearing member, and/or if the non-
> clearing member is alleged to have engaged in <u>reckless</u> <u>and</u>
> <u>unbusinesslike dealing</u> inconsistent with just and equitable
> principles of trade, the disposition of any and all funds in the
> applicable trading account(s) may be suspended by the clearing
> member...pending a determination by the Arbitration Committee
> regarding the appropriateness of the non-clearing member's
> conduct." [Emphasis added].

28.   No written (or oral) limits on Sklena's trading have ever been in place at L/B.

29.   Sklena's trading on April 2, 2004 was manifestly not "reckless" or "unbusinesslike."

30.   Regulation 333.03(b) provides that where the primary clearing member suspends trading

account proceeds, this Committee will review that suspension to ". . . determine if

sufficient grounds exist to warrant continuation of the suspension pending a final

determination by the Arbitration Committee."

31.   Neither L/B nor Joseph Bonfitto have "sufficient grounds" to suspend the profits or

confiscate the equity that Sklena earned in his trading account. Sklena's trading on April

2, 2004 was as close to riskless arbitrage as can occur within the marketplace.

011.1195217.2

32.    Neither L/B nor Joseph Bonfitto have any basis whatsoever to confiscate the $160,000 of trading account equity in Sklena's account which is totally unrelated to Sklena's April 2, 2004 trading.

**PRAYER FOR RELIEF**

WHEREFORE, Sklena requests this Committee enter a Decision providing that:

a)    L/B and Bonfitto release the equity balance in excess of $160,000 held in Sklena's trading account as of the month end March 31, 2004;

b)    L/B and Bonfitto release the $778,683 in trading proceeds earned by Sklena and previously maintained in Sklena's trading account (with interest) from April 2, 2004;

c)    L/B and Bonfitto pay Sklena interest on his trading proceeds as well as all his legal fees and expenses incurred in obtaining this Committee's Decision; and

d)    Such further relief as the Committee considers to be just and proper.

Dated:  July 16, 2004

Respectfully submitted,

DAVID SKLENA

By _____

Foley & Lardner LLP
Counsel for David Sklena

Scott E. Early, Esq.
Jerald L. Jeske, Esq.
Foley & Lardner, LLP
321 North Clark Avenue
Suite 2800
Chicago, IL 60610
Phone (312) 832-4500
Fax    (312) 832-4700

011.1195217.2

## CERTIFICATE OF SERVICE

I, the undersigned, certify that I served a copy of Amended Statement of Claim on this

16th day of July, 2004, before the hour of 5:00 p.m. on the following:


**BY MESSENGER DELIVERY**
Sean A. Gallagher, Esq.
Chicago Board of Trade.
141 W. Jackson Blvd., Suite 600
Chicago, Illinois 60604

**BY U.S. MAIL:**
John D. Ruark, Esq.
Lawrence, Kamin, Saunders & Uhlenhop, LLC
208 S. LaSalle Street, Suite 1750
Chicago, IL 60604-1188


Subscribed and Sworn to before me
this 16th day of July, 2004

Notary Public

OFFICIAL SEAL
HEIDI VAN HOWE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-26-2006

7

011.1195217.2

# FOLEY

FOLEY & LARDNER LLP
ATTORNEYS AT LAW

321 NORTH CLARK STREET
SUITE 2800
CHICAGO, IL  60610-4764
312.832.4500 TEL
312.832.4700 FAX
www.foley.com

May 4, 2004

WRITER'S DIRECT LINE
312.832.4352
searly@foley.com EMAIL

CLIENT/MATTER NUMBER
069953-0103

VIA FACSIMILE (312) 341-7779 AND MESSENGER

Mr. Joseph Bonfitto
Lawrence-Bonfitto Trading Company
141 West Jackson Boulevard
Suite 2450
Chicago, Illinois 60604

Re:     Mr. David Sklena

Dear Mr. Bonfitto:

Please be advised that this firm represents Mr. David Sklena.  Mr. Sklena has filed new Primary Clearing Member ("PCM") authorizations at First Futures Division of Refco Group Ltd., LLC ("First Futures") with the Chicago Board of Trade.  It is our understanding that you have refused to release Mr. Sklena from Lawrence-Bonfitto Trading Company to First Futures and suspended transfer of the proceeds of Mr. Sklena's trading account.  We hereby demand that you approve these releases immediately.

This correspondence is intended to provide you with notice that if PCM status is not released by the close of business (5:00 p.m. CST) tomorrow, May 5, 2004, we have been authorized to proceed on Mr. Sklena's behalf to petition for the Exchange to compel the release of both PCM status and the proceeds of Mr. Sklena's trading account pursuant to Exchange Regulation 333.03(b).

Sincerely,

Foley & Lardner LLP

By: _Scott E. Early_

Scott E. Early
Counsel for David Sklena

cc:     Mr. Sean Gallagher
        Mr. Dean Payton
        Ms. Nancy Binion Dye

# FOLEY

**FOLEY & LARDNER LLP**
**ATTORNEYS AT LAW**

321 NORTH CLARK STREET
SUITE 2800
CHICAGO, IL 60610-4764
312.832.4500 TEL
312.832.4700 FAX
www.foley.com

WRITER'S DIRECT LINE
312.832.4352
searly@foley.com EMAIL

CLIENT/MATTER NUMBER
069953-0103

May 4, 2004

VIA FACSIMILE (312) 341-7779 AND MESSENGER

Mr. Joseph Bonfitto
Lawrence-Bonfitto Trading Company
141 West Jackson Boulevard
Suite 2450
Chicago, Illinois 60604

    Re: Mr. David Sklena

Dear Mr. Bonfitto:

    Please be advised that this firm represents Mr. David Sklena. Mr. Sklena has filed new Primary Clearing Member ("PCM") authorizations at First Futures Division of Refco Group Ltd., LLC ("First Futures") with the Chicago Board of Trade. It is our understanding that you have refused to release Mr. Sklena from Lawrence-Bonfitto Trading Company to First Futures and suspended transfer of the proceeds of Mr. Sklena's trading account. We hereby demand that you approve these releases immediately.

    This correspondence is intended to provide you with notice that if PCM status is not released by the close of business (5:00 p.m. CST) tomorrow, May 5, 2004, we have been authorized to proceed on Mr. Sklena's behalf to petition for the Exchange to compel the release of both PCM status and the proceeds of Mr. Sklena's trading account pursuant to Exchange Regulation 333.03(b).

    Sincerely,

    Foley & Lardner LLP

    By: _Scott E. Early_
      Scott E. Early
     Counsel for David Sklena

cc: Mr. Sean Gallagher
  Mr. Dean Payton
  Ms. Nancy Binion Dye

BRUSSELS  LOS ANGELES  ORLANDO  SAN FRANCISCO  TAMPA
CHICAGO  MADISON  SACRAMENTO  SILICON VALLEY  TOKYO -
DETROIT  MILWAUKEE  SAN DIEGO  TALLAHASSEE  WASHINGTON, D.C.  011.1194366.1
JACKSONVILLE    SAN DIEGO/DEL MAR    WEST PALM BEACH

# HOLLAND & KNIGHT LLP

| | |
|---|---|
| Annapolis | San Antonio |
| Atlanta | San Francisco |
| Bethesda | Seattle |
| Boston | Tallahassee |
| Bradenton | Tampa |
| Chicago | Washington, D.C. |
| Fort Lauderdale | West Palm Beach |
| Jacksonville | |
| Lakeland | International Offices: |
| Los Angeles | Caracas* |
| Miami | Helsinki |
| New York | Mexico City |
| Northern Virginia | Rio de Janeiro |
| Orlando | São Paulo |
| Portland | Tel Aviv* |
| Providence | Tokyo |
| St. Petersburg | *Representative Offices |

131 South Dearborn Street
30th Floor
Chicago, Illinois 60603

312-263-3600
312-578-6666 Fax
www.hklaw.com

JERRY HOLISKY
Senior Counsel
312-715-5787
jerry.holisky@hklaw.com

May 5, 2004

**Via Facsimile (312-832-4700)**
Mr. Scott E. Early
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60610-4764

    Re:   David Sklena

Dear Mr. Early:

As you know, this firm represents Lawrence-Bonfitto Trading Company ("LBTC"). We reviewed your letter to Joe Bonfitto dated May 4, 2004, which was delivered to LBTC at about 4 p.m. yesterday.

In March 2004, Joe Bonfitto, president of LBTC, met with David Sklena regarding Mr. Sklena's trading. Mr. Sklena had been suffering trading losses and had recently been forced to sell his AM membership. At this meeting, Mr. Bonfitto instructed Mr. Sklena to reduce the size of his trading.

The Federal government's March 2004 jobs report was released on Friday, April 2, 2004. In the two minutes immediately _prior_ to the release, June T-Bonds dropped over a full point. Following the release of the report, futures continued to fall.

Notwithstanding Mr. Bonfitto's prior instructions, Mr. Sklena then put LBTC at substantial risk by putting on a long position of 2,975 June 5 Year T-Notes, including buying 2,274 T-Notes in a single transaction, at a time when the net liquidating equity in his trading account was just over $20,000. Even though Mr. Sklena had recently been able to repurchase an AM Membership, the size of his position in the volatile market on April 2d clearly represented reckless and unbusinesslike dealing inconsistent with just and equitable principles of trade on the part of Mr. Sklena.

Mr. Scott E. Early
May 5, 2004
Page 2

Such trading activity by Mr. Sklena is within the scope of CBOT Regulation 333.03(a), and is a violation of both long-standing practices and principles of trade at the CBOT and Mr. Sklena's Account Agreement with LBTC. As soon as Mr. Bonfitto learned of Mr. Sklena's trading activities on April 2, he forcefully informed Mr. Sklena that LBTC objected to certain trades and the substantial risk they had created for the firm. Mr. Bonfitto then advised Mr. Sklena that he would not be able to retain the profit on the trades in question. For the reasons stated above and based on general principles of equity, the clearing firm, LBTC, is entitled to recover the benefits of such trading activity by the non-clearing member.

On Monday, April 5, LBTC and Mr. Sklena reached an oral agreement pursuant to which Mr. Sklena agreed to give up part of the profit on the transactions in question. LBTC agreed to accept $778,683.38, out of Mr. Sklena's $1,778,683.38 total gross profits from trades on April 2, and a transfer of that amount was made from Mr. Sklena's trading account to LBTC that day. On Thursday, April 29, 2004, Mr. Sklena announced to Joe Bonfitto that the settlement he had agreed to more than three weeks earlier wasn't a good deal for him and, therefore, he was reneging on it.

Joe Bonfitto responded by revoking Mr. Sklena's trading privileges with LBTC. In your letter to Mr. Bonfitto, you demand that LBTC release both its PCM status vis-à-vis Mr. Sklena, and the "proceeds of Mr. Sklena's trading account."

First, LBTC is not required to release PCM status because Mr. Sklena may have "current debts related to the conduct of business as a trader" depending on the resolution of the parties' dispute regarding their April 5 settlement. See Rule 333.00(d). Second, given the egregious nature of Mr. Sklena's reckless conduct – in violation of both CBOT rules and limits established by LBTC, there is clearly ample grounds to suspend the disposition of funds in Mr. Sklena's trading account until this dispute is fully and finally resolved.

Nonetheless, and without prejudice to any of its rights as described in this letter, LBTC is today releasing its PCM status in order to demonstrate its good faith intent to reach an amicable resolution of the parties' current disputes. A copy of the Release is enclosed with this letter.

Sincerely yours,

HOLLAND & KNIGHT LLP

Jerry Holisky

JH/dm

cc: Joseph Bonfitto

Encls:

# EXHIBIT 12

**BEFORE THE ARBITRATION**
**EXECUTIVE COMMITTEE**
**OF THE CHICAGO BOARD OF TRADE**

| | |
|---|---|
| DAVID SKLENA, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| LAWRENCE-BONFITTO TRADING | ) |
| COMPANY and JOSEPH BONFITTO | ) |
| | ) |
| Respondents. | ) |
| | ) |

## SECOND AMENDED STATEMENT OF CLAIM

Now comes Claimant, DAVID SKLENA ("Sklena"), by and through his attorneys, Foley & Lardner LLP, as and for his Second Amended Statement of Claim requests that this Committee enter a decision awarding Sklena all of the proceeds from his trading account at Respondent Lawrence-Bonfitto Trading Company ("L/B") which proceeds are being fraudulently withheld by the firm at the direction of Respondent Joseph Bonfitto ("Bonfitto"). In support thereof, Sklena states as follows:

### Factual Background

1. David Sklena ("Sklena") has been a member of the Exchange since 1990. He currently owns an Associate Membership.

2. For nine (9) years, Sklena has been a substantial broker and local trader in the Five Year Treasury Note pit clearing his trades through L/B.

3. Throughout that time, Sklena traded positions of substantial size yielding significant profits and significant debits with both profits and debits amounting to several hundred thousand dollars. All debits have been promptly and fully satisfied by Sklena.

4.      L/B and Sklena have never agreed to any written (or oral) limitations or trading restrictions regarding Sklena's trading activity.

5.      For the month ending March 31, 2004, Sklena maintained a positive equity balance in excess of $40,000 in his trading account #84100 at L/B.

6.      On April 2, 2004, Sklena occupied his usual spot in the Five Year Treasury Note pit at the opening of trade. As has been his recent practice, Sklena had immediate access to his computer in the pit to allow him to trade electronically.

7.      That morning, rumors were circulating regarding a premature release of the unemployment data. As a result, trading was active and prices began to move downward just prior to the release of the unemployment data at 7:30 a.m. CST.

8.      After the release of the unemployment data at 7:30 a.m. CST, the market continued to decline sharply. Sklena began actively trading and earned substantial profits. As a consequence of the market activity, Sklena observed a significant difference develop between prices that were bid on the computer and those offers prevailing in the pit.

9.      Sklena noticed various brokers in the pit actively offering to sell below the prevailing bids on the computer screen. In reliance upon these price differentials, Sklena lifted a broker's offer. Upon lifting the broker's offer, the broker confirmed the quantity of the trade to be 2,274 contracts.

10.     Sklena immediately offset 485 contracts in the pit to limit his exposure. He then proceeded to sell the remainder of his long position in a rising market in increments of 25 and 50-lots on the computer until he had evened out his position. In total, Sklena flattened his position within eight (8) minutes.

2

11.    All trades were promptly checked, confirmed without exception and cleared on the April 2, 2004 morning clearing run without any problems whatsoever.

12.    On April 2, 2004 Sklena earned proceeds in his trading account at L/B resulting from his trading activity totaling in excess of $1,777,000.

13.    On April 5, 2004, David Sklena met with Joseph Bonfitto, President and principal shareholder of L/B, at Bonfitto's request.

14.    Bonfitto told Sklena that Sklena's trades on April 2, 2004 were too large and that, as a result, Bonfitto was being forced by the Clearing Corporation to deposit additional funds to continue his clearing business.  As a consequence, Bonfitto stated that he intended to close L/B as a clearing firm rather than have the Exchange "do it for him."

15.    Bonfitto further told Sklena that all his trading profits were being confiscated by L/B to "pay all the people you [Sklena] just put out of work."

16.    On information and belief, neither L/B nor Bonfitto has ever been told by the Exchange clearing officers that Sklena's trades had created a problem for L/B with regard to clearing.

17.    After continued discussions on April 5, 2004, regarding Sklena's trading proceeds, Bonfitto stated that he would be willing to accept $778,683 of the $1,777,377 in Sklena's trading account and would allow Sklena to withdraw $1,000,000 of the trading proceeds that Sklena had earned.

18.    Bonfitto subsequently offered Sklena a legal release in an attempt to legitimize his efforts to extract in excess of $778,000 from Sklena.  Sklena never signed the release that Bonfitto presented to Sklena.

011.1195217.3

19.    As of April 29, 2004, Sklena maintained a positive equity balance of $163,648 in his trading account #84100 at L/B which resulted from Sklena's trading activity that was not related to Sklena's trading from April 2, 2004.  Bonfitto and L/B confiscated this positive equity balance.

20.    On or about April 29, 2004, after Sklena had an opportunity to seek counsel and observed the fact that Bonfitto was not being "forced to close his clearing firm," Sklena told Bonfitto that L/B had no right to any of Sklena's trading account proceeds or any of the equity balance maintained in Sklena's trading account.   Bonfitto consequently told Sklena he had confiscated all the existing proceeds (in excess of $942,000) from Sklena's trading account and he would sue Sklena "for the entire amount."

21.    On April 30, 2004, Sklena filed with the Exchange new primary clearing registration forms whereby First Futures Division of Refco Group Ltd., LLC ("First Futures") agreed to become Sklena's new primary clearing member.

22.    On May 4, 2004, Sklena demanded the release of all assets held in his trading account at L/B and the release of his primary clearing member status from L/B and Bonfitto. (Attached hereto as Exhibit A is a copy of Sklena's demand notice).

23.    On May 5, 2004, in response to Sklena's demand, counsel for L/B and Bonfitto stated that L/B and Bonfitto was refusing to release the assets in Sklena's trading account (funds that L/B and Bonfitto had wrongfully confiscated) but would release Sklena's primary clearing member status. (Attached hereto as Exhibit B is a copy of L/B and Bonfitto's response to Sklena's demand notice).

24.    On May 6, 2004, L/B and Bonfitto released Sklena's primary clearing member status allowing Sklena to trade through First Futures.  L/B and Bonfitto have continued to wrongfully withhold the release of Sklena's funds in excess of $942,000.

## **CLAIM FOR RELIEF**

25.    Sklena restates and incorporates by reference the allegations set forth in paragraphs 1 through 24 of the Amended Statement of Claim as though fully set forth herein.

26.    L/B and Joseph Bonfitto have refused to release the assets held in Sklena's trading account at L/B by attempting to assert a right pursuant to Exchange Regulation 333.03(a).

27.    Regulation 333.03(a) provides, in pertinent part, that:

> "If a non-clearing member trades in excess of <u>written</u> limits prescribed by the carrying clearing member, and/or if the non-clearing member is alleged to have engaged in <u>reckless and unbusinesslike dealing</u> inconsistent with just and equitable principles of trade, the disposition of any and all funds in the applicable trading account(s) may be suspended by the clearing member...pending a determination by the Arbitration Committee regarding the appropriateness of the non-clearing member's conduct." [Emphasis added].

28.    No written (or oral) limits on Sklena's trading have ever been in place at L/B.

29.    Sklena's trading on April 2, 2004 was manifestly not "reckless" or "unbusinesslike."

30.    Regulation 333.03(b) provides that where the primary clearing member suspends trading account proceeds, this Committee will review that suspension to ". . . determine if sufficient grounds exist to warrant continuation of the suspension pending a final determination by the Arbitration Committee."

31.    Neither L/B nor Joseph Bonfitto have "sufficient grounds" to suspend the profits or confiscate the equity that Sklena earned in his trading account.  Sklena's trading on April 2, 2004 was as close to riskless arbitrage as can occur within the marketplace.

011.1195217.3

32.    Neither L/B nor Joseph Bonfitto have any basis whatsoever to confiscate the $163,648 of

trading account equity in Sklena's account which is totally unrelated to Sklena's April 2,

2004 trading.

**PRAYER FOR RELIEF**

WHEREFORE, Sklena requests this Committee enter a Decision providing that:

a)  L/B and Bonfitto release the $778,683 in trading proceeds earned by Sklena and

previously maintained in Sklena's trading account #84100 (with interest) from

April 2, 2004;

b)  L/B and Bonfitto release the equity balance of $163,648 (with interest) held in

Sklena's trading account #84100 as of the month end April 30, 2004;

c)  L/B and Bonfitto pay Sklena interest on all his trading proceeds as well as all his

legal fees and expenses incurred in obtaining this Committee's Decision; and

d)  Such further relief as the Committee considers to be just and proper.

Dated:  August 11, 2004                         Respectfully submitted,

                                                DAVID SKLENA

                                                By _____
                                                   Foley & Lardner LLP
                                                   Counsel for David Sklena

Scott E. Early, Esq.
Jerald L. Jeske, Esq.
Foley & Lardner, LLP
321 North Clark Avenue, Suite 2800
Chicago, IL 60610
Phone (312) 832-4500
Fax    (312) 832-4700

 **FOLEY**

**FOLEY & LARDNER LLP**
**ATTORNEYS AT LAW**

321 NORTH CLARK STREET
SUITE 2800
CHICAGO, IL 60610-4764
312.832.4500 TEL
312.832.4700 FAX
www.foley.com

May 4, 2004

**WRITER'S DIRECT LINE**
312.832.4352
searly@foley.com EMAIL

**CLIENT/MATTER NUMBER**
069953-0103

<u>VIA FACSIMILE (312) 341-7779 AND MESSENGER</u>

Mr. Joseph Bonfitto
Lawrence-Bonfitto Trading Company
141 West Jackson Boulevard
Suite 2450
Chicago, Illinois 60604

    Re: Mr. David Sklena

Dear Mr. Bonfitto:

    Please be advised that this firm represents Mr. David Sklena. Mr. Sklena has filed new Primary Clearing Member ("PCM") authorizations at First Futures Division of Refco Group Ltd., LLC ("First Futures") with the Chicago Board of Trade. It is our understanding that you have refused to release Mr. Sklena from Lawrence-Bonfitto Trading Company to First Futures and suspended transfer of the proceeds of Mr. Sklena's trading account. We hereby demand that you approve these releases immediately.

    This correspondence is intended to provide you with notice that if PCM status is not released by the close of business (5:00 p.m. CST) tomorrow, May 5, 2004, we have been authorized to proceed on Mr. Sklena's behalf to petition for the Exchange to compel the release of both PCM status and the proceeds of Mr. Sklena's trading account pursuant to Exchange Regulation 333.03(b).

    Sincerely,

    Foley & Lardner LLP

    By: _Scott E. Early_

     Scott E. Early
    Counsel for David Sklena

cc: Mr. Sean Gallagher
  Mr. Dean Payton
  Ms. Nancy Binion Dye

BRUSSELS  LOS ANGELES  ORLANDO   SAN FRANCISCO  TAMPA
CHICAGO   MADISON   SACRAMENTO  SILICON VALLEY  TOKYO -
DETROIT   MILWAUKEE  SAN DIEGO   TALLAHASSEE   WASHINGTON, D.C.  011.1194366.1
JACKSONVILLE       SAN DIEGO/DEL MAR       WEST PALM BEACH

# HOLLAND & KNIGHT LLP

| | |
|---|---|
| Annapolis | San Antonio |
| Atlanta | San Francisco |
| Bethesda | Seattle |
| Boston | Tallahassee |
| Bradenton | Tampa |
| Chicago | Washington, D.C. |
| Fort Lauderdale | West Palm Beach |
| Jacksonville | |
| Lakeland | International Offices: |
| Los Angeles | Caracas* |
| Miami | Helsinki |
| New York | Mexico City |
| Northern Virginia | Rio de Janeiro |
| Orlando | São Paulo |
| Portland | Tel Aviv* |
| Providence | Tokyo |
| St. Petersburg | |
| | *Representative Office |

131 South Dearborn Street
30th Floor
Chicago, Illinois 60603

312-263-3600
312-578-6666 Fax
www.hklaw.com

JERRY HOLISKY
Senior Counsel
312-715-5787
jerry.holisky@hklaw.com

May 5, 2004

**Via Facsimile (312-832-4700)**
Mr. Scott E. Early
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60610-4764

Re:    David Sklena

Dear Mr. Early:

As you know, this firm represents Lawrence-Bonfitto Trading Company ("LBTC"). We reviewed your letter to Joe Bonfitto dated May 4, 2004, which was delivered to LBTC at about 4 p.m. yesterday.

In March 2004, Joe Bonfitto, president of LBTC, met with David Sklena regarding Mr. Sklena's trading. Mr. Sklena had been suffering trading losses and had recently been forced to sell his AM membership. At this meeting, Mr. Bonfitto instructed Mr. Sklena to reduce the size of his trading.

The Federal government's March 2004 jobs report was released on Friday, April 2, 2004. In the two minutes immediately prior to the release, June T-Bonds dropped over a full point. Following the release of the report, futures continued to fall.

Notwithstanding Mr. Bonfitto's prior instructions, Mr. Sklena then put LBTC at substantial risk by putting on a long position of 2,975 June 5 Year T-Notes, including buying 2,274 T-Notes in a single transaction, at a time when the net liquidating equity in his trading account was just over $20,000. Even though Mr. Sklena had recently been able to repurchase an AM Membership, the size of his position in the volatile market on April 2d clearly represented reckless and unbusinesslike dealing inconsistent with just and equitable principles of trade on the part of Mr. Sklena.

Mr. Scott E. Early
May 5, 2004
Page 2

Such trading activity by Mr. Sklena is within the scope of CBOT Regulation 333.03(a), and is a violation of both long-standing practices and principles of trade at the CBOT and Mr. Sklena's Account Agreement with LBTC. As soon as Mr. Bonfitto learned of Mr. Sklena's trading activities on April 2, he forcefully informed Mr. Sklena that LBTC objected to certain trades and the substantial risk they had created for the firm. Mr. Bonfitto then advised Mr. Sklena that he would not be able to retain the profit on the trades in question. For the reasons stated above and based on general principles of equity, the clearing firm, LBTC, is entitled to recover the benefits of such trading activity by the non-clearing member.

On Monday, April 5, LBTC and Mr. Sklena reached an oral agreement pursuant to which Mr. Sklena agreed to give up part of the profit on the transactions in question. LBTC agreed to accept $778,683.38, out of Mr. Sklena's $1,778,683.38 total gross profits from trades on April 2, and a transfer of that amount was made from Mr. Sklena's trading account to LBTC that day. On Thursday, April 29, 2004, Mr. Sklena announced to Joe Bonfitto that the settlement he had agreed to more than three weeks earlier wasn't a good deal for him and, therefore, he was reneging on it.

Joe Bonfitto responded by revoking Mr. Sklena's trading privileges with LBTC. In your letter to Mr. Bonfitto, you demand that LBTC release both its PCM status vis-à-vis Mr. Sklena, and the "proceeds of Mr. Sklena's trading account.".

First, LBTC is not required to release PCM status because Mr. Sklena may have "current debts related to the conduct of business as a trader" depending on the resolution of the parties' dispute regarding their April 5 settlement. See Rule 333.00(d). Second, given the egregious nature of Mr. Sklena's reckless conduct – in violation of both CBOT rules and limits established by LBTC, there is clearly ample grounds to suspend the disposition of funds in Mr. Sklena's trading account until this dispute is fully and finally resolved.

Nonetheless, and without prejudice to any of its rights as described in this letter, LBTC is today releasing its PCM status in order to demonstrate its good faith intent to reach an amicable resolution of the parties' current disputes. A copy of the Release is enclosed with this letter.

Sincerely yours,

HOLLAND & KNIGHT LLP

Jerry Holisky

JH/dm

cc: Joseph Bonfitto

Encls:

## CERTIFICATE OF SERVICE

I, Jerald L. Jeske, certify that I served a copy of Second Amended Statement of Claim on this 11th day of August, 2004, before the hour of 5:00 p.m. on the following:

**BY U.S. MAIL**
Sean A. Gallagher, Esq.
Chicago Board of Trade.
141 W. Jackson Blvd., Suite 600
Chicago, Illinois 60604

**BY MESSENGER DELIVERY**
John D. Ruark, Esq.
Lawrence, Kamin, Saunders & Uhlenhop, LLC
208 S. LaSalle Street, Suite 1750
Chicago, IL 60604-1188

011.1195217.3

# EXHIBIT 13

LAW OFFICES OF

## LAWRENCE, KAMIN, SAUNDERS & UHLENHOP, L.L.C.

208 SOUTH LA SALLE STREET · SUITE 1750

CHICAGO, ILLINOIS 60604-1188

PHONE (312) 372-1947

FAX (312) 372-2389

WWW.LKSU.COM

RAYMOND E. SAUNDERS
PAUL B. UHLENHOP
KENT LAWRENCE
ROBERT L. SCHLOSSBERG
CHARLES J. RISCH
MICHAEL WISE
PETER E. COOPER
DAVID L. REICH
JOHN S. MONICAL
JOHN D. RUARK
PAUL M. WELTLICH
MITCHELL B. GOLDBERG

LAWRENCE, LAWRENCE, KAMIN & SAUNDERS (1972-1983)
LAWRENCE, GOLDBERG, LAWRENCE & LEWIN (1946-1972)
LEVY, GOLDBERG & LAWRENCE (1932-1946)

OF COUNSEL
ROBERT J. LAWRENCE

July 23, 2004

Arbitration Committee of the
Chicago Board of Trade
141 West Jackson Boulevard
Chicago, Illinois 60604

Re:     **In the Matter of the Arbitration of**
        **David Sklena v. Lawrence-Bonfitto Trading Company and Joseph Bonfitto**

Dear Committee Members:

Respondents Lawrence-Bonfitto Trading Company ("LBTC") and Joseph Bonfitto, by their attorneys Lawrence, Kamin, Saunders & Uhlenhop, L.L.C., in answer to the Amended Statement of Claim of David Sklena, state as follows:

LBTC and Bonfitto deny each and every allegation contained in the Amended Statement of Claim, except to the extent that any such allegation is expressly admitted herein.

## I.     INTRODUCTION

Dave Sklena's trading activity on April 2 was in direct violation of risk limits placed on him by LBTC and Joe Bonfitto.  However, even if LBTC hadn't placed any limits on him, for Sklena to take a 2,274 lot order in the 5-Year Notes with only about $21,000 in his trading account was reckless – and it was done in absolute disregard of the serious financial risk to which such trading exposed LBTC and Joe Bonfitto, personally.

CBOT Arbitration Committee
July 23, 2004
Page 2

Joe Bonfitto permitted Dave Sklena to return to the 5-Year Note pit because the two reached a settlement on April 5th regarding Sklena's trading on April 2d. However, Sklena's bad faith acts were not limited to April 2d. From April 5th to April 29th (the last day he traded at LBTC), Sklena engaged in a continuing course of conduct to obtain the benefits of settling with LBTC without having to live up to his obligations under the settlement agreement. For example, Sklena used LBTC's office manager to obtain a $450,000 check from LBTC without the knowledge of Joe Bonfitto and, with that money in hand, Sklena continued trading in size that violated the specific limits placed on him by LBTC and Bonfitto.

## II.    SKLENA'S CLAIM

Dave Sklena's claim asserts that his trading on April 2d was "as close to riskless arbitrage as can occur." As will be discussed below, Sklena's largest open position may have been as large as 2,918 5-Year Notes at a moment when, due to the release of an unemployment report, futures were in virtual free-fall. According to Sklena's Amended Statement of Claim, he closed out this position in eight minutes. Even an eight minute close out of this position demonstrates the risk involved. During those eight minutes, the market easily could have gotten away from him, the electronic bids that he thought he could sell into could have disappeared or the electronic system could have gone down. Any of these would have had catastrophic consequences for LBTC.

This trading may have been riskless -- to Sklena. With only $21,000 in his account, his downside was limited. In contrast, as Sklena's guarantor, LBTC's downside was not limited at all.

That Sklena believes (or is willing to claim) that such a situation is "riskless" shows a reckless disregard for the financial exposure he placed on LBTC and Joe Bonfitto personally. On April 2d, Sklena had $21,000 in his account and a seat then worth about $260,000, on which he owed $156,000 (LBTC's canceled guaranty of the loan is attached as Exhibit 1). Sklena made over $1.7 million on April 2d. However, had the market continued to decline, it would have been LBTC that would have borne the brunt of a loss that could have quickly reached and exceeded an equivalent size.

Sklena's largest single transaction was the purchase of 2,274 contracts at a price of 111-06.5. It is not certain when Sklena purchased this 2,274 lot because there is no print of 111-06.5 in the open outcry time and sales (Open outcry time and sales is attached as Exhibit 2). However, Sklena did start frantically selling 5-Year Notes electronically at approximately 7:31:34, so he presumably bought it immediately before that.

CBOT Arbitration Committee
July 23, 2004
Page 3

Assuming he bought the 2,274 immediately before he began selling at 7:31:34, Sklena's trading cards and electronic trading records reflect a long position of at least 644 at the time he took the 2,274. (Sklena's trading cards are attached as Exhibit 3; CBOT records reflecting his electronic activity are attached as Exhibit 4). Sklena's card number 916 shows a sale of a 485-lot following his purchase of the 2,274 lot. Assuming that this was sold at the same moment he bought the 2,274, Sklena would have still been long more than 2,400 5-Year Notes in an extremely volatile market. For example, CBOT time and sales records for electronic trading show that during the *second* of 7:31:26, the 5-Year Notes traded between 111-05 and 111-13.5 (CBOT electronic time and sales from 7:20 a.m. to 7:45 a.m. is attached as Exhibit 5; the trading for 7:31:26 may be found on page 34). If the market had declined just the amount of the range traded electronically during the second of 7:31:26, a 2,400 contract long position would have lost $637,500.

In addition to its reckless disregard for the seriousness of the risk he placed upon LBTC, Sklena's claim contains factual errors. The claim twice states that Sklena trades 10-Year Notes (he was a 5-Year Note trader at LBTC). The claim states that he closed out his long position in 50-lot increments (Sklena fired off sales of more than 60 25-lot transactions before he ever sold a 50-lot).

Sklena's claim also conveniently omits some relevant items, such as the fact that he was already long at least 644 5-Year Notes when he took that 2,274 lot. While he asserts that he had positive equity in excess of $160,00 for the month ended March 31, he doesn't mention that, following a withdrawal of funds on April 1 to purchase a membership, the balance in his account at the start of the day on April 2d was about $21,000. (His statement for April 2 is attached as Exhibit 6). He doesn't mention that, had his account been marked to the market at 111-06.5 at the moment he took the 2,274 lot, his account would have reflected a loss of approximately $75,000 on the day. He doesn't mention that he purchased hundreds of 5-Year Notes electronically in the minutes after he accumulated that 2,400 lot long position. (See pages 5-7 of Exhibit 4) "Riskless arbitrages" do not require more than 100 transactions to close out, do not cover a price range of one full point, and do not require propping up of the price.

### III.    SUMMARY OF EVENTS

To further put Sklena's statements and omissions into context, here is a brief summary of events in March and April of 2004:

1.    <u>Sklena's Losses Following the March Unemployment Report.</u>

CBOT Arbitration Committee
July 23, 2004
Page 4


On March 5, 2004, four weeks prior to the trades which are the subject matter of this arbitration, on the date of the release of the February Employment Situation report, Sklena's account suffered large losses, in part because he traded large size that day. Sklena's account went debit, and he was forced to sell his AM membership. It was Bonfitto's understanding that Sklena was further forced to borrow money and mortgage his home as a result of the March 5th losses. A copy of Sklena's statement reflecting his March 5th losses is attached as Exhibit 7.

2.    **Sklena Told to Reduce Size**

Due to the debit in Sklena's account following his March 5th losses, LBTC did not permit him to return to the floor for a time. In mid-to-late March, Joe Bonfitto met with Sklena and told Sklena that he must reduce the size of his trading. Bonfitto told Sklena that the industry had changed and that Sklena had to reduce the risk in his trading. Bonfitto told Sklena that, in particular, he had to stop taking 200 and 300 lot trades and reduce the size of his trading unit to 20 or 50 lots. Bonfitto emphasized the necessity of reducing the size of Sklena's trades on days when reports were released, specifically including unemployment reports. Sklena indicated that he would do this. Joe Bonfitto told Joe Postel, the office manager of LBTC, and Jim Bonfitto, a risk manager of LBTC, about this conversation. It should be noted that paragraph 9 of the customer agreement Sklena signed specifically states that LBTC has the right to limit positions. The customer agreement is attached as Exhibit 8.


3.    **April Unemployment Market Conditions**

On April 2d, the Employment Situation report for March was released. Approximately 2 minutes prior to the release of the report, prices on U.S. treasury futures, including the 5-Year note contract, began to plunge. The sharp decline prior to the report led to rumors that the number had been leaked. Regardless of whether such a leak occurred, it was an unusually volatile trading day, with a trading range in the 5-Year notes greater than 2 full points.

4.    **Sklena's $21,000 Account Balance and 2,918-lot Position**

At the beginning of the day on April 2d, Dave Sklena had a liquidating equity in his account of approximately $21,000. Despite Bonfitto's directions to reduce his trading size, Sklena had a number of large trades on April 2d, including a 2,274-lot, a 500-lot, and 4 separate trades greater than 200-lots. At the moment he purchased the 2,274 lot, Sklena appears to have been long 644 5-Year notes. The loss of just one $31.25

CBOT Arbitration Committee
July 23, 2004
Page 5

tick on just this 644-lot position would have cost more than $20,000 or just about all the equity in Sklena's account.  To that 644-lot position, Sklena added 2,274.  While he asserts that he immediately offset 485 lots, he still had an open position of more than 2,400 contracts.  Fortunately, despite the enormous risk of Sklena's trading on April 2d, his trading that day was profitable, with a total trading profit of approximately $1,778,000.

Joe Bonfitto was in California on April 2d.  However, after Bonfitto called in at 9:00 am and learned of Sklena's trading, Bonfitto directed Joe Postel, an employee of LBTC, to get Sklena off the trading floor and not let Sklena back on the floor until he had met with Bonfitto.

5.    **April 5th Meeting**

On April 5th, the following Monday, Bonfitto and Sklena met at approximately 8:00 a.m.  Bonfitto told Sklena that the risk taken by Sklena on April 2d was so excessive that it endangered LBTC.  Bonfitto described the possible consequences if the trade had gone against Sklena, which included the possibility of LBTC going out of business.  Bonfitto told Sklena that, considering the risk exposure caused by Sklena, he believed that LBTC might be entitled to take the entire profit.  Bonfitto told Sklena that, due to his long-time relationship with Sklena, he did not want take the entire amount.  However, in light of the financial risk that LBTC had been exposed to, Bonfitto proposed that the profit be split between Sklena and LBTC.

6.    **Sklena Counter-Offer**

Sklena told Bonfitto that he wanted to think about this.  Approximately two hours later, Sklena returned.  Sklena told Bonfitto that he had spoken with his attorney.  Rather than split the profit, Sklena made a counter-offer: that LBTC receive $778,000 and that Sklena would be permitted to retain $1.0 million.

Bonfitto considered Sklena's proposal and agreed to it.  Bonfitto noted that he would want Sklena to sign a release regarding this arrangement.  Sklena indicated that this would be okay and that, in fact, his lawyer would probably want such a document.  Sklena requested that he be permitted to withdraw $500,000 from the account to pay off Sklena's mortgage and seat loan.  Bonfitto agreed to this withdrawal, but indicated that Sklena would have to leave the balance in the account.  A copy of the check for $500,000 is attached as Exhibit 9.

7.    **LBTC Permits Sklena to Withdraw Cash and Return to Floor**

CBOT Arbitration Committee
July 23, 2004
Page 6

In reliance upon this agreement, Bonfitto had $778,000 transferred out of Sklena's account. Bonfitto also permitted Sklena to withdraw $500,000 and further agreed to let Sklena return to the trading floor.

Their differences having been resolved, Bonfitto also invited Sklena to attend the Cubs home opener on the next day, April 6th. Sklena accepted the invitation and attended the game with Bonfitto.

Bonfitto gave a Sklena a simple 2 paragraph written release on approximately April 10th. A copy of the unsigned release is attached as Exhibit 10.

8.    **Sklena Withdraws More Cash from Account**

On approximately April 22d, on information and belief, Sklena approached Joe Postel, a LBTC employee, and requested that Postel cut a check from Sklena's account. Postel, the LBTC office manager, had given notice to LBTC earlier in the month and was in his final days of employment at LBTC. Without notifying his boss, Joe Bonfitto, Postel surreptitiously cut a check for $450,000 out of Sklena's account. Bonfitto did not learn of this check until at least one week later. A copy of this check is attached as Exhibit 11.

9.    **Sklena Continues to Violate Risk Limits**

Despite Bonfitto's instructions regarding trading size, on April 29th, following the release of GDP, Sklena's traded at least 2 separate 1,000 lots. A copy of Sklena's statement reflecting his April 29th activity is attached as Exhibit 12.

10.    **Sklena Backs Out**

When Sklena had not delivered the signed release by April 29th, Bonfitto inquired as to what was going on. Sklena told Bonfitto that he felt he had been pressured into a bad deal and that he wasn't going to sign the release. Bonfitto indicated to Sklena that, if Sklena was going to renege on the agreed arrangement, then LBTC would be justified in retaining all profits from Sklena's reckless trading on April 2d.

Sklena then telephoned Diane, a LBTC employee, and sought to get a check from his account for $163,000, representing the remaining balance of the account. Joe Bonfitto was standing next to Diane when Sklena called. Bonfitto took the phone from Diane and told Sklena that no additional withdrawals would be permitted.

CBOT Arbitration Committee
July 23, 2004
Page 7

## IV.    ARGUMENT

### Sklena, Having Accepted the Benefits of a Settlement, Should Not Be Permitted to Renege on His Agreement.

On April 5th, Sklena and Bonfitto reached a verbal agreement regarding Sklena's profits from his trading on April 2d.  The two agreed that LBTC would be entitled to retain $778,000 in acknowledgment of the excessive risk assumed by Sklena, and placed upon LBTC, on April 2d.  As a result of the handshake agreement that they reached on that day, Bonfitto immediately permitted Sklena to withdraw $500,000 and to return to the trading floor.

Sklena apparently believed that this was an acceptable resolution on April 5th, because he accepted Bonfitto's invitation to attend the Cubs' home opener the following day.

More than three weeks later, however, Sklena decided he didn't like the agreement he had made, so he informed Joe Bonfitto on April 29th that the deal was off.  However, prior to telling Bonfitto that he was repudiating the agreement, Sklena surreptitiously used a LBTC employee to withdraw an additional $450,000.

In short, having accepted the benefits of his verbal agreement with Bonfitto, Sklena should not be now be permitted to repudiate his verbal agreement.  In effect, Sklena fraudulently procured the performance of LBTC and Bonfitto and then backed out when it was his turn to perform.  Just like the trading Sklena engaged in April 2d, Sklena wants the upside and wants someone else to bear the downside.   Heads Dave wins, tails Joe loses.  The Respondents request that the Committee deny all the relief requested in Sklena's Amended Statement of Claim.

## V.    COUNTERCLAIMS

1.    LBTC and Bonfitto Are Entitled to All Profits from Sklena's Trading on April 2, 2004

CBOT Rules contemplate that a clearing member firm may retain all profits of a local trader when that trader violates written trading limits or engages in reckless and unbusinesslike dealing.  CBOT Regulation 333.03 provides, in relevant part, that:

*"If a non-clearing member trades in excess of written limits prescribed by the carrying clearing broker, and/or the non-clearing member is alleged to have engaged in reckless*

CBOT Arbitration Committee
July 23, 2004
Page 8

*and unbusinesslike dealing inconsistent with just and equitable principles of trade*, the disposition of any and all funds in the applicable trading account(s) may be suspended by the carrying clearing member… pending a determination by the Arbitration Committee regarding the appropriateness of the non-clearing member's conduct." *(emphasis added)*

This CBOT regulation is not an anomaly – it is in keeping with industry custom and practice. The Chicago Mercantile Exchange has a similar rule, known as the "Shot Rule." CME Rule 511 provides, in relevant part, that

*"If a member trades in excess of limits prescribed by his qualifying clearing member, without sufficient funds in his account to have immediately margined the position, and such trades are profitable, the qualifying clearing member shall be entitled to retain the profits derived from such excess trades, subject to a determination by the Arbitration Committee respecting the appropriateness of the member's conduct."*

Given the volatility of the market on April 2d, for Sklena to assume an open position of 644 Five-Year Notes, let alone add 2,274 lots to such a position, when his account had a total equity of $21,000 was reckless. If the market had moved against Sklena, he would not have been able to make good on the losses because he had no other assets. Sklena had, after all, been forced to sell his membership and mortgage his house as a result of losses in the previous month.

The CBOT regulation is not clear as to exactly what a clearing firm must do to invoke it. Bonfitto did not suspend **all** funds in Sklena's account following the April 2d trading because the two individuals reached a verbal agreement on April 5th. Further, by the time that Sklena repudiated his agreement on April 29th, Sklena had surreptitiously withdrawn additional funds from his account. Thus, by the time that Bonfitto had been told that Sklena was repudiating the agreement, Sklena had already withdrawn $950,000 from the account.

While LBTC and Bonfitto request that the Committee find that they are entitled to all Sklena's profits from trading on April 2d (since, after all, they would have been required to pay for all losses less the $21,000 equity in Sklena's account), if the Committee does not so determine, LBTC and Bonfitto request in the alternative that the Committee enforce the verbal agreement reached on April 5th between Sklena and Bonfitto and confirm that the Respondents are entitled to retain the $778,000 settlement amount and any other proceeds held in Sklena's account.

2.    LBTC Is Entitled to Receive Its Legal Fees and Costs.

CBOT Arbitration Committee
July 23, 2004
Page 9


On March 24, 1995, David Sklena entered into a Customer Account Agreement with LBTC in which he agreed to bear LBTC's legal costs in any arbitration proceeding in which LBTC was the substantially prevailing party. Paragraph 11 of that Customer Agreement provides in relevant part that:

> *If Customer brings any suit, reparations or arbitration proceeding against Broker in which Broker is the substantially prevailing party, Customer shall pay Broker's attorneys' fees and expenses in connection with defending against any such suit, reparations or arbitration proceeding.*

A copy of the Customer Agreement signed by Dave Sklena is attached as Exhibit 8. This matter is being heard solely due to Sklena's repudiation of the verbal settlement agreement he reached with Joe Bonfitto on April 5th. LBTC requests that the Committee find in favor of Respondents and include, as part of such finding, that LBTC is entitled to receive its attorneys' fees from Sklena.


3.    <u>LBTC Is Entitled to Any Trading Profits Between April 2, 2004 and April 29, 2004.</u>

Based upon the verbal agreement entered into between Joe Bonfitto and Dave Sklena on April 5, 2004, Sklena was permitted to return to the trading floor. One of the conditions to this permission was that Sklena would reduce the size of his trading.

Between April 5th and April 29th, Sklena had net profits of approximately $110,000. It would be unjust enrichment to allow Sklena to retain these funds. He was permitted to return to the floor after April 5th, guaranteed by LBTC, based upon the fact that a verbal agreement had been reached and upon the condition that he reduce the size of his trades. Since Sklena has attempted to repudiate the verbal agreement and since he violated the trading restrictions, LBTC should be permitted to retain these funds.


## VI.    CONCLUSION

Having repudiated his April 5th verbal agreement with Joe Bonfitto, David Sklena is now demanding that he receive all profits from his reckless trading on April 2d along with interest.

CBOT Arbitration Committee
July 23, 2004
Page 10

For open outcry trading to be viable, it must be possible to rely upon a trader's word.  Sklena's claim against LBTC and Bonfitto should be denied for the simple reason that Sklena has consistently failed to live up to his verbal promises:

- Sklena was permitted to return to the floor after April 5th by promising Bonfitto that he would reduce the size of his trading, but he did not.  He even traded 1,000 lots on April 29th.

- Sklena was permitted to withdraw $500,00 on April 5th to pay off loans after he agreed to turn over $778,000 to LBTC, but within weeks, he was trying to back out of the agreement.

- Sklena was permitted to withdraw the $500,000 mentioned above on the condition that he leave the balance of the profits in his account. Notwithstanding this condition, he later surreptiously used a LBTC employee to get a check for $450,000.  It was only after this that he told Bonfitto that he was backing out of his agreement.

Further, LBTC and Bonfitto request that the Committee determine that:

1.     Respondents are entitled to retain all of Sklena's trading profits from April 2d, 2004 and that Sklena pay to Respondents $1,778,000 less any amounts held by or previously transferred to Respondents or, in the alternative, that Respondents are entitled to retain those amounts held by or previously transferred to LBTC;

2.     Respondents are entitled to retain Sklena's trading profits from the period of April 6th to April 29th; and

2.     Sklena pay Respondents' attorneys' fees pursuant to his LBTC Customer Agreement.

Dated:   July 23, 2004          LAWRENCE, KAMIN, SAUNDERS & UHLENHOP, L.L.C.
                                Attorneys for Respondents Joseph Bonfitto and
                                Lawrence-Bonfitto Trading Company
                                208 South LaSalle Street, Suite 1750
                                Chicago, Illinois 60604
                                (312) 372-1947


                                By: _____

cc:    Scott E. Early, Esq., Attorney for David Sklena

## CERTIFICATE OF SERVICE

I, John D. Ruark, an attorney certify that I served the above Answer on behalf of Holland & Knight LLC, by causing true and correct copies to be hand delivered and delivered via U.S. Mail, postage prepaid on the _____23rd_____ day of July 2004 to:

    Sean A. Gallagher, Esq.
    Chicago Board of Trade
    141 West Jackson Boulevard
    Suite 600
    Chicago, Illinois  60604

    Scott E. Early, Esq.
    Foley & Lardner LLP
    321 North Clark Street
    Suite 2800
    Chicago, Illinois  60610-4764

                        John D. Ruark

\\Fileserver\all access\JDR\Certificate of Service 072304.doc

# EXHIBIT 14

OCT-05-2004  09:57        CBOT LEGAL DEPT                    312 435 3623      P.02



**Chicago Board of Trade**

October 4, 2004

# BOARD OF TRADE OF THE CITY OF CHICAGO

---

In the Matter of the Arbitration between )
)
David Sklena, Claimant )
)
)
v. )                    **DECISION**
)
Lawrence-Bonfitto Trading Company )
& Joseph Bonfitto, Respondents. )

---

We, the undersigned, being a majority of the Arbitrators selected to hear and determine a matter in controversy between the above-mentioned Claimant and Respondent, set forth in a demand for arbitration dated May 14, 2004;

And having heard and considered the proofs of the parties at a hearing held on September 29 and September 30, 2004, have decided and determined that in full and final settlement of this matter, the Respondents, Lawrence-Bonfitto Trading Company & Joseph Bonfitto, shall pay to the Claimant, David Sklena, the amount of $85,270.00.

The Committee also determined that the arbitration filing fee in the amount of $250.00 shall be divided as follows: David Sklena shall pay $125.00 and Lawrence-Bonfitto Trading Company & Joseph Bonfitto shall pay $125.00

The Committee further determined that the stenographic fees shall be divided equally.

Failure to pay this award within the time period prescribed by Exchange Regulation 630.13(c), may result in the suspension of the defaulting party's membership privileges, including floor access and the benefit of member transaction fees.

Joel R. Riechers, Chairman                George Bakouris

Pamela Davis Rogers                        James Schwartz

J. Andrew Wallace

141 W. Jackson Blvd.
Chicago, Illinois 60604-2994
312 435-3500

TOTAL P.02