IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br>          Plaintiff, | No. 08 CIV 192 |
| v. | District Judge Kendall |
| EDWARD C. SARVEY<br>    and<br>DAVID G. SKLENA,<br>          Defendants; | Magistrate Ashman |
| LAWRENCE-BONFITTO TRADING COMPANY<br>    and<br>JOSEPH J. BONFITTO,<br>          Relief Defendants. | |

PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S REPSONSE
OPPOSING RELIEF DEFENDANTS LAWRENCE BONFITTO TRADING COMPANY
AND JOSEPH J. BONFITTO'S MOTION TO DISMISS

I.
INTRODUCTION

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") hereby

submits its Response Opposing Relief Defendants Lawrence-Bonfitto Trading Company

("Bonfitto Trading") and Joseph J. Bonfitto's ("J. Bonfitto") (collectively "Relief Defendants")

Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal

Rules of Civil Procedure ("F.R.Civ.P."). For the reasons described below, the Relief

Defendants' motion must be denied.

The Relief Defendants' motion is not well-taken. Here, the subject matter jurisdiction

conferred by Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-1

(2000), over the primary defendants, Edward C. Sarvey ("Sarvey") and David G. Sklena (Sklena"), is clear and unambiguous and is not contested by any party.[1]  It also is uncontroverted that the Relief Defendants received funds that were obtained from conduct alleged in the complaint over which the plaintiff has jurisdiction.  Under these circumstances, the case law is abundantly clear that it is not necessary to make an additional assertion of subject matter jurisdiction against the Relief Defendants, who are joined as nominal defendants to aid the recovery of relief.  The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong.

While the Relief Defendants dispute the allegation that they have no legitimate interest in the futures trading profits that are the subject of litigation, that is a question of fact that is not properly the subject of a motion to dismiss for lack of subject matter jurisdiction.  Similarly, the fact that the Relief Defendants prevailed against Sklena in an exchange arbitration that determined solely their respective rights to the $1.65 million in futures trading profits that Sklena reaped on April 2, 2004, is neither dispositive nor relevant.  No consideration was given to the public interest, which was not represented in that private proceeding.  Indeed, the Relief Defendants' conduct in this tawdry affair shows that they cast a blind eye to how Sklena managed to gain $1.65 million in a matter of minutes.  Therefore, Bonfitto Trading and J. Bonfitto are properly named as Relief Defendants and their motion to dismiss should be denied.

---

[1] The district court has original jurisdiction over all actions arising under United States law, 28 U.S.C. § 1331, as well as all civil actions commenced by an agency of the United States expressly authorized to sue by Act of Congress.  28 U.S.C. § 1345.

## II.
## BACKGROUND

On January 9, 2008, Plaintiff CFTC filed a Complaint For Injunctive and Other Equitable

Relief and Civil Monetary Penalties Under The Commodity Exchange Act ("Complaint"). The

Complaint charges Sarvey and Sklena, two registered floor brokers who traded in the Chicago

Board of Trade's ("CBOT") Five Year Treasury Note ("Five Year Note") futures contract pit,

with noncompetitively trading 2,274 June 2004 Five Year Note futures contracts on April 2,

2004. As a result of their noncompetitive trading, customers whose orders comprised the 2,274

Five Year Note futures contracts were defrauded by approximately $2.1 million. As alleged, in a

matter of minutes, Sarvey made approximately $350,000 in profits and Sklena made

approximately $1.65 million in profits from the fraudulent noncompetitive trades.[2]

Of the $1.65 million Sklena made from the trades, Bonfitto Trading and J. Bonfitto

confiscated approximately $650,000 without regard to whether Sklena had obtained the funds

legally and without regard to whether any customers or other third persons might have a claim to

the funds.[3]  The Complaint names Bonfitto Trading and J. Bonfitto as Relief Defendants

precisely because they have no legitimate claim to the funds as compared to the defrauded

futures customers.  Their specious claim of ownership is not sufficient to avoid disgorgement.

The Complaint therefore requests that Bonfitto Trading and J. Bonfitto be required to disgorge

the funds they received from Sarvey and Sklena's fraudulent conduct.

---

[2] Two other traders were beneficiaries of the other funds.

[3] Defendants claim in their response to Relief Defendants' motion to dismiss that Relief
Defendants obtained $858,000 of Sklena's trading profits.  However, Relief Defendants' only
confiscated $650,000 of Sklena's illegally obtained trading profits resulting from his trade of
2274 contracts opposite Sarvey on April 2, 2004 that is at issue here.  The differential is Sklena's
profits as a result of other trades on or around the same day that are not at issue here. (*See* Ex. 2
at pp. 162-163 to Relief Defendants' Motion to Dismiss)

## III.
## JURISDICTIONAL STANDARD PERTAINING TO RELIEF DEFENDANTS

### A.     The Commission Will Meet Its Burden of Establishing Jurisdiction

The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction. *United Phosphorus, Ltd v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir.), *cert. denied*, 540 US 1003 (2003), *citing Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3rd Cir. 1977). If subject matter jurisdiction is not evident on the face of the complaint, a motion to dismiss for lack of subject matter jurisdiction is analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true; however, if a complaint is formally sufficient, the movant may use affidavits and other material to support the motion. *Id.* The district court is free to look beyond the jurisdictional allegations of the complaint and weigh whatever evidence is submitted on the issue. *Id. See also Capital Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993); *Roman v. USPS*, 821 F.2d 382, 385 (7th Cir. 1987).

### B.     The Court Has Subject Matter Jurisdiction Over the Defendants and the Cause of Action

The Commission possesses original jurisdiction over this action under Section 6c(a) of the Act, 7 U.S.C. § 13c(a), which provides, in relevant part:

> Whenever it shall appear to the Commission that any ... person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation, or order thereunder, ... the Commission may bring an action in the proper district court of the United States ... to enjoin such act or practice, or to enforce compliance with this Act, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions...

There is no question that subject matter and personal jurisdiction over Sarvey and Sklena is proper under this statute. The Defendants admitted subject matter jurisdiction in the Consent Order of Preliminary Injunction entered by the district court. (Dkt. 41, filed 2/25/2008). The transactions giving rise to the funds in controversy involved futures contracts, over which the

4

Commission has exclusive jurisdiction. See Section 2 of the Act, 7 U.S.C. § 2. The relief

defendants make no showing that such jurisdiction over the Defendants is improper.

C.    A Court Can Obtain Equitable Relief From A Non-Party Against Whom No
      Wrongdoing Is Alleged If It Is Established That The Non-Party Possesses
      Illegally Obtained Profits But Has No Legitimate Claim To Them.

        The Seventh Circuit and many other courts have long endorsed actions against nominal

defendants to collect the proceeds of fraud. As the Seventh Circuit set forth in *SEC v. Cherif*,

933 F.2d 403, 414 (7th Cir. 1991), *cert. denied*, 502 U.S. 1071 (1992), in the context of an

enforcement fraud case, the Commission may name as a "nominal" or "relief" defendant anyone

who received the illegal profits of the principal defendants' fraud and who does not have a

legitimate claim to ownership of the funds. The relief defendant does not face any claim of legal

liability for the actual fraud committed by the defendants, but is a non-party joined in an action

to effect full relief in the marshalling of assets that are the fruit of underlying fraud. Such

nominal or relief defendant is typically a trustee, agent or depositary, who has possession of the

funds which are the subject of litigation and are joined purely as a means to facilitate collection

of such funds. *Id.  See also SEC v. Egan*, 856 F. Supp. 401, 402 (N.D. Ill. 1993) (the SEC does

not need to show exactly where the profits went to have relief defendants disgorge the benefits

"that they derived from the violations by the culpable defendants").

        As stated by the Ninth Circuit in *Colello*: "[A]mple authority supports the proposition

that the broad equitable powers of the federal courts can be employed to recover ill gotten gains

for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one

who has received the proceeds after the wrong." *SEC v. Colello*, 139 F.3d 674, 676-77 (9th Cir.

1998). Thus, courts have the power to order disgorgement from parties that have not committed

any wrong-doing, but who have "received proceeds after the wrong." *Id.*, 139 F.3d at 675.

*Accord, SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (recipients of ill-gotten funds or gifts

5

purchased with money obtained through securities fraud had no legitimate claim to funds and

could be required to disgorge the benefit); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d

187, 191 (4th Cir. 2002) (although the court would lack subject matter jurisdiction over claims

asserted directly against transferees, who were not charged with violating the Commodity

Exchange Act, transferees could be sued as nominal defendants); *SEC v. Cavanagh,* 155 F.3d

129, 136 (2nd Cir. 1988) (federal courts may order equitable relief against a nominal defendant

where such person has received ill-gotten funds and does not have a legitimate claim to those

funds); *SEC v. Antar*, 120 F. Supp.2d 431, 438-40 (D.N.J. 2000) (court had ancillary jurisdiction

over transferees); *CFTC v. IBS, Inc.*, 113 F. Supp.2d 830, 851-52 (W.D.N.C. 2000) (court had

jurisdiction over innocent transferees and could preliminarily enjoin them from disposing of

funds in question); *SEC v. Better Life Club of America, Inc.*, 995 F.Supp. 167, 181 (D.D.C.1998),

*aff'd*, 203 F.3d 54 (D.C. Cir.), *cert. denied*, 528 US 867 (1999) (district court could exercise

supplemental jurisdiction in securities fraud action brought by the SEC over claims for

disgorgement and for imposition of constructive trust on assets of third parties who had not

themselves violated securities laws, but who had allegedly accepted gratuitous transfers of assets

from primary violator, where SEC's claims against non-violators arose from same scheme of

securities fraud).

In cases such as this, the Commission need only establish subject matter jurisdiction over

the primary Defendants. A federal district court does not have to obtain subject matter

jurisdiction over nominal defendants to exercise its jurisdiction "because there is no claim

against the relief defendant, it is unnecessary to obtain subject matter jurisdiction over the relief

6

defendant once jurisdiction over the primary defendants is established." *Cherif,* 933 F.2d at 414; *Kimberlynn Creek Ranch* , 276 F.3d at 191; *Colello*, 139 F.3d at 676.[4]

"Federal district courts have the jurisdiction to decide the legitimacy of ownership claims to assets alleged to be proceeds from violations of federal law, and may order the nominal defendant to turn over funds when the dispute between the parties is resolved." *Cherif*, 933 F.2d at 414. The federal district court's jurisdiction over nominal defendants is rooted in ancillary equitable jurisdiction, not subject matter jurisdiction. *See, e.g, Colello,* 139 F.3d at 676 (ample authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrong doing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong ). *Accord, Kimberlynn Creek*, 276 F.3d 187 at 192.

## IV.
## THE RELIEF DEFENDANTS' CLAIMED STANDARD FOR NAMING RELIEF DEFENDANTS IS CLEARLY ERRONEOUS

The Relief Defendants contend that a person or entity may be joined as a "nominal" or "relief" defendant to aid in the recovery of funds without an assertion of subject matter jurisdiction only if there is "no dispute that the relief defendant has no ownership interest in the property that is the subject of the litigation," and cite *Cherif* at 414 as their basis for this standard.[5] This misconstrues the issues as to the Relief Defendants at this point in the litigation.

---

[4] The Relief Defendants contend in footnote 9 of their motion that in the alternative the court should dismiss them pursuant to F.R.Civ.P. 12(b)(6). However, Rule 12(b)(6) is not applicable here because it governs motions to dismiss for failure to state a claim upon which relief can be granted. The CFTC has already stated a sufficient cause of action against Defendants, and there is no requirement that a separate cause of action must be stated against an individual in order to name him as a Relief Defendant. *Cherif*, 933 F.2d at 414.

[5] It appears that Relief Defendants are referencing the statement in *Cherif* that "a nominal defendant holds the subject matter of the litigation in a subordinate or possessory capacity as to
(footnote continued . . .)

The only issues to be decided by this Court as pertaining to the Relief Defendants are (1) whether they received any of the profits as a result of the primary Defendants' fraud and (2) whether they have a legitimate claim to them. There is no dispute that the Relief Defendants received approximately $650,000 from trading profits reaped by Sklena as a result of his and Sarvey's trading of 2,274 contracts on April 2, 2004. Thus, the issue to be decided by this court is, assuming that the trading profits were the product of illegal trade practices and fraud, whether the Relief Defendants had a legitimate claim to a share of the profits. *See Cavanagh*, 155 F.3d at 136 ("[Relief defendant] does not dispute that she received proceeds. Thus, the issue is whether [she] has a 'legitimate claim' to the ... proceeds"). This determination needs to be made in the context of all the facts and circumstances, which include the rights of the customers whose orders were defrauded. As between a relief defendant and the victims of a fraud, equity dictates that the rights of the victims are paramount. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020 (N.D. Ind. 2000).

The Relief Defendants contend that Sklena's assumption of a large long position opposite Sarvey exposed the clearing firm to market risk, and thereby gives them a legitimate interest in

---

( . . . footnote continued)

which there is no dispute" *Id* at 414 citing *Colman v. Shimer*, 163 F.Supp. 347, 351 (W.D. Mich. 1958). In *Colman,* the Court sorted out who was a nominal versus a necessary party by examining which defendants were actually "in dispute" with the plaintiff - meaning which defendants were at the center of the cause of action brought by the plaintiff. It is in this context that the court in *Colman* stated that a "nominal party has possession of the funds which are the subject of litigation in a subordinate capacity as to which there is no dispute," meaning that the nominal party has possession of funds but is not the real party "in dispute" with the plaintiff. For example, *in Colman,* the plaintiff's action was based upon rescission of a contract. One defendant was not a signatory to the contract, but was named in the suit because he was in possession of funds that were necessary to satisfy a judgment should the plaintiff prevail, and the Court held that he was a nominal party because he was only in possession of funds to satisfy a judgment and was not involved in the main cause of action before the court - the contract dispute. The other defendant was the actual signatory to the contract and therefore was the sole party "in dispute" with the plaintiff.

8

the proceeds to the trade regardless of the *bona fides* of the trade. The complaint specifically alleges the contrary. Moreover, the Relief Defendants' assertion must be determined in the context of all the facts and circumstances. *Cf. Colello*, 139 F.3d at 677 (court drew adverse inference from nominal defendant's invocation of Fifth Amendment privilege not to testify); *Kimberlynn Creek Ranch*, 276 F.3d at 192 ("a claimed ownership interest must not only be recognized in law; it must also be valid in fact").

The Commission is prepared to prove that the Relief Defendants did not act in good faith and turned a blind eye to whether Sklena had obtained the profits through legitimate means. The Relief Defendants did not inquire as to how Sklena had managed to purchase a huge quantity of contracts at virtually the market low. The Relief Defendants ignored Sklena's contention that he had a good "cushion" when he acquired the position. The Relief Defendants did not inquire into the interests of public customers. The Relief Defendants only thought about themselves. The Commission will contend that they acted with unclean hands.[6] Under the doctrine of unjust enrichment, a plaintiff must establish the defendant was enriched and that "the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff." *Antar*, 831 F. Supp at 402 (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir.), *cert. denied*, 479 U.S. 987 (1986). The Seventh Circuit in its *Cherif* decision did not use the"no dispute" language to set the standard of naming a nominal defendant in the context that the Relief Defendants use it. Rather, that language was used to describe which parties were actually involved in the primary dispute before the court, and which parties were ancillary to it.

---

[6] The Commission arguably could have alleged that the Relief Defendants directly or indirectly violated the Act or Commission Regulations, but did not.

9

Further, according to the Relief Defendants erroneous interpretation of *Cherif,* if there is

some dispute over whether they are legitimately entitled to the proceeds from the alleged

fraudulent conduct, the CFTC cannot name them as relief defendants. If this were accurate then

the entire concept of relief defendants would be unworkable because any time a relief defendant

was named they would simply dispute the claim that they did not have a legitimate interest in the

funds at issue and be dismissed from the case. Additionally, if the Relief Defendants' reading of

*Cherif* were accurate then the Seventh Circuit's' statement in *Cherif* that "federal district courts

have jurisdiction to decide the legitimacy of ownership claims to assets alleged to be proceeds

from violations of federal law" would be completely contradictory and meaningless.

Instead, *Cherif* affirms that a relief defendant is joined to aid recovery because he has

possession of illegally obtained funds without any legitimate claim to them. The relief defendant

will likely dispute whether he has a legitimate claim to the funds, but that is not grounds for his

dismissal. Instead, that is a factual issue to be determined once the dispute between the primary

parties is decided. *Id* at 414.

V.

## THE CHICAGO BOARD OF TRADE ARBITRATION COMMITTEE DID NOT DETERMINE THAT RELIEF DEFENDANTS HAVE A LEGITIMATE CLAIM TO THE ILLEGALLY OBTAINED TRADING PROFITS THEY RECEIVED FROM SKLENA

Relief Defendants claim that the decision of the Chicago Board of Trade's ("CBOT")

Arbitration Committee awarding Relief Defendants approximately $650,000 of Sklena's illegally

obtained trading profits from the April 2, 2004 trade of 2,274 contracts opposite Sarvey shows

that they somehow have a legitimate claim to the funds.[7]  As discussed *infra*, it is premature to consider this issue insofar as it is a but one of many facts and circumstances to be considered whether the Relief Defendants have any legitimate claim to any portion of Sklena's trading profits.

In point of fact, the Commission believes that the private arbitration proceeding between the Relief Defendants and Sklena is irrelevant.  The arbitration committee only adjudicated the private rights to those monies as between the wrongdoer, Sklena and J. Bonfitto and Bonfitto Trading.  No competing interests were considered.  The instant case involves the rights to those funds as between Sklena, the wrongdoer and Sarvey's customers, who were the innocent victims of Sarvey and Skelna's fraud.  The Relief Defendants obtained approximately $650,000 of fraudulently obtained customer funds and therefore they have no legitimate claim to them and must disgorge them for subsequent distribution to the defrauded customers.  *See SEC v. Infinity Group Co.*, 993 F. Supp. 314, 331 (E.D. Pa. 1998)(services rendered in furtherance of a fraud do not constitute a legitimate claim on the ill-gotten gains of the fraud).

In *Infinity Group*, a relief defendant claimed that she rendered consideration in the form of administrative and clerical services and thus, should be permitted to retain the funds she received from Defendants.  In ordering her to disgorge those funds, the *Infinity* Court declared:

> Moreover, to the extent that [relief defendant] earned any of the funds which
> were transferred into these trusts, she did so in the service of the very

---

[7] Defendants claim in their response to Relief Defendants motion to dismiss that the "CBOT Arbitration Panel did not rule in favor of Bonfitto Trading."  However, Sklena claimed before the arbitration panel that he was entitled to approximately $938,000 in profits that Relief Defendants had obtained.  The arbitration panel awarded him $85,270, and permitted the Relief Defendants to keep the balance, $650,000 of which resulted from the trades at issue here. (*See* Ex.11 to Relief Defendants' Motion to Dismiss at ¶¶ 20-32; and Ex. 14 to Relief Defendants' Motion to Dismiss).

> unlawful offering and sale of securities which is the subject of these
> proceedings. It would be contrary to the securities law to allow [relief
> defendant] to launder the proceeds of a securities fraud by billing bilked
> investors for services rendered in furtherance of that fraud. **Illegal
> consideration is invalid consideration and thus cannot shield ill-gotten
> gains from disgorgement.** (Emphasis added).

Similarly in *Think Achievement Corp.*, 144 F. Supp. 2d at 1020, the Court held that between a

relief defendant and the victims of a fraud, equity dictates that the rights of the victims are

paramount. Thus, while Relief Defendants may have a claim to the profits vis a vis Sklena, that

is not the issue here. Rather, the issue here is whether Sarvey's defrauded customers have a

paramount right to the profits vis-à-vis the Relief Defendants, and equity dictates that they do.

Finally, J. Bonfitto and Bonfitto Trading's lack of supervision of Sklena under

circumstances when they apparently knew that he posed a risk to the clearing firm is a factor that

allowed Sklena's fraud to occur. The Relief Defendants permitted Sklena to trade a large

number of contracts instead of terminating their relationship when they were first apprised that

Sklena had suffered large trading losses without sufficient capital to cover them in March 2004.

*(See Exhibit A, Transcript of J. Bonfitto's testimony before the CBOT Hearing Committee ("J.*

*Bonfitto, Hearing Comm. Tr".), pages 26-30).* J. Bonfitto merely counseled Sklena to trade in

smaller amounts and to accumulate smaller overall positions, but there is a question of fact

whether the Relief Defendants performed any meaningful supervision to ensure that Sklena

adhered to the counseling.*(See Exhibit B, Transcript of J. Bonfitto's testimony before the CBOT*

*Arbitration Committee, pages 176-180; 185-186)*.

The Relief Defendants did not learn of their purported exposure to risk until after the fact.

Even then, there is a question whether the Relief Defendants acted in good faith. The

Commission is prepared to prove that when J. Bonfitto learned that Sklena had executed the

2,274 lot trade against Sarvey on April 2, 2004, he called Sklena into his office and questioned

him about the trade because it was outside of the parameters he had given to Sklena. Before Sklena responded to J. Bonfitto's questions about the trade, Sklena asked J. Bonfitto whether "his office was bugged." *(Exhibit A, J. Bonfitto, Hearing Comm. Tr., pages 35-37)*. Sklena then told J. Bonfitto that he had a good "cushion" on the 2,274 trades, indicating that he knew he would make money on them. *(Id.)*.

Sklena's question as to whether or not J. Bonfitto's office "was bugged" is particularly incriminating because it is an inquiry likely to be made only if one intends to hide violative conduct. Despite this question and Sklena's failure to adhere to the instructed trading parameters, and the financial risk to which Sklena's trade exposed Bonfitto Trading, J. Bonfitto did nothing to investigate whether the trade was lawfully executed. Instead, J. Bonfitto shared in the illegal profits.

Neither Bonfitto Trading nor J. Bonfitto has any legitimate equitable or legal claim to the approximately $650,000 in illegal trading profits they received as compensation from Sklena for purportedly exposing the firm to market risk. Therefore they should be ordered to disgorge these funds for the purpose of making restitution to customers.

## VI.
## CONCLUSION

The Relief Defendants' motion to dismiss for lack of subject matter jurisdiction must fail. The Court has subject matter jurisdiction over the Defendants and thus does not need to obtain subject matter jurisdiction over the Relief Defendants who received illegally obtained funds and have no legitimate claim to them. For the foregoing reasons, the Commission requests that the Court deny the Relief Defendants' Motion.

Dated:  March 28, 2008                    Respectfully Submitted,


                                           ____/s/_____
                                           Susan Gradman
                                           Senior Trial Attorney (sgradman@cftc.gov)
                                           Commodity Futures Trading Commission
                                           525 West Monroe Street, Suite 1100
                                           Chicago, Illinois 60661
                                           (312) 596-0523
                                           (312) 596-0714 (facsimile)


                                           _____/s/_____
                                           Camille M. Arnold
                                           Senior Trial Attorney (carnold@cftc.gov)
                                           Commodity Futures Trading Commission
                                           525 West Monroe Street, Suite 1100
                                           Chicago, Illinois 60661
                                           (312) 596-0524
                                           (312) 596-0714 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned, an attorney with the Commodity Futures Trading Commission, certifies that on March 28, 2008, I caused the foregoing,

- *Notice of Filing*

- *Plaintiff's Commodity Futures Trading Commission's Response Opposing Relief Defendants Lawrence Bonfitto Trading Company and Joseph J. Bonfitto's Motion To Dismiss*

to be electronically filed with the Clerk of the Court using CM/ECF and to be served on the following individuals by Electronic means and/or ECF notification.

## SERVICE LIST

Scott Early, Esq.
Foley & Lardner, LLP
321 North Clark Street
Suite 2800
Chicago, Illinois 60610-4764
*searly@foley.com*

Lisa Tharpe, Esq.
Foley & Lardner, LLP
321 North Clark Street
Suite 2800
Chicago, Illinois 60610-4764
*ltharpe@foley.com*

Charles Risch
Lawrence, Kamin Saunders & Uhlenhop
LLC
300 South Wacker Drive
Suite 500
Chicago, Illinois 60606
*crisch@lksu.com*

Paul M. Weltlich
Lawrence, Kamin, Saunders & Uhlenhop
LLC
300 South Wacker Drive
Suite 500
Chicago, Illinois 60606
*pweltlich@lksu.com*

John S. Monical
Lawrence, Kamin, Saunders & Uhlenhop
LLC
300 South Wacker Drive
Suite 500
Chicago, Illinois 60606
*jmonical@lksu.com*

Mitchell B. Goldberg
Lawrence, Kamin, Saunders & Uhlenhop
LLC
300 South Wacker Drive
Suite 500
Chicago, Illinois 60606
*mgoldberg.@lksu.com*

John Ruark
Lawrence, Kamin Saunders & Uhlenhop LLC
300 South Wacker Drive
Suite 500
Chicago, Illinois 60606
*jruark@lksu.com*

Respectfully submitted,

**s/ Camille M. Arnold**
Camille M. Arnold
Senior Trial Attorney
(carnold@cftc.gov)
Commodity Futures Trading
Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0524 (Arnold)
(312) 596-0714 (facsimile)

# EXHIBIT A

1                    BEFORE THE HEARING COMMITTEE
                              OF THE
2                      CHICAGO BOARD OF TRADE

3    IN THE MATTER OF:                )
                                      )
4    WILLIAM A. MALEK, EDWARD C.      )
     SARVEY, DAVID G. SKLENA and      )No. 2005 INB-12C,
5    MICHAEL L. HALLIN,               )     D, E and F
                                      )
6
             REPORT OF THE PROCEEDINGS at the hearing
7    of the above-entitled cause on January 8th, 2007 at
     2:15 p.m., 141 West Jackson Street, 6th Floor Board
8    Room, Chicago, Illinois.

9        COMMITTEE BOARD MEMBERS:

10           MR. RAYMOND L. CZUPEK, Chairman
             MR. JEROME F. VRABEL
11           MR. A. JOHN YAVARI
             MR. MICHAEL RYAN
12           MR. STEPHEN GELDERMAN
             MR. STEPHEN S. STRONG
13
         APPEARANCES:
14           ON BEHALF OF EDWARD C. SARVEY, WILLIAM A.
             MALEK and DAVID G. SARVEY:
15           MR. SCOTT EARLY

16           ON BEHALF OF OIA:
             MS. ANN PULASKI
17           MR. DEAN PAYTON
             MR. DAVID SILVA
18

19

20

21

22

23

24

                                                          1

```
 1                    I N D E X
                                     Re-    Re-    By
 2    Witnesses:          Direct  Cross  direct  cross  Examiner
      Joe Bonfitto          24      37      42

 3

 4    Jennifer Baum        44

 5

 6

 7

 8                  E X H I B I T S

 9    Number          For Identification          In Evidence

10                    (None so marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

2

1   him on any matters that come up and you rely on the

2   record in the arbitration matter.

3       MR. EARLY: I don't completely understand

4   counsel's comment with respect to what the scope of

5   cross examination is, but I understand the

6   Committee's ruling to hear Mr. Bonfitto and we made

7   our objection for the record.

8       MS. PULASKI: We are just giving Mr. Bonfitto a

9   copy of the exhibit book to refer to a couple of

10  the exhibits.

11                   (Witness sworn.)

12               JOE BONFITTO,

13  called as a witness herein, having been first duly

14  sworn, was examined and testified as follows:

15               DIRECT EXAMINATION

16               BY

17               MS. PULASKI:

18      Q.   Will you please identify yourself by

19  stating your name and spelling it for the record?

20      A.   My name is Joe Bonfitto, B-o-n-f-i-t-t-o.

21      Q.   And what is your current occupation?

22      A.   I don't have a job, I'm semi retired.

23      Q.   Are you presently a member of the Chicago

24  Board of Trade?

                                                    24

1    **A.**   I'm a shareholder, I don't hold my trading

2    right any longer.

3        **Q.**   Were you previously a member?

4        **A.**   I was a member from 1984 on.

5        **Q.**   Until when?

6        **A.**   I sold my trading right in '03 -- no, I'm

7    sorry, '05.  I still have my shares.

8        **Q.**   Could you provide the hearing panel with a

9    brief summary of your career at the exchange?

10       **A.**   I started out as a floor clerk in the bond

11   room in 1981 or '82, working for a brokerage group

12   in the 30-year pit.

13              In 1984, I started leasing a fractional

14   membership and filling small orders for the group.

15   Two years later, I left that group and started

16   trading for my own account.  I did that -- I traded

17   for my own account from '86 then on until '01 in

18   the 30-year pit.  In 1995, another member and I

19   from the 30-year pit, Steve Lawrence, opened up a

20   clearing firm.  We cleared mostly financial

21   traders.  That firm was opened until 2004.  I

22   traded then in the 10-year pit in '02, '03 and part

23   of '04 and I haven't traded since.

24       **Q.**   What products did you trade?  I think you

25

1   said you traded 10-year and 30-year bonds, was

2   there anything else?

3      **A.**   And I briefly made a few uneventful

4   appearances in the bean pit.

5      **Q.**   Did you ever trade electronically?

6      **A.**   Very small part-time.

7      **Q.**   Do you know David Sklena?

8      **A.**   I do.

9      **Q.**   And what was your relationship with him?

10     **A.**   He was one of the locals who cleared my

11  firm from pretty much from when we started in '95

12  until we closed in 2004.  I also knew him socially

13  from being in the building together, we were

14  friends.

15     **Q.**   I would like to refer you to March 5th,

16  2004, which was the first Friday in March and it

17  was an unemployment day.  To your knowledge, was

18  Mr. Sklena trading on that day?

19     **A.**   Yes.

20     **Q.**   And was he clearing through your firm on

21  that day?

22     **A.**   He was.

23     **Q.**   I would like you to look at the exhibit

24  book and refer to Tab No. 5.

26

1    MR. EARLY: Mr. Chairman, again, for the record,

2    we have objected, March 5th is not a charge date,

3    March 5th is not at issue in this hearing with

4    respect to Mr. Sklena or anyone else.

5       CHAIRMAN CZUPEK: Ms. Pulaski, do you have a

6    response to that?

7       MS. PULASKI: Yes.  Well, first of all there are

8    certain trades charged on March 5th, although

9    that's not the purpose for which we are asking

10   Mr. Bonfitto questions.  But certain activity on

11   March 5th, we do intend to show it's relevant to

12   Mr. Sklena's activity on April 2nd.

13      CHAIRMAN CZUPEK: Was that one of the dates that

14   you had in your opening statement?

15      MS. PULASKI: Yes.  Well, I didn't refer to it by

16   date, but in my opening statement I said that he

17   had blown out of the market the month before and

18   this is what the testimony will refer to.

19      CHAIRMAN CZUPEK: Continue on.

20   BY MS. PULASKI:

21      Q.   Mr. Bonfitto, looking at Exhibit 5, are

22   these pages Mr. Sklena's account statements for

23   March 5th, 2004?

24      A.   They are.

27

1    **Q.**    And did Mr. Sklena make or lose money

2    trading on this day?  On Page 5 of the exhibit,

3    would you refer to that page?

4    **A.**    He lost a little over $300,000.

5    **Q.**    If you turn to Page 7, was Mr. Sklena a

6    debit at the conclusion of that day?

7    **A.**    His account was a $290,000 debit.

8    **Q.**    Did he have the funds to cover the debit on

9    March 5th?

10   **A.**    Not at that time, no.

11   **Q.**    Do you know how he did cover the debit?

12   **A.**    As I recall, he sold his membership and

13   leveraged, I believe, some -- got a loan against

14   his house and I think he might have borrowed some

15   money from his brother, if I remember correctly.

16   **Q.**    And was he off the floor for a period of

17   time after that?

18   **A.**    Yeah, for a few weeks.

19   **Q.**    Did you meet with Mr. Sklena after his

20   March 5th trading?

21   **A.**    I met with him before he started trading

22   again, yeah.

23   **Q.**    And were you responsible for -- I'm sorry,

24   let me ask it a different way.  Why was he off the

28

1  floor for that period of several weeks?

2      **A.**    He wasn't -- we didn't let him trade until

3  he cleared up his debit.

4      **Q.**    When you met with him, what did you

5  discuss?

6      **A.**    Well, I recall the conversation going

7  something like, you know, I talked to him in terms

8  of both his clearing firm and as a friend, that,

9  you know, the financial markets have gotten thin,

10  and, you know, if you didn't have a lot of equity,

11  which was clear at that point, either he was

12  strapped for cash or whatever, it took him a little

13  while to pay his debit, so I didn't feel like

14  either as his clearing firm or his friend, that he

15  should be participating heavily in risky

16  situations.

17          We talked about the unemployment number

18  in particular because he had lost money on that the

19  previous month.  And just a general consensus was,

20  that, you know, times have changed, things are

21  different, it was a lot harder to come back from a

22  big loss and that he should abstain, especially

23  from putting himself in risky situations when the

24  markets were volatile.

                                                    29

1    **Q.**    Did you talk about size?

2    **A.**    I spoke particularly about the unemployment

3    number.  I believe I used a number like going to

4    trade it all, a 20 or a 50 lot is a good idea,

5    nothing above that -- I think I might have even

6    said wait until the market has processed, but if

7    you do, that you keep it small, like a 20 or a 50

8    lot.

9    **Q.**    And did he agree to do that?

10   **A.**    I believe he kind of went along, yeah, sure

11   he went along with what I was saying.

12   **Q.**    Now on April 2nd, 2004, the first Friday in

13   April and the next unemployment day, were you in

14   the office?

15   **A.**    No, I was in California.

16   **Q.**    Did you check in with your office that day?

17   **A.**    No, I got a phone call from my office.

18   **Q.**    And can you describe that phone call?

19   **A.**    My brother Jimmy was working for me at the

20   time and he called my cell phone and asked me if I

21   had seen what had happened in the financial

22   markets, that the unemployment number had come in

23   way out of whack and that there was a huge move in

24   the market.

30

1    **A.**    I believe it was around 8:15.

2    **Q.**    And was anyone else present?

3    **A.**    No.

4    **Q.**    What did you say to Mr. Sklena?  Well, let

5    me ask you first, at that point did you know what

6    Mr. Sklena had traded on that previous Friday?

7    **A.**    Certainly.

8    **Q.**    And what was that, that you knew?

9    **A.**    It was somewhere, somewhere around 2500 --

10   he took a 2500 lot or somewhere around there.  I

11   don't remember the exact number now, but a large --

12   he took the other side of a very big order.

13   **Q.**    Were you upset by that?

14   **A.**    Certainly.

15   **Q.**    Why were you upset?

16   **A.**    I felt that he had put my clearing firm at

17   extreme and excessive amount of risk and exposure

18   without having very much equity to stand behind the

19   trade.

20   **Q.**    So when you met with him on the following

21   Monday morning, what did you say to him?

22   **A.**    First thing I said was, you know, what the

23   hell were you thinking, something like that.

24   **Q.**    And what was the first thing that he said

35

1   to you?

2       **A.**   He asked me if my office was bugged.

3       **Q.**   What did he tell you about his trading on

4   April 2nd?

5       **A.**   He told me that I didn't have anything to

6   worry about because he had a cushion on the trade.

7       **Q.**   Do he tell you what that cushion was?

8       **A.**   I believe he told me around 8 or 9 tics.

9       **Q.**   He didn't tell you that it was 25 or 30

10  tics, did he?

11      **A.**   No.

12      **Q.**   Did his response make you feel any better

13  about the situation?

14      **A.**   No.

15      **Q.**   Why not?

16      **A.**   Well, I had been in the business a long

17  time and I traded electronically since that box had

18  shown up.  And I traded fairly good sized myself

19  and I had a few occasions where I had a few too

20  many contracts on me when the market was moving

21  quickly and you're not able to exit that trade on

22  the computer.

23              So I very strongly felt that with a

24  position that size and with him not having any

                                                        36

1  equity to back it up, that if that trade had gone

2  against him, that A, he wouldn't have been able to

3  exit the trade and I had strong suspicions that he

4  wouldn't have exited the trade, that he might have

5  added to the trade and it could have been a

6  disastrous trade that my clearing firm and myself

7  personally would have had to bear the brunt of.

8     **Q.**   Did you say anything to him about who

9  should be trading that kind of size?

10     **A.**   I told him those types of orders should

11  only be -- the other side should only be taken by

12  big financial institutions that have hundreds of

13  millions behind them. Pension funds, even the

14  biggest traders, you know, would take a portion of

15  that trade, but never would take the whole trade

16  during unemployment.

17     MS. PULASKI: I don't have any further questions.

18     CHAIRMAN CZUPEK: Mr. Early.

19             CROSS EXAMINATION

20             BY

21             MR. EARLY:

22     **Q.**   Mr. Bonfitto, my name is Scott Early, we've

23  met before, haven't we?

24     **A.**   Yes, sir.

37

# EXHIBIT B

1              BEFORE THE ARBITRATION COMMITTEE

2                         OF THE

3                 CHICAGO BOARD OF TRADE

4

5    - - - - - - - - - - - - - - - - - -:
                                        :
6    IN THE MATTER OF:                   :
                                        :
7    DAVID SKLENA,                       :
                                        :
8           Claimant,                    :
                                        :
9           VS.                          :
                                        :
10   LAWRENCE BONFITTO TRADING           :
     COMPANY AND JOSEPH BONFITTO,        :
11                                       :
            Respondents.                 :
12                                       :
     - - - - - - - - - - - - - - - - - -:
13

14           Proceedings had in the above-entitled

15   matter on the 30th day of September, 2004, at

16   141 West Jackson, 6th Floor, Conference Room B,

17   Chicago, Illinois.

18
        COMMITTEE BOARD MEMBERS:
19
             MR. J. RICK RIECHERS, Chairman.
20           MR. JAMES H. SCHWARTZ
             MS. PAMELA DAVIS-ROGERS
21           MR. J. ANDREW WALLACE
             MR. GEORGE BAKOURIS
22
        ALSO PRESENT:
23
             MR. SEAN GALLAGHER, Legal Liaison
24

                                                    1

1       APPEARANCES (continued):

2           ON BEHALF OF CLAIMANT:

3               FOLEY & LARDNER, LLP., by
                MR. SCOTT E. EARLY and
4               MR. JERALD L. JESKE

5           ON BEHALF OF RESPONDENTS:

6               LAWRENCE, KAMIN, SAUNDERS &
                UHLENHOP, L.L.C., by
7               MR. JOHN D. RUARK and
                MR. CHARLES J. RISCH

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                    2

1   CHAIRMAN RIECHERS:  Mr. Early.

2              DIRECT EXAMINATION

3                   BY

4              MR. EARLY:

5      Q.   Mr. Bonfitto, my name is Scott Early and I

6   represent Mr. Sklena.  We have not met before.

7      A.   No, we have not met.

8      Q.   Now I want to ask you a few questions about

9   what you said on direct.  You talked on direct about

10  the conversations you had with Dave Sklena after the

11  March 5th trading day.  Do you recall that

12  testimony?

13     A.   I do.

14     Q.   Now when you said in your testimony that you

15  talked to David about what size he should trade, did

16  you put any written limits on his trading?

17     A.   I didn't.

18     Q.   Did you put any restrictions on his

19  computer?

20     A.   No.  It doesn't make any sense to do that.

21  You can put a 25 limit on someone, then they can do

22  25, 25, 25, 25.

23     Q.   So it's your testimony that trading

24  technology and the system doesn't make a failsafe

1  system whereby you can put restrictions on a

2  person's trading?

3     A.    That s not my testimony.  I didn't put any

4  written limits.  I didn't put any limit on his

5  computer.

6     Q.    Now at the same time, March of '05, you were

7  the principal owner of Lawrence Bonfitto, correct --

8     A.    Correct.

9     Q.    -- if not the sole owner, correct?

10     A.    I was the sole owner.

11     Q.    You were the sole owner?

12           So this is your money that's at risk?

13     A.    Correct.

14     Q.    And you are saying you were concerned about

15  David's trading, but you didn't put any written

16  limits on; is that correct?

17     A.    Correct.

18     Q.    Did you monitor his trading on a daily

19  basis?

20     A.    I asked.

21     Q.    Did you personally go check?

22     A.    No, I had somebody do that for me.  I had a

23  risk manager.

24     Q.    So you had somebody else do it?

177

```
 1      A.   I did.
 2      Q.   So it's your money and you asked somebody
 3  else to do it?
 4      A.   I did.
 5      Q.   Did you tell him that he couldn't trade a
 6  certain size?
 7      A.   Did I tell David?
 8      Q.   Did you tell Joe Postel, your risk manager,
 9  that David couldn't trade a certain size?
10      A.   I told him I met with him.  He's to keep his
11  size down.
12      Q.   You didn't tell him to limit him to 50 or 20
13  lot?
14      A.   I don't recall if I said that to Joe.
15      Q.   I'm going to read you from your submission
16  in this case at Page 4, Paragraph 2, quote, and this
17  is in reference to the March 5th time frame,
18  "Bonfitto (sic) told Sklena in particular that he
19  had to stop taking 200 and 300 lot trades and reduce
20  the size of his trading to 20 or 50 lot."
21             And your testimony here is today you
22  don't recall whether you said that to David?
23      A.   I said that to David.
24      Q.   You said to start trading at 20 or 50 lots?
```

178

1     A.    I told him to trade 20 and 50 lots,

2   especially unemployment.

3     Q.    Did you tell that to Joe Postel?

4     A.    I may have.

5     Q.    Did you put it in writing?

6     A.    I did not.

7     Q.    Had you ever in the nine years that you had

8   been running Lawrence Bonfitto fired a local trader?

9     A.    Fired a local trader?

10    Q.    Yes, told him you weren't going to clear him

11  any more.

12    A.    I know our company had.  I don't know if I

13  had personally.

14    Q.    Your company had, the company in which you

15  were a major shareholder, if not the sole

16  shareholder?

17    A.    Yes.

18    Q.    So you knew that was an option you had?

19    A.    To let guys go?

20    Q.    Yes.

21    A.    Sure.

22    Q.    And you knew if you didn't when you put

23  people down on the floor you were at risk for trades

24  that they made.  That's what a clearing member does,

179

1  right?

2      A.    I'm solely at risk.

3      Q.    That's right.  You knew that?

4      A.    I did.

5      Q.    So you knew if you couldn't take anybody's

6  trading, you could fire them?

7      A.    I'm sorry.

8      Q.    If you didn't like the way one of your

9  customers were trading, you would let them go,

10  right?

11     A.    Right.

12     Q.    You didn't do that with David in March?

13     A.    Did I let him go in March?

14     Q.    Correct.

15     A.    No.

16     Q.    You didn't let him go in April either, did

17  you?

18     A.    No.

19     Q.    Now you referred to some discussions on the

20  morning of April 5th with Mr. Tom Cargie, a member

21  of the Exchange legal staff.  Do you recall that

22  testimony?

23     A.    I do.

24     Q.    Did Mr. Cargie tell you that Exchange

1  time when he left, that's almost the whole month of

2  April, you never checked with Dave as to whether or

3  not he was signing that?

4      A.   (Witness shook head.)

5      Q.   It is your money that was in the firm,

6  right?

7      A.   Correct.

8      Q.   And he's down there trading on the floor

9  every day?

10     A.   Correct?

11     Q.   You saw the trading that he was doing every

12  day?.

13     A.   Correct.

14     Q.   You saw the 500 lots, the 400 lots, the 300

15  lots repeatedly through the month of April after

16  this conversation with him, correct?

17     A.   I did.

18     Q.   And you never fired him?  You never told him

19  to leave?

20     A.   No.

21     Q.   You never cut off his clearing at that

22  point?

23     A.   No.

24     Q.   You never put written trading limits on him

185

1 after that, did you?

2    A.  No.

3    Q.  Joe Postel resigned on the 5th of April,
4 correct?

5    A.  Correct.

6    Q.  After the 5th of April, after Mr. Postel
7 resigned, did you review Dave's trading account
8 every day?

9    A.  I'm sorry?

10   Q.  After the 5th when Dave went back on the
11 floor, did you personally review his trading account
12 every day?

13   A.  Myself and Andy looked at his cards.  I
14 wasn't reviewing his statements.

15   Q.  You were looking at his cards?

16   A.  Yes.

17   Q.  So you saw his trading cards?

18   A.  I did.

19   Q.  Now you talked about when David left on the
20 last day you told him that he couldn't withdraw the
21 funds from his account, correct?

22   A.  I told him on the last day when he was at my
23 firm when he said that he was backing out of the
24 deal.