IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| | ) | Case No. 08 C 192 |
| Plaintiff , | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| EDWARD SARVEY | ) | |
| and | ) | |
| DAVID G. SKLENA, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| LAWRENCE-BONFITTO TRADING | ) | |
| COMPANY | ) | |
| and | ) | |
| JOSEPH J. BONFITTO, | ) | |
| | ) | |
| Relief Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff U.S. Commodity Futures Trading Commission ("the Commission") brought suit against Edward Sarvey ("Sarvey") and David Sklena ("Sklena"), alleging that they engaged in a series of non-competitive trades at the Chicago Board of Trade ("CBOT"). The Commission impled Lawrence-Bonfitto Trading Company ("Bonfitto Trading") and Joseph Bonfitto ("Bonfitto") as relief or nominal defendants, alleging that they hold funds resulting from Sklena's non-competitive trading in which they have no legitimate ownership interest. Bonfitto and Bonfitto Trading filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that they are not properly before the Court as nominal defendants.

1

## STATEMENT OF FACTS

Sarvey and Sklena were floor brokers in the Five-Year Treasury Note futures pit at the CBOT. Bonfitto Trading was Sklena's clearing firm. Complaint at ¶ 49. As such, Bonfitto guaranteed Sklena's trades and was obligated by contract and CBOT rule to pay whatever amount Sklena could not to the Clearing House to settle Sklena's losses. Motion to Dismiss at 2 *citing* CBOT Rule 333.00(a).

On March 5, 2004, Sklena suffered large losses in his trading account resulting in a $300,000 debit balance at the end of the day. Bonfitto Testimony at 144:14-18. Sklena was only able to satisfy his debt to Bonfitto Trading by selling his CBOT seat and then mortgaging his house to buy a new seat. *Id*. at 145:2-10. Bonfitto, fed up with Sklena's large trades, told him to reduce the size of his trades, especially when unemployment numbers were released. *Id*. at 146:16-20.

Trading in the five-year note pit is very active when the Department of Labor's Bureau of Labor Statistics ("BLS") releases its monthly "Employment Situation" report because the employment number is an important factor in the market value of Treasury Notes and Treasury Note futures contracts. Cmplt. at ¶¶ 27-29. The BLS released an employment report on April 2, 2004 at 7:30 am. *Id*. at ¶¶ 29, 32. After the release, the price of June 2004 Note futures contract prices broke sharply, dropping more than a point in approximately one and one-half minutes. *Id*. at ¶ 32. The low price in the pit of 111.050 occurred at 7:31:35 am, and the low price on the CBOT's electronic trading platform of 111.045 occurred at 7:31:23 am. *Id*. at ¶ 32. The market subsequently rallied and was quoted at a point higher at 7:36 am. *Id*. at ¶ 33. Specifically, the price in the pit hit 112.050 at 7:36:07 am, and the price on the electronic platform hit 112.055 at 7:36:03 am. *Id*.

Both Sarvey and Sklena were trading in the pit prior to the release. *Id.* at ¶¶ 34-35. Between 7:31:51 am and 7:37:14 am, Sarvey noncompetetively sold 2,274 contracts to Sklena at 111.065, a price that was a few "ticks" above the market low and that was last active before 7:31:51 am. *Id.* at ¶ 40. At the time Sarvey sold these contracts to Sklena, the market was trading within a range of 111.230 to 112.055. *Id.* at ¶ 41.

At about the same time as Sarvey noncompetitively sold the 2,274 contracts to Sklena at 111.065, he competitively bought back 485 contracts for his personal trading account from Sklena at 111.070, also a price near the market low. *Id.* at ¶ 43. Sklena offset his net purchase of 1,879 contracts by selling them at higher prices ranging from 112.015 to 112.065 in the prevailing market on April 2, 2004. *Id.* at ¶ 44. An analysis of Sklena's account shows that this required eighty-two separate transactions, ranging from ten to one hundred and fifty contracts per sale, both in the CBOT pit and on CBOT's electronic trading platform. William McLean Testimony 206:21 - 209:23; Arbitration Exhibit A. In doing so, he made a profit of approximately $1.65 million. Cmplt. at ¶ 44. However, Bonfitto and Bonfitto Trading note that if the market had dropped 1 and 21/32's, as it had earlier in a similar amount of time, he could have lost $2,515,781. MTD at 4.

Bonfitto learned via telephone that Sklena had taken a long position of at least 2,200 contracts, in direct contravention of his instructions, and that at the beginning of the trading day, Sklena had only $21,000 in his clearing account. Bonfitto Test. at 152:6-16; 157:2-4; Sklena Daily Acct. Statement. Thus, Sklena's risk of loss far exceeded his financial resources. Bonfitto had his employees set up a meeting between him and Sklena for the next morning. Bonfitto Test. at 155:16-23; 157:5-9.

In the meantime, Bonfitto spoke to the CBOT legal department, which informed him that CBOT Regulation 333.03 authorizes a CBOT clearing firm to freeze funds in the event of reckless activity by a broker. *Id*. 157:11 - 158:8; CBOT Reg. 333.03. As such, when Bonfitto met with Sklena, he argued that Bonfitto Trading was entitled to all of Sklena's profits obtained in the reckless trades. Bonfitto Test. at 162:2-5  Sklena told Bonfitto that he did not have anything to worry about because he had a cushion of the trade. *Id*. at 159:11-16. This did not aleviate Bonfitto's concern, however, because when the market was moving so quickly, one could easily lose disatrous amounts of money. *Id*. at 154:16-155:15; 159:17-160:8.

Bonfitto and Sklena negotiated an agreement by which Sklena would receive $1,000,000 and Bonfitto would retain the balance as payment for exposure to potentially large risk of loss. *Id*. at 161:22-163:6. Bonfitto allowed Sklena to withdraw $500,000 immediately to pay off loans but maintained the remaining funds in Bonfitto Trading's account. *Id*. at 163:13-17. Bonfitto had a written agreement prepared for Sklena's signature. *Id*. at 168:21-169:13.

Sklena did not sign the agreement and instead continued to take large trading positions. *Id*. at 170:6-21. Eventually, he told Bonfitto that he did not intend to sign the agreement. *Id*. at 171:4-6. At that point, Bonfitto terminated Sklena's trading privileges and froze the balance in his account - approximately $160,000. *Id*. at 171:18-20.

After an exchange of attorney letters, Sklena filed an arbitration claim against Bonfitto Trading seeking the return of approximately $778,000 of Sklena's April 2, 2004 profits and later added the $160,000 that remained in Sklena's account. Sklena Statement of Claim. Bonfitto Trading, in turn, argued that it was placed at a considerable risk of loss as a result of the large postions Sklena took when he lacked the resources to cover his losses. Bonfitto Answer. Following

4

a two-day arbitration, a CBOT arbitration panel issued an order requiring Bonfitto Trading to return $80,000 of the approximatley $938,000 of profits ($778,000 from April 2, 2004 and $160,000 from April 29, 2004) to Sklena.  Arbitration Decision.

## STANDARD

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1); *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).  "If subject matter jurisdiction is . . . not evident on the face of the complaint, the motion to dismiss . . . would be analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true.  However, as here, if the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction, the movant may use affidavits and other material to support the motion."[1] *United Phosphorus*, 322 F.3d at 946; *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) *citing Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979).  The party asserting jurisdiction must establish it by "competant proof."  *U.S. Phosphorus*, 322 F.3d at 946; *NFIC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995) *citing McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936).  This means that jurisdiction must be established by a preponderance of the

---

[1] Although this Court considers the evidence submitted by the parties, it appears that it could determine that Bonfitto and Bonfitto trading are not nominal defendants based solely on the allegations in the Complaint.  That is, it is clear from the Complaint that Bonfitto Trading was guaranteeing Sklena's trades and was thus providing a service in exchange for the funds, giving it a legitimate claim to those funds.  *See* Cmplt. at ¶ 10 (Bonfitto Trading "cleared the trading activity of Sklena").

evidence or "proof to a reasonable probability." *NFIC*, 45 F.3d at 237, *citing Gould v. Artisoft, Inc.*, 1 F.3d 544, 547 (7th Cir. 1993).[2]

## DISCUSSION

"A nominal defendant is a party who may be joined as a party to aid recovery without an assertion of subject matter jurisdiction because he or she holds and has no ownership interest in property that is the subject matter of the litigation." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991). A nominal defendant is a "trustee, agent, or depository" and holds the subject matter of the litigation "in a subordinate or possessory capacity," and the fact that such a defendant holds the funds in such a capacity is not in dispute. *Id.* That is, a nominal defendant "has no legitimate claim to the disputed property." *SEC v. Ross*, 504 F.3d 1130, 1141 (9th Cir. 2007) *citing SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) and *Cherif*, 933 F.3d at 414; *see also CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191 (4th Cir. 2002) ("a nominal defendant has no ownership interest in

---

[2] Neither party cites caselaw in which a nominal party is dismissed by means of a motion to dismiss for lack of subject matter jurisdiction, and indeed, Bonfitto and Bonfitto Trading's Motion is not, strictly speaking, one for dismissal for lack of subject matter jurisdiction, it being that this court need not have subject matter jurisdiction over nominal parties. However, courts often address the issue of whether a given party is a nominal party in deciding motions to dismiss for lack of subject matter jurisdiction, generally in deciding whether a party is nominal and thus irrelevant for purposes of diversity. *Jennings v. Hill*, No. 05 C 974, 2005 WL 1041327, at *2 (N.D.Ill. May 3, 2005) (defendant had ownership interest in property at issue and therefore was not nominal and relevant for diversity); *Alberto-Culver Co. v. Sunstar, Inc.*, No. 01 C 5825, 2001 WL 1249055, at * 4 (N.D.Ill. October 17, 2001) (bank a nominal party and diversity jurisdiction therefore exists); *Selfix v. Bisk*, 867 F.Supp. 1333, 1335-36 (N.D.Ill. 1994) (defendant disinterested in the litigation was nominal and thus irrelevant for diversity purposes). Bonfitto and Bonfitto Trading's aim in this motion is also the same as that of a motion to dismiss for lack of jurisdiction. That is, they argue that they are not properly impled before this court. If the Court determines that parties are in fact not nominal and they are joined as purely nominal parties, it follows that they should be dismissed. As both parties have submitted evidence on the issue of whether Bonfitto and Bonfitto trading are in fact nominal parties, in the interest of efficiency, this Court will make a determination regarding Bonfitto and Bonfitto trading's status as nominal parties at this juncture.

the funds at issue"). Such a defendant is not a real party in interest, and it is of no importance to him which side prevails. *Cherif*, 933 F.3d at 414. A nominal defendant is generally joined merely as a means of facilitating the collection of property at the resolution of the dispute. *Id*.

"The paradigmatic example of a nominal defendant is 'a bank or trustee [that] has only a custodial claim on the property'" at issue. *Ross*, 504 F.3d at 1141 *citing Colello*, 139 F.3d at 677. If a party performed some service or rendered some consideration in exchange for the property, that party generally has an ownership interest in the property and thus cannot be joined as a nominal defendant. *See Ross*, 504 F.3d at 1142 (party received compensation for services rendered and thus had presumptive title to that compensation); *Kimberlynn Creek*, 276 F.3d at 192 ("receipt of funds as payment for services rendered to an employer constitutes one type of ownership interest that would preclude proceeding against the holder of the funds as a nominal defendant"); *SEC v. Cavanagh*, 155 F.3d 129, 137 (2nd Cir. 1998) (parties had no legitimate claim to property because they recieved it as a gift and gave no consideration); *Jennings v. Hill*, No. 05 C 974, 2005 WL 1041327, at *2 (N.D.Ill. May 3, 2005) (party had an ownership interest in fees paid to him for legal services); *SEC v. Infinity Group Co.*, 993 F.Supp. 324, 331 (E.D.Pa. 1998) (nominal defendant admitted that he performed no consideration for funds received).

Bonfitto and Bonfitto Trading admit that they received allegedly fraudulently-obtained funds from Sklena, but the Commission has not established that they have no ownership interest in those funds. Bonfitto holds the funds in a capacity much different than that of a mere custodian, recipient of a gift or fraudulent transferee. First, Bonfitto provided Sklena with a service - it acted as his clearer and thus guaranteed his trades. Cmplt. at ¶ 49; MTD at 2 *citing* CBOT Rule 333.00(a). Bonfitto made the decision to freeze Sklena's account and thus freeze the money Sklena made from

7

his trades with Sarvey in response to Sklena's pattern of taking long and risky positions, in contravention of his instructions, and he was authorized to do so pursuant to CBOT Regulation 333.03. Bonfitto Test. at 146:16-20; 157:11-158:8; 162:2-5; CBOT Reg. 333.03. The fact that Bonfitto provided Sklena with a service, guaranteeing his trades, including his risky trades over a long period, and froze his funds pursuant to a regulation governing that service, establishes that it in fact has some legitimate claim to the funds.

The Commission argues that Bonfitto did not provide Sklena with a service regarding the funds acquired from his trades with Sarvey because there was no risk in the trade and thus no risk to guarantee. It seems unnecessary that there be actual risk in this particular trade in order to have a claim to the property because Bonfitto Trading was guaranteeing the trades, Bonfitto believed it was exposed to risk, and Bonfitto froze the funds in response to the pattern of large trades. Bonfitto Test. at 146:16-20; 154:16-155:15; 157:11-158:8; 162:2-5. Regardless, it appears that Bonfitto was at least arguably exposed to risk. Sklena purchased the contracts from Sarvey at a price below market, and thus it was very unlikely that he would lose money in reselling the contracts. Cmplt. at ¶¶ 40-41. However, Sklena had to resell them, and it took him eighty-two separate transactions to do so. *Id*. at ¶¶ 43-44; McLean Test. 206:21-209:23; Arbitration Exhibit A. It would have taken only one sharp drop off in the market for Sklena to actually lose money, and such a drop would not be impossible on a volatile market day following a BLS report release. Cmplt. at ¶¶ 27-29; Bonfitto Test. 154:16-155:15. Indeed, Bonfitto and Bonifitto Trading note that had the market dropped 1 and 21/32's, he would have lost over two million dollars. MTD at 4.

The argument that Bonfitto has a legitimate claim to the funds is greatly bolstered by the fact that their claim to the money was already reviewed in an arbitration.[3]  The arbitration panel heard evidence regarding Bonfitto's seizure of the funds in Sklena's account under CBOT Reg. 333.03 and awarded only $85,270.00 of the $942,331 at issue to Sklena.  Arbitration Award.  By inference, it also decided to allow Bonfitto to retain the rest of the funds.

The Commission was not a party to that arbitration and thus was not able to argue other claims to the funds.  However, the issue here is not who has the greatest right to the funds.  Bonfitto and Bonfitto trading are impled as nominal defendants.  As such, the only question is whether they have any legitimate ownership interest in the property at issue.  *See e.g. Cherif*, 933 F.3d at 414.  If they do, they may not be impled as merely nominal defendants.

Similarly, it is irrelevant whether Bonfitto and Bonfitto trading acted in "good faith" in receiving the funds.  Plaintiffs may not name parties as nominal defendants while also implying that they violated the law.  *Id*. at 415 (implication that purported nominal defendant helped in fraudulent scheme implied that it may be appropriate to name him as an outright defendant); *Ross*, 504 F.3d at 1142 (one may not designate a defendant nominal while implying that he is at fault and thus deprive him of his right to fully litigate the question of his own liability).  A nominal defendant by definition has no interest in the subject matter of the litigation.  *Cherif*, 933 F.2d at 414.  If the Commission wants to asserts that Bonfitto and Bonfitto Trading obtained the property by some means that implies complicity in wrongdoing, it should implead them as outright defendants, not nominal defendants.

---

[3] It is worthy of note that Bonfitto argued that it was indeed exposed to risk when Sklena took such a long position in his trading on April 2, 2004.  Bonfitto Answer at 2.

For the reasons stated above, this Court finds that Bonfitto and Bonfitto trading are not nominal defendants, and the Motion to Dismiss is granted. Plaintiff is given 14 days from the date of this order to amend its Complaint if Plaintiff desires to do so.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: July 17, 2008