IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 08 C 192 |
| EDWARD SARVEY and DAVID SKLENA, | ) ) | Judge Virginia M. Kendall |
| Defendants. | ) ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The United States Commodity Futures Trading Commission (CFTC or "Commission") sued defendants Edward Sarvey and David Sklena, two former traders at the Chicago Board of Trade (CBOT), in an enforcement action for violations of Commodity Exchange Act ("the Act") and various CFTC regulations.  Specifically, the Commission asserts that on April 2, 2004, right after the government released its monthly jobs report, Sarvey and Sklena executed two illegal and noncompetitive trades of Treasury note futures contracts.  According to the CFTC, Sarvey and Sklena arranged a trade between themselves at a below market price, and as a result, Sarvey's clients lost more than $2 million while Sklena netted over $1.6 million.  The government indicted both defendants for the same April 2004 trades and Sklena was convicted of wire fraud, commodity fraud and non-competitive trading in November 2010 after a bench trial.[1]  The CFTC now moves for summary judgment, seeking a permanent injunction banning Sklena from violating the Act, trading as well as an order requiring him to disgorge his profits from the illegal trades and pay three times

---

[1]Sarvey died before the criminal trial.

his gain as a civil monetary penalty under the Act. Sklena, now *pro se*, did not respond to the motion, and for the following reasons the Court grants the Commission's motion (Doc. 104) in its entirety.

## I.    MATERIAL UNDISPUTED FACTS

Because Sklena did not respond to the CFTC Local Rule 56.1 statement of material facts, the following facts are deemed admitted, and all citations are to the CFTC 56.1 statement (Doc. 104-1). *See* L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")

### A.    Parties and Background

Sklena was a floor broker on the CBOT registered with the Commission between October 1987 until September 2009, when he was suspended by the CFTC pending resolution of his criminal indictment. (¶ 4.) Sklena began trading in the pit for Five Year Note futures beginning in 1991 or 1992. (*Id.*) A Five-Year Note is a United States Treasury note that matures in five years. The contract unit for trading Five-Year Note futures is $100,000 and is quoted in points, with par on the basis of 100 points. (¶ 1.) In other words, each point equals $1000. (*Id.*) At the relevant time period in 2004, Sarvey was a dual trader, meaning he executed orders for his customers as well as his own account or accounts he held an interest in. (¶ 3.) When he traded for himself, Sarvey typically traded anywhere from 10 to 500 contracts (or "lots") per transaction. (*Id.*) At that time, Sklena primarily traded for his personal account. (¶ 6.) Sklena and Sarvey are not strangers: besides working in the same pit, the CBOT brought disciplinary actions against Sklena in 2000 and 2001 for

noncompetitive trading with Sarvey, which Sklena settled after accepting a fine and a brief trading suspension. (¶ 5.)[2]

On the first Friday of every month at 7:30 a.m. Central time, the Bureau of Labor Statistics releases its jobs report for the previous month, which can lead to significant volatility in the futures market. (¶ 2.) On the first Friday of March 2004, a month before the day in question, Sklena lost $320,000 of his own money trading Five-Year Note futures contracts with Sarvey after the February jobs report came out. (¶ 7.) Sklena had insufficient capital to absorb the loss, so his clearing firm had to cover it and Sklena had to repay the clearing firm by selling his CBOT membership. (*Id.*) Later that month, he had to borrow money from family and take out an additional loan on his house to buy another seat so he could trade. (*Id.*) The clearing firm warned Sklena to limit his trading going forward because he only had $58,000 in equity in his account. (¶ 8.) As the court that convicted Sklena noted, Sklena told his clearing firm that he would trade only 20 to 50 contracts at a time. (*See* Doc. 104-4, ¶ 17.)

**B.     Overview of Sklena and Sarvey's April 2, 2004 Trading**

On April 2, 2004, the first Friday of that month, the government released the jobs report for March at the usual time. (¶ 9.) On that day, Sklena and Sarvey were positioned adjacent to each other in the trading pit. (¶ 6.) When the report came out, the price for futures contracts of June 2004 Five-Year Notes dropped sharply for 90 seconds. (¶ 9(a).) Over the next 15 seconds, the price quickly rebounded, though not up to the level it was before the report came out. (¶ 9(b).) During the

---

[2]CBOT also fined Sklena $125,000 and suspended him from trading for 75 days based on the April 2, 2004 trades at issue here. (¶5.)

90 seconds the price dropped, 2,474 "sell stop"[3] orders from Sarvey's customers became "elected," making them immediately executable as market trades. (¶¶10, 12.) In other words, when the orders became elected, Sarvey had an obligation to fill the orders at the best market price. (¶ 12.) Once elected, orders do not become unelected: even though the market quickly rebounded from its low right after the report came out, Sarvey still had to fill his orders at the best possible price. (¶ 12.)

Ninety seconds after the 2,474 contracts became elected, Sarvey asked his clerk how many contracts he need to sell. (¶ 15(a).) At that point, the market price was higher than the price at which he eventually filled the orders. (*Id.*) About four minutes later, Sarvey sold 2,274 of his contracts to Sklena at an agreed price of 111.065. ¶ 15(b).) That transaction was 45 times larger than the largest trade Sklena told his clearing firm he would make and the price was significantly lower than the market price at the time of the sale, which was somewhere between 112.010 and 112.025. (*Id.*)[4] Just seconds later, Sklena sold 485 of the 2,274 contracts back to Sarvey for his personal account at 111.070, a price higher than Sklena had just paid but still lower than the prevailing market price at the time, leaving Sklena with 1,789 contracts and Sarvey with 485 contracts. (¶ 15(c).) To offset their below-market purchases, Sklena and Sarvey immediately sold those contracts back into the market at the higher prevailing prices. (¶ 15(d).) In short, Sklena compensated Sarvey for the low-price contracts by selling them back to Sarvey at a below market price, knowing that they could both offset the low-priced contracts in the rallying market and make money. (¶ 17.) Sklena and Sarvey profited $1,652,187.50 and $357,250, respectively, on the trades. (¶ 18.) However, because

---

[3]A "sell stop" order is an order to sell a futures contract if the market reaches a specific price. (¶ 11.)

[4]Specifically, at that time, the prevailing market price in the CBOT's live pit was 112.020 to 112.025, and the prevailing price on CBOT's electronic exchange was 112.010 to 112.020. (¶ 15(b).)

Sarvey's customers' orders were filled at a non-competitive price near when the prevailing market was trading considerably higher, his customers were disadvantaged to the tune of $2,048,781. (*Id.*)

### C. Evidence of Sklena Aiding and Abetting the Scheme

Digging deeper into the events of that the morning, the Commission presents the following details about the trades to demonstrate that Sklena actively aided and abetted the scheme. First, based on their history of trading together since 2000, Sklena knew that Sarvey was selling customer contracts— not trading on his own account—when he sold the 2,274 contracts. (¶ 16.) Sklena also knew, based on his experience as a broker and handling Sarvey's orders as his backup broker, that Sarvey was obligated to fill his customers' sell orders at the best available price in the prevailing market. (*Id.*) Based on recordings of the headset conversations between Sarvey's assistant and clerk, Sarvey and Sklena did not discuss a trade when the market price was 111.065, the eventual trading price. (¶ 20.) It was not until 90 seconds after that price, when the market had rallied and the price increased, that Sarvey's clerk started to figure out how many contracts Sarvey needed to sell. (¶ 21.) About two minutes later, when Sarvey asked his clerk what his lowest sell stop order was, the market had been above 111.065 for four minutes. (¶ 23.) Sarvey knew what the market price was - he was in the pit and trading on the CBOT's electronic exchange and must have known the prevailing prices. (*Id.*) Almost six minutes after 111.065 was an active price, and when the prevailing price was over 112 as noted above, Sarvey's clerk confirmed a price of 111.065 for the contracts. (¶ 22.)

One *second* after Sarvey sold 2,274 contracts to Sklena, Sklena, acting against his economic interest, sold 485 contracts back to Sarvey at a below market price; Skelena could have made much more selling the contracts to someone else at the prevailing price. (¶ 24.) Immediately after he bought the 2,274 contracts from Sarvey in the pit, Skelena reset his computer from 25-lot sales to

5

50-lot sales and started selling them off on the CBOT's electronic exchange.  (¶ 24.)  Sklena also

recorded the trade with Sarvey out of sequence on his trading cards, which is an irregularity

associated with noncompetitive trading.  (¶¶ 26-28.)

## II.  STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In determining

whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable

inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d

654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, the Court will "limit its analysis of the facts on summary judgment to evidence that is

properly identified and supported in the parties' [Local Rule 56.1] statement."  *Bordelon v. Chicago*

*Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact

is supported by the record and not adequately rebutted, the court will accept that statement as true

for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in

the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927,

933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule

56 demands something more specific than the bald assertion of the general truth of a particular

matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the

truth of the matter asserted.'").

6

III.     DISCUSSION

A.     Sklena's Participation in the Scheme

The CFTC asserts that Sarvey defrauded his customers and that Sklena aided and abetted that fraud by participating in Sarvey's scheme.  Sections 4b(a)(2)(i) and (iii) of the Act[5] prohibit any person from cheating, defrauding or deceiving another person in connection with orders for futures contracts.  *See* 7 U.S.C. § 6b(a)(2)(i), (iii).  Traders are fiduciaries of their customers and defraud their customers when the noncompetitively execute customer orders by picking prices and opposing traders rather than trading in the open market.  *United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992).  In *Ashman*, the defendants, traders in the CBOT's soybean futures pit, arranged "matched" trades after the market closed within the market closing range.  *Id*. at 477-78.  The traders asserted that when a customer's order was filled at a price within the range, "the customer received exactly what he asked for" and the traders did not defraud their customers of their property under the wire fraud statutes.  *Id*. at 477.  The court found that "[b]y picking customer prices and opposing traders, the defendants removed their customers from the pit's competitive marketplace and forced the customers to accept the results they selected, guaranteeing profits to the [broker] and denying the customer the opportunity to obtain a better price."  *Id*. In other words, "[t]he selection of prices without competition deprived customers in the instant case of a clear market opportunity to obtain the best price for their orders. It does not matter if the defendants' customers were not harmed financially because of the scheme."  *Id.*  Similarly, "trading ahead" of customers—where the broker buys for his own account before submitting a customer order that will raise the price—is illegal

---

[5]Following the CFTC's practice, the Court will use the section numbers from the Act, not the numbers from the United States Code.  For instance, § 4b of the Act is § 6b of the relevant code title.

because it allows the broker to profit from information that comes at no cost to the broker "automatically in his capacity as a broker" and undermines the customer's trust in the market. *United States v. Dial*, 757 F.2d 163, 166-68 (7th Cir. 1985).

Here, when the market dipped and Sarvey's stop orders became elected, he had an obligation to sell them at the best possible price. By the time he went to sell the contracts, the market had quickly rebounded from the dip, which was good fortune for his customers because they should have received a better price. However, when he sold them, he did not sell them at the best possible price, choosing instead to sell them at the lower price that triggered the stop sell order. Any argument that Sarvey's customers got what they wanted, namely, a sale at their chosen stop price, is foreclosed by *Ashman*. In effect, Sarvey, solely by his position as a broker and in violation of his fiduciary duties, improperly transferred the benefit of that market rebound from Sarvey's customers to himself (and, even more so, to Sklena). *See Ashman*, 979 F.2d at 477; *Dial*, 757 F.2d 163, 166-68.

Further, it is clear that Sarvey and Sklena acted with scienter, and that Sklena aided and abetted Sarvey's violations. The Commission must demonstrate scienter to show a violation of § 4b. *See Hlavinka v. Commodity Futures Trading Comm'n*, 867 F.2d 1029, 1033 (7th Cir. 1989) ("for commodities fraud, negligence is not enough"); *Indosuez Carr Futures v. Commodity Futures Trading Comm'n*, 27 F.3d 1260 (7th Cir. 1994) ("commodities laws should track securities laws"); *see also Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 102 (2d Cir. 2000) (requiring scienter to demonstrate a violation of § 4b). Under § 13(a) of the Act, "any person who aids or abets the commission of a violation of the Act, or any of the rules, regulations or orders thereunder, or who acts in combination or concert with any other person in such violation . . . may be held responsible for such a violation as a principal." 7 U.S.C. § 13c(a). To violate § 13(a), Sklena must have known

8

of Sarvey's objective in the scheme and had a desire to help him attain it. *See Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987) (noting Congress modeled § 13(a) on 18 U.S.C. § 2 and intended § 13(a) to be interpreted the same way).

Sklena clearly had a financial motive for the illegal trades. Just a month before, Sklena lost $320,000 trading after the jobs report. The most obvious indicator of scienter on the part of Sarvey and Sklena was the timing and the structure of the trades themselves. Sklena knew these were customer sales - the size of the trade was too large to be out of Sarvey's personal account. The trade was not made anywhere close to the prevailing market price and the market's quick dip and recovery was an opportunity to meet customer expectations as to the stop sale price but still make a substantial profit. Further, when he was supposed to be treading carefully and trading lots of no more than 50 contracts, Sklena bought 2,274 contracts. If the trade was made at the prevailing market price, perhaps Sklena could argue he was a down-on-his-luck trader pushing all his chips into the middle of the table hoping to win big. However, under the circumstances it was extraordinarily unlikely that Sklena would undertake such a massive trade unless it had no risk whatsoever. But what truly shows scienter and that Sklena aided and abetted the scheme was his instant sale of 485 contracts back to Sarvey at a below market price. Without that sale Sklena might have argued that Sarvey was confused as to the market price and Sklena took advantage of that confusion when he bought the 2,274 contracts. However, there is no economic justification for the 485 contract sale, and that trade was made so quickly after the first trade that it was clearly pre-arranged. The second trade was purely a vehicle to compensate Sarvey for his involvement in the scheme. Finally, Sarvey and Sklena's past history of noncompetitive trades and the out of sequence trading cards reflects their

9

knowledge of how to conduct such trades together, their ability to conduct such trades together, and their intent to profit on such trades.[6]

### B.     The CFTC's Remedies

On February 10, 2008, the Court entered a preliminary consent order enjoining Sklena from, among other things, violating the commodity trading laws and participating in trading activities, both for his own account and on behalf of others. (*See* Doc. 41.) Now, the Commission seeks to make those terms permanent, and also seeks under the Act the disgorgment of the $1,652,187.50 Sklena made on the trade as well as a civil monetary penalty of $4,956,562.50, three times Sklena's gain.[7] The Court addresses each in turn.

Section 6c(a) of the Act permits the Court to enjoin Sklena from violating the Act or CFTC regulations in the future. *See* 7 U.S.C. § 13a-1(a). The Commission is entitled to injunctive relief if it shows that a violation has occurred and that there is a reasonable likelihood of future violations. *See Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (noting that statutory injunctions like the ones provided for by § 6c(a) "need not meet the requirements for an injunction imposed by traditional equity jurisprudence."). Here, Sklena has repeatedly traded in a non-competitive way. Despite his past disciplinary actions, he has not curbed this behavior and he has demonstrated that dire financial straights will lead him to violate the Act.

Next, the CFTC seeks an order permanently banning Sklena from trading directly or indirectly for himself or others and from acting in any capacity that requires registration with the

---

[6]Sarvey and Sklena's below market trade aimed at defrauding investors also violated CFTC Regulation 1.38(a), which requires all trades to be executed "openly and competitively by open outcry . . . ." 17 C.F.R. § 1.38(a).

[7]The CFTC does not seek restitution because Sklena must pay restitution as part of his criminal conviction. (*See* Doc. 104-2 at 14.)

Commission.  A trading ban is appropriate when there is some sort of nexus between the violation

of the Act and the integrity of the commodity future markets.  *See Monieson v. Commodity Futures*

*Trading Comm'n*, 996 F.2d 852, 863 (7th Cir. 1993) (finding a trading ban appropriate and noting

the CFTC takes a broad view of what threatens the integrity of the markets).  There is no question

that Sklena's actions undermine the integrity of the commodities market: trading at the prevailing

market price and brokers who faithfully execute their customers orders are, put simply, the

foundations of commodities trading.  *See Dial*, 757 F.2d at 166-68.  Given Sklena's repeated

noncompetitive trading, the significant amount of money he received from his participation in the

scheme, and his criminal conviction based on the April 2004 trades, there is no basis to allow Sklena

to participate in commodities trading in the future.

As for disgorgement, allowing Sklena to retain his ill-gotten gains would "frustrate" the

purposes of the Act.  *See Hunt*, 591 F.2d at 1221-23 (finding that a district court has the power under

the Act to order disgorgement of illegally obtained trading profits); *see also Commodity Futures*

*Trading Comm'n v. British Am. Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir. 1986) (noting

that disgorgement provides protection to investors).  There is no basis to permit Sklena to benefit

from his illegal trades and he must disgorge his $1,652,187.50 profit from the trade.

Finally, § 6c(d)(1) of the Act permits the Court to assess a civil monetary penalty of up to

three times the monetary gain to Sklena for each violation of the Act and its regulations.  *See* 7

U.S.C. § 13a-1(d)(1); 17 C.F.R. § 143.8(a)(ii) (setting out the maximum civil monetary penalty to

be "not more than the greater of $120,000 or triple the monetary gain to such person for each such

violation.")  As noted above, Sklena is a repeat offender, and his violations are serious because they

undermine the public's trust in the commodities markets and brokers in general.  *See Dial*, 757 F.2d

at 166-68. By not responding to the CFTC's motion, he offers no justification why the Court should not impose the civil monetary penalty of $4,956,562.50, which is three times his gain from the illegal trades.[8]

## IV.    CONCLUSION

For the foregoing reasons, the CFTC's motion for summary judgment (Doc. 104) is granted. The Court permanently enjoins Sklena from: (1) violating the Act or any CFTC regulation; and (2) trading commodity futures directly or indirectly for himself, others, or acting in any capacity that requires registration with the CFTC. The Court orders Sklena to disgorge his $1,652,187.50 in profits from the trade and pay a civil monetary penalty of $4,956,562.50, plus post-judgment interest.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: February 10, 2012

---

[8]In determining the amount of the civil monetary penalty, "the financial worth of the defendant or the collectibility of any fine are no longer relevant considerations." *Brenner v. Commodity Futures Trading Comm'n*, 338 F.3d 713, 723 (7th Cir. 2003).